UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

FRANCIS D. SPELLICY,

                                             Plaintiff,

                                                                      6:19-cv-00608
v.                                                                    (MAD/TWD)

DOE #1 DEBT COLLECTOR,

                                             Defendant.
_____

APPEARANCES:

FRANCIS D. SPELLICY
Plaintiff, *pro se*
137 East Water Street, #10
Syracuse, NY 13202

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.     INTRODUCTION

        The Clerk has sent to the Court the amended complaint submitted by *pro se* Plaintiff

Francis D. Spellicy against Defendant Doe #1 Debt Collector for initial review.  (Dkt. Nos. 9,

10.)  Previously, by Order and Report-Recommendation filed August 12, 2019 (the "Report-

Recommendation"), this Court granted Plaintiff's application to proceed *in forma pauperis* and

recommended that Plaintiff's original complaint, alleging violations of the Fair Debt Collection

Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*., and the Fair Credit Reporting Act

("FCRA"), 15 U.S.C. § 1681, *et seq*., be *sua sponte* dismissed with leave to amend pursuant to

28 U.S.C. § 1915(e) for failure to state a claim upon which relieved may be granted and as time-

barred.  (Dkt. No 7.)  On August 23, 2019, Plaintiff filed objections to the Report-

Recommendation.  (Dkt. No. 8.)  On September 20, 2019, prior to the District Court acting on

the Report-Recommendation, Plaintiff filed an amended complaint.  (Dkt. No. 9.)  By Order filed

September 24, 2019, the Honorable Mae A. D'Agostino, United States District Judge, noted that

pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, Plaintiff was entitled to amend

his complaint once as a matter of course.  (Dkt. No. 10.)  As such, the amended complaint was

referred to this Court for initial review and the Report-Recommendation was terminated as moot.

*Id*.  For the reasons that follow, the Court recommends that Plaintiff's amended complaint be

dismissed pursuant to 28 U.S.C. § 1915(e) without leave to amend.

## II.    DISCUSSION

### A.    Standard of Review

Inasmuch as Plaintiff is presently proceeding *in forma pauperis*, the Court must consider

the sufficiency of the allegations set forth in the amended complaint in light of 28 U.S.C. §

1915(e).  Section 1915(e) directs when a person proceeds *in forma pauperis*, "the court shall

dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or

malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief

against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the

complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325

(1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such

as when the claims are the product of delusion or fantasy; or (2) the claim is based on an

indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437

(2d Cir. 1998) (citations and internal quotation marks omitted).  Although extreme caution

should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse

party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*,

700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not

frivolous before permitting a plaintiff to proceed.  *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260

(2d Cir. 1991) (per curiam) (holding a district court has the power to dismiss a complaint *sua*

*sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to

state a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While Rule 8(a) of the Federal Rules of Civil

Procedure, which sets forth the general rules of pleading, "does not require detailed factual

allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation."  *Id*.

In determining whether a complaint states a claim upon which relief may be granted, "the court

must accept the material facts alleged in the complaint as true and construe all reasonable

inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994)

(citation omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in

a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*.

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to

raise the strongest arguments they suggest.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185,

191 (2d Cir. 2008) (citation omitted).  Moreover, a court should not dismiss a *pro se* complaint

"without giving leave to amend at least once when a liberal reading of the complaint gives any

indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

**B.      The Amended Complaint**

Plaintiff's amended complaint is similar in substance to the original complaint. (Dkt. Nos. 1, 9.) Notably, Plaintiff has "abandoned" his FDCPA claim as "too difficult to remedy" and "attempts to remedy issues of timeliness, diligence, and stating a claim per FRCA 15 U.S.C. [§] 1681s-2(b) [("Section 1681s-2(b)")] against Defendant Doe #1 Debt Collector. (Dkt. No. 9 at 1.[1])

The amended complaint states Defendant Doe #1 Debt Collector attempted to collect a debt not owed to "them" by Plaintiff. *Id*. Plaintiff informed Defendant, both verbally and in writing, "to cease and desist its harassing, threatening behavior," advising "I owe no one." *Id*. By way of background, in the original complaint, Plaintiff explained the alleged debt at issue stems from his visit to the emergency room at University Hospital, located in Syracuse, New York, in "late 2015 or early 2016," which was paid "in full" by his insurance company. (Dkt. No. 1 at 6, 10.) Nevertheless, "some months later," Defendant Doe #1 Debt Collector sent Plaintiff a bill for that emergency room visit and made numerous harassing telephone calls attempting to collect the alleged debt, which Plaintiff did not owe. *Id*. at 6. In June 2016,

---

[1] Page references to documents identified by docket number refer to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office. Unless noted, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

Plaintiff disputed the charge and "instructed the debt collector to cease and desist all harassment." *Id*. at 7.

In August of 2016, Plaintiff moved to Delaware. (Dkt. No. 9 at 1, *see also* Dkt. No. 1 at 3, 7, 9.) "Plaintiff stopped being contacted by [Defendant] Doe #1 [Debt Collector] prior to moving to Delaware." (Dkt. No. 9 at 1.) However, "Plaintiff's credit score had been dinged almost simultaneously upon his arrival in Dover, Delaware. I fell to 590 from above 620. 620 is the threshold needed to qualify to rent a home in Dover, DE." *Id*. Despite numerous attempts over the course of two months, Plaintiff was unable to secure rental housing. *Id*. At the time he was unsure "why he was denied application for housing." *Id*.

In "Spring of 2017," Plaintiff "finally identified the culprit of his credit score woes, as University Hospital and Syracuse Orthopedics Surgeons who share a common collection agent in Liverpool, NY." *Id*. at 2. Plaintiff claims the "entire problem grew from an alleged billing error. In which double dipping was attempted in Plaintiff's identify without this knowledge." *Id*.[2]

Plaintiff "used Credit Karma, which reports all three credit reporting agencies in one report." *Id*. "Plaintiff had no bills on credit, no lines of credit open, nor was seeking no credit in 2016 or 2017. Only housing which he had been approved for prior to the September 2016 move." *Id*. He filled out the "dispute portion, Karma site provide to challenge false information, and followed guidance to open a credit card to boost credit rating." *Id*. "Plaintiff cautiously waited one month and checked rating 597, and the negative collection data was removed." *Id*.

---

[2] The Court notes both the original and amended complaints contain allegations of "double dipping," whereby Plaintiff claims Defendant Doe #1 Debt Collector submitted "false claims" to the New York State Workers' Compensation Board for the emergency room visit at issue because Plaintiff's insurance company paid the debt "in full." (Dkt. Nos. 9 at 3, 1 at 4.)

In September of 2017, Plaintiff "avoided sub-agents and applied directly with a home owner for a 2 bedroom unit." *Id*. "Application denied; reason given, Plaintiff was in collection." *Id*.

Plaintiff contacted an attorney in Philadelphia and scheduled a meeting with her on November 22, 2017, to sign documents and "let her sue the parties involved." *Id*. Plaintiff, who is a cancer patient at University Oncology, also had a meeting scheduled on November 17, 2017, to meet "face to face" with "billing to attempt to acquire a hardcopy data for my attorney." *Id*. Plaintiff claims "Univ. Hosp. billing had already admitted it started the false billing and debt collection process." *Id*. By November 15, 2017, Plaintiff had obtained "hard copy from N.Y. State workman's compensation, for false claim." *Id*. at 3.[3] "All copies of credit reports were obtained." *Id*. "Plaintiff was diligent and done asking nicely for [Defendant] Doe #1 [Debt Collector] to act ethically." *Id*.

However, on November 15, 2017, an "extraordinary thing" happened and Plaintiff was "falsely arrested" and held "on no bail by a very out of balance court, run by the influence of William Fitzpatrick, D.A., who had operated a vendetta against Plaintiff for years." *Id*. at 3. "This action for false arrest, the taking of Plaintiff's person, place, and things, with no opportunity for bail, strangled and frustrated his ability to move this action forward." *Id*. Plaintiff was denied access to phone books and did not have access to his phone records. *Id*. "Plaintiff wrote to University Hospital twice with no response." *Id*. Plaintiff "filed a FOIA for documents and records, never answered." *Id*.

---

[3] In the original complaint, Plaintiff stated that he received a telephone call from the New York State Workers' Compensation Board in late February 2017. (Dkt. No. 1 at 9.) From this telephone call, Plaintiff became aware "that [Defendant] had place[d] derogatory information on his credit report " and was "using Plaintiff's identity without his knowledge to obtain payment" from the Workers' Compensation Board, which was an attempt "to double dip on [the disputed] debt." *Id.* at 4, 9.

Approximately one year later, on November 18, 2018, Plaintiff was transferred into custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *Id*.[4] While incarcerated, among other things, Plaintiff was transferred to numerous facilities, which further frustrated his abilities to "make legitimate inquires" as to the identity of Defendant Doe #1 Debt Collector because his legal mail was not forwarded to him. *Id*.

By Spring of 2019, Plaintiff finally had access to a computer and began researching civil law, FDCPA, and FCRA. *Id*. Plaintiff also "wrote to over 15 attorneys." *Id*. By letters dated March 26, 2019, the credit reporting agencies denied Plaintiff access to his "once a year free credit report." *Id*. Although Defendant Doe #1 Debt Collector is "not directly responsible" for the actions of the New York State police and other state actors, related to the November 15, 2017, arrest and his subsequent confinement, Plaintiff claims Defendant Doe #1 Debt Collector has "benefited" from the various non-parties' actions, in part, because University Hospital "hid [the debt collector's] identity." *Id*. Accordingly, Plaintiff contends "equitable tolling" should apply to his FCRA claim because from November 15, 2017, until November 14, 2019, despite his "due diligence" he was "stonewalled" and "denied" his free annual credit report. *Id*. at 4-11. Plaintiff requests monetary damages. *Id*. at 14. For a complete statement, reference is made to the amended complaint.

## C.    Analysis

The FCRA "regulates credit reporting procedures to ensure the confidentiality, accuracy, relevancy, and proper utilization of consumers' information." *Longman v. Wachovia Bank, N.A.*,

---

[4] According to the public website maintained by DOCCS, Plaintiff was received into custody on November 19, 2018, and received an indeterminate sentence of between two and four years for burglary in the third degree, a class D felony. Plaintiff was released to parole on November 14, 2019. *See* http://nysdoccslookup.doccs.ny.gov (DIN 18B3023) (last visited June 8, 2020).

702 F.3d 148, 150 (2d Cir. 2012) (citing 15 U.S.C. § 1681(b)).  The FCRA imposes two general

duties on "furnishers of information"[5] to a credit reporting agency: (1) a duty to provide accurate

information under Section 1681s-2(a); and (2) a duty to undertake an investigation upon receipt

of notice of dispute from a consumer reporting agency under Section 1681s-2(b).  *Id.*  Although

there is no private right of action under Section 1681s-2(a), courts recognize a private right of

action for willful or negligent non-compliance with Section 1681s-2(b).  *Nguyen v. Ridgewood*

*Sav. Bank*, 66 F. Supp. 3d 299, 305 (E.D.N.Y. 2014) (collecting cases).

      The Court construes Plaintiff's amended complaint as alleging a violation of Section

1681s-2(b).  (Dkt. No. 9 at 1.[6])  To state a claim under Section 1681s-2(b), a plaintiff-consumer

must show that (1) a furnisher received notice of a credit dispute from a credit reporting agency

(as opposed to from the consumer alone) and (2) the furnisher negligently or willfully failed to

conduct a reasonable investigation.  *Jackling v. HSBC Bank USA, N.A.*, No. 15-CV-6148 (FPG),

2019 WL 162743, at *4 (W.D.N.Y. Jan. 10, 2019); *Redhead v. Winston & Winston, P.C.*, No. 01

Civ. 11475, 2002 WL 31106934, at *5 (S.D.N.Y. Sept. 20, 2002).  The reasonableness of a

furnisher's investigation depends upon the nature and scope of the consumer's dispute.  *See*

*Okocha v. HSBC Bank USA, N.A.*, No. 08-CV-8650, 2010 WL 5122614, at *6 (S.D.N.Y. Dec.

14, 2010) (examining the reasonableness of a furnisher of information's investigation based upon

---

[5]  The term "furnishers of information" is not defined in the statute, *see* 15 U.S.C. § 1681a, but it has been interpreted to mean "entities that transmit, to credit reporting agencies, information relating to debts owed by consumers."  *Kane v. Guaranty Residential Lending, Inc.*, No. 04-CV-4847, 2005 WL 1153623, at *3 (S.D.N.Y. May 16, 2005) (collecting cases).  The Court assumes for purposes of this Order and Report-Recommendation that Defendant Doe #1 Debt Collector is alleged to be a furnisher of information.

[6]  To the extent Plaintiff alleges Defendant Doe #1 Debt Collector reported derogatory credit information that it knew was false, which lowered his credit score, such claim would fall under Section 1681s-2(a).  However, as noted above, there is no private right of action for a violation of Section 1681s-2(a).

"what it was told by the credit bureau"). The FCRA does not require that a furnisher of information delete a consumer's disputed account, but rather "simply requires the furnisher of information to investigate and to report information from the investigation." *Ritchie v. N. Leasing Sys., Inc.*, No. 12-CV-4992, 2016 WL 1241531, at *17 (S.D.N.Y. Mar. 28, 2016).

Here, Plaintiff has not plausibly alleged either element of a Section 1681s-2(b) violation. While Plaintiff claims that in the Spring of 2017 he notified Credit Karma of the disputed debt at issue, he does not allege that Defendant Doe #1 Debt Collector received notice of Plaintiff's disputed debt from a consumer credit agency and thereafter acted in willful or negligent noncompliance with the statute. Plaintiff's amended complaint therefore fails to state a claim against Defendant Doe #1 Debt Collector under Section 1681s-2(b) of the FCRA. Accordingly, the Court recommends *sua sponte* dismissing the amended complaint pursuant to 42 U.S.C. § 1915(e).

Normally, when a *pro se* plaintiff's complaint is facially deficient, he or she is given at least one chance to amend the complaint to state a viable claim. Here, Plaintiff was afforded such an opportunity and still failed to state a claim. (Dkt. No. 10.) The Court is cognizant that Plaintiff's amended complaint also purports to "remedy the timeliness issue" discussed in the Report-Recommendation. However, as discussed above, because Plaintiff filed the amended complaint as a matter of right, the Report-Recommendation was terminated as moot. (Dkt. No. 10.) Nevertheless, the Court has thoroughly reviewed Plaintiff's equitable tolling arguments and, for reasons explained below, finds such relief is not warranted in this case. *See In re U.S. Lines, Inc.*, 318 F.3d 432, 436 (2d Cir. 2003) (noting that the doctrine of equitable tolling permits a court, "under compelling circumstances, [to] make narrow exceptions to the statute of limitations in order 'to prevent inequity'").

9

In the amended complaint, Plaintiff names Defendant Doe #1 Debt Collector as the sole defendant in this action.  While a plaintiff may bring an action against an unidentified "Doe" defendant, the plaintiff must identify and serve that individual within the statute of limitations for the conduct alleged.  *See Sewell v. Bernardin*, 795 F.3d 337, 342 (2d Cir. 2015).  Although the statute of limitations is an affirmative defense, district courts may *sua sponte* dismiss an untimely claim where the plaintiff's own papers on their face set forth the facts pertinent to the defense.  *See Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (holding that a complaint may be dismissed *sua sponte* based on a statute of limitations defense "that appears on the face of the complaint"); *see also Lent v. CCNH, Inc.*, No. 5:13-CV-942 (MAD/ATB), 2015 WL 3463433, at *9 (N.D.N.Y. June 1, 2015) (citing *Waldron v. Milana*, No. 5:10-CV-0065, 2013 WL 2445047 (N.D.N.Y. June 5, 2013)).  Nonetheless, a district court typically should not dismiss claims as time-barred without providing a *pro se* plaintiff with "notice and opportunity to be heard" as to whether there might be a meritorious tolling argument or other reason why the complaint might be considered.  *See Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007).

A claim arising under the FCRA must be brought "not later than the earlier of: (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs."  15 U.S.C. § 1681p.  "The shorter two year-year limitation runs from the date that [the plaintiff] was on 'inquiry notice' of a[] FCRA violation."  *Andresakis v. Capital One Bank (USA) N.A.*, No. 09 Civ. 08411(DAB)(FM), 2011 WL 846830, at *3 (S.D.N.Y. Feb. 3, 2011), *report and recommendation adopted by* 2011 WL 1097413 (S.D.N.Y. Mar. 23, 2011).

Statutes of limitations, however, are also subject to equitable tolling in appropriate circumstances.  Equitable tolling applies in extraordinary circumstances where a plaintiff shows:

(1) the defendant concealed the existence of the plaintiff's cause of action; (2) the plaintiff remained ignorant of that cause of action until some point within the limitations period; and (3) the plaintiff's continuing ignorance was not due to lack of diligence. *See New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). The concealment element is met when the plaintiff shows either that the affirmative acts of the defendant prevented discovery of the plaintiff's claim or that the wrong itself was self-concealing. *See id.* "[E]ven assuming equitable tolling applie[s] to FCRA claims," *Trans Union LLC v. Lindo*, 393 F. App'x 786, 789 (2d Cir. 2010), the Court finds such relief is not warranted in this case.

Plaintiff commenced this action by filing his original complaint on May 20, 2019. (Dkt. No. 1.[7]) The amended complaint states that in "Spring of 2017" Plaintiff learned his credit score was damaged. The Court notes that in the original complaint, Plaintiff stated he learned of his damaged credit in February of 2017 an "filed a challenge to credit reporting agencies, Experian, Trans Union, Equifax . . . in late February 2017." (Dkt. No. 1 at 4, 9.) Consequently, to be timely, Plaintiff needed to commence this action within two years of that discovery. *See Marcinski*, 36 F. Supp. 3d at 209 (finding "based on the unambiguous language of the FCRA as well as its stated purpose, the statute of limitations began to run . . . when [the plaintiff] discovered that [the defendants] had failed to comply with their FCRA duties[.]"). Here, even assuming the Defendant Doe # 1 Debt Collector received notice of the credit dispute from a

---

[7] Under the prison mailbox rule, a *pro se* complaint submitted by a prisoner is deemed "filed" at the time it was delivered to "prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 276 (1988); *see also Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001). The date that a complaint is signed is the date that the prisoner is presumed to have handed that complaint to a prison guard for mailing. *See Shaw v. Superintendent*, No. 03-CV-0610 (NPM), 2007 WL 951459, at *3 n. 3 (N.D.N.Y. Mar. 28, 2007); *Garraway v. Broome Cty.*, No. 03-CV-0681 (TJM), 2006 WL 931729, at *3-4 (N.D.N.Y. Apr. 7, 2006). Plaintiff's original complaint is dated May 20, 2019, and was filed by the Clerk's office on May 22, 2019. (Dkt. No. 1 at 14.)

credit reporting agency and then had an additional 30 days to comply with its obligations under

Section 1681s-2(b) to conduct a reasonable investigation, the two-year statute of limitations

would have expired before Plaintiff commenced this action on May 20, 2019.  While Plaintiff

has alleged a so-called series of "extraordinary events," all which stem from his November 15,

2017, "false arrest" and resulting incarceration, such events do not involve Defendant Doe #1

Debt Collector in any way.  Plaintiff's assertion that Defendant Doe #1 Debt Collector

"indirectly" benefited from the "extraordinary events" of other non-party actors is meritless.

Therefore, and for the reasons discussed above, the Court finds Plaintiff's FCRA claim against

Defendant Doe #1 Debt Collector is also barred by the two-year statute of limitations.

Given the nature of the FCRA claim at issue, the Court finds Plaintiff would be unable to

cure the deficiencies in the amended complaint and therefore recommends Plaintiff's amended

complaint be dismissed without leave to amend.  *Cuoco*, 222 F.3d at 112.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Plaintiff's amended complaint (Dkt. No. 9) be **DISMISSED**

**WITHOUT LEAVE TO AMEND**; and it is further

**ORDERED** that the Clerk serve a copy of this Order and Report-Recommendation on

Plaintiff, along with a copy of the unpublished decisions cited herein in accordance with the

Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[8]  Such objections shall be filed with the Clerk of the

---

[8]  If you are proceeding *pro se* and are served with this Report-Recommendation by mail, three
additional days will be added to the fourteen-day period, meaning that you have seventeen days
from the date the Report-Recommendation was mailed to you to serve and file objections.  Fed.
R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72.


Dated: June 9, 2020
        Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

holiday, then the deadline is extended until the end of the next day that is not a Saturday,
Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 6:19-cv-00608-MAD-TWD   Document 12   Filed 06/09/20   Page 14 of 107

Jackling v. HSBC Bank USA, N.A., Not Reported in Fed. Supp. (2019)

2019 WL 162743

2019 WL 162743
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

William T. JACKLING, Plaintiff,
v.
HSBC BANK USA, N.A. and HSBC
Mortgage Corporation (USA), Defendants.

Case # 15-CV-6148-FPG
|
Signed 01/10/2019

**Attorneys and Law Firms**

Matthew D. Nafus, Scottsville, NY, for Plaintiff.

Chad W. Flansburg, Richard T. Tucker, Phillips Lytle LLP, Rochester, NY, Preston Lee Zarlock, Phillips Lytle LLP, Buffalo, NY, for Defendants.

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

**INTRODUCTION**

 *1  William T. Jackling brings this action against HSBC Bank USA, N.A. and HSBC Mortgage Corporation (USA) (collectively "HSBC") asserting six claims for violation of the Fair Credit Reporting Act ("FCRA"), a seventh claim for breach of contract, an eighth claim for violation of the Truth in Lending Act ("TILA"), and a ninth claim under the Home Affordable Modification Program ("HAMP"). He primarily claims that HSBC inaccurately reported several of his monthly mortgage payments as delinquent, causing him to suffer the denial of credit and emotional damages. HSBC moves for summary judgment as to all of Jackling's claims. As set forth below, summary judgment is GRANTED in part and DENIED in part.

**BACKGROUND**

Since 2007, William and Martha Jackling had a mortgage loan with HSBC. In 2010, the Jacklings applied for a loan modification due to financial hardship.

**I. The 2010 Forbearance Agreement**

In response to their modification application, in April 2010, HSBC offered the Jacklings a Forbearance Agreement under which HSBC would accept partial payments starting in June 2010.

The Forbearance Agreement contained a "Credit Reporting" provision stating that HSBC would report the Jacklings' loan as delinquent for so long as the loan was not current under the original loan documents, even if the Jacklings timely made the partial payments in accordance with the Forbearance Agreement. ECF Nos. 62-10, ¶ 21; 62-15 at 4. The Forbearance Agreement also provided that HSCB would hold the partial payments in a suspense account until they totaled an amount sufficient to pay the oldest delinquent monthly payment in full. ECF Nos. 62-10, ¶ 21; 62-15 at 3. The Jacklings signed the Forbearance Agreement on May 5, 2010 and sent it to HSBC. ECF Nos. 62-15; 69, ¶ 11.

But the Jacklings also signed a second copy of the Forbearance Agreement in which they crossed out the language in the "Credit Reporting" provision allowing HSBC to report the loan as delinquent. ECF No. 62-16 at 4 (the "Altered Forbearance Agreement"). Jackling claims that he sent the Altered Forbearance Agreement to HSBC along with the original, unaltered copy (hereinafter the "Original Forbearance Agreement"). ECF No. 69, ¶ 11. Relying on an unintelligible mark on HSBC's signature line, ECF No. 62-16 at 5, Jackling claims that HSBC signed and agreed to the Altered Forbearance Agreement. [1]

[1]    It is undisputed that HSBC never signed the Original Forbearance Agreement. But since HSBC's alleged promise not to report the 2010 forbearance payments as delinquent only arises from the Altered Forbearance Agreement, regardless of whether HSBC signed the Original Forbearance Agreement, HSBC was entitled to report the payments as delinquent if it did not enter into the Altered Forbearance Agreement. This issue is discussed further below.

 *2  Pursuant to the Forbearance Agreement, between June and December 2010, the Jacklings made six partial payments and three full payments. ECF Nos. 62-29 at 5-6; 69, ¶ 15. HSBC held the partial payments in the suspense account and applied them in arrears once enough funds were received for a full monthly payment. ECF Nos. 62-10, ¶ 37; 62-29 at 5-6. The full payments were also applied in arrears to the

Jackling v. HSBC Bank USA, N.A., Not Reported in Fed. Supp. (2019)

2019 WL 162743

Case 6:19-cv-00608-MAD-TWD   Document 12   Filed 06/09/20   Page 15 of 107

next oldest delinquent monthly payment, so that by December 2010, the Jacklings were only current through November 2010. *Id.* Thus, although the Jacklings timely made their payments under the Forbearance Agreement, the payments were untimely under the original loan documents, and as permitted by the Original Forbearance Agreement, HSBC considered the payments to be delinquent. ECF Nos. 62-10, ¶ 22-25; 62-15 at 3-4.

## II. The 2011 Loan Modification

In January 2011, HSBC approved the Jacklings' request for a loan modification. Pursuant to the resulting Loan Modification Agreement, the unpaid interest for the months of December 2010, January 2011, and February 2011 [2] were capitalized and added to the principal balance of the Jacklings' loan, and the Jacklings were to begin making modified payments on March 1, 2011. ECF Nos. 62-10, ¶ 62; 62-26 at 2-3; 62-28 at 3, 6, 7, 10; 62-29 at 7.

[2]     The modification documents suggest that interest for November 2010 was also capitalized. ECF No. 62-26 at 2. It is unclear why, since Jackling seems to have made a payment that was applied to November 2010, but in any case, Jackling signed the Loan Modification Agreement, so he cannot now argue that the capitalization term was incorrect.

The Jacklings timely made their full March, April, and May payments under the Loan Modification Agreement, ECF Nos. 69-5 at 14; 62-26 at 7-8, but for reasons unclear on the record, HSBC held these payments in a suspense account and did not apply them to their respective due dates until May 2011. ECF No. 62-29 at 8. The Jacklings' payments for the first five months of 2011 were reported as "unknown" or "late." ECF Nos. 37, ¶ 25; 69, ¶ 22; 69-12 at 3.

## III. The Jacklings' History of Complaints to HSBC About Adverse Credit Reporting

At various points in 2010 and/or 2011, Jackling contacted HSBC to complain that it was improperly reporting several of his 2010 and 2011 payments as delinquent to credit reporting agencies ("CRAs"). ECF No. 69, ¶ 23. According to Jackling, HSBC should not have reported the 2010 partial forbearance payments as delinquent because it agreed not to by signing the Altered Forbearance Agreement, ECF Nos. 37, ¶¶ 15-20; 69, ¶ 9-19, and it should not have reported the 2011 modification payments as delinquent because the Jacklings timely and fully

made them under the Loan Modification Agreement. ECF Nos. 37, ¶¶ 21-23; 69, ¶ 20-21.

On September 8, 2011, HSBC sent the Jacklings a letter advising them that it had removed any delinquencies as to their March and April 2011 payments, and that their account was now reporting as current and in good standing. ECF No. 69-13 at 2. But HSBC did not correct the reporting, and on December 6, 2011, he sent HSBC a letter again asking it to report no late payments. ECF Nos. 69, ¶¶ 23-24; 69-14 at 2.

The record is silent as to whether there were any credit reporting issues during 2012-2013, but in February 2014, the Jacklings contacted HSBC again and in response, on April 22, 2014, the servicer [3] of the Jacklings' loan sent the Jacklings a letter telling them that "no delinquencies have been reported to the credit bureaus." ECF Nos. 69, ¶ 23; 69-5 at 2.

[3]     HSBC transferred servicing of the loan to PHH Mortgage Corporation in May 2013. ECF No. 71-2, ¶¶ 4-13.

## IV. The TransUnion Credit Report at Issue in this Case

 **\*3**  Despite HSBC's and the servicer's assurances that the Jacklings' account was current and in good standing and that no delinquencies had been reported, a TransUnion credit report dated July 13, 2014 reflected numerous delinquencies and payments of "unknown" status, including the March and April 2011 payments for which HSBC had told the Jacklings any delinquency reports were removed:

• 08/2010 30 days late

• 09/2010 30 days late

• 10/2010 60 days late

• 11/2010 90 days late

• 12/2010 60 days late

• 01/2011 X – unknown

• 02/2011 X – unknown

• 03/2011 X – unknown

• 04/2011 X – unknown

• 05/2011 30 days late

ECF Nos. 37, ¶ 25; 69, ¶ 22; 69-12 at 3.

Case 6:19-cv-00608-MAD-TWD  Document 12  Filed 06/09/20  Page 16 of 107

Jackling v. HSBC Bank USA, N.A., Not Reported in Fed. Supp. (2019)

2019 WL 162743

## V. The Jacklings' Disputes as to TransUnion's Credit Report

Jackling asserts that he initiated a dispute of the July 13, 2014 credit report with TransUnion in July 2014, but there is no documentary evidence of this dispute in the record. HSBC contends that TransUnion did not notify it of the dispute, ECF No. 62-9; 62-10, ¶¶ 49-57, and the Jackling seems to concede this. ECF No. 69, ¶ 25.

Jackling initiated a second dispute with TransUnion in December 2014. ECF No. 37, ¶¶ 24-27; 69, ¶ 25. HSBC did receive notice of this dispute from TransUnion. ECF Nos. 62-10, ¶ 53; 62-9 at 4. CRAs like TransUnion notify furnishers of information like HSBC of disputes through an electronic transmission format called an Automated Consumer Dispute Verification ("ACDV"). HSBC received an ACDV from TransUnion on December 12, 2014 and responded on December 16, 2014. ECF Nos. 62-10, ¶ 50; 62-9 at 4. The ACDV record reflects that HSBC modified the Jacklings' account information, but it is not clear how. ECF No. 62-9 at 4.

Jackling initiated a third dispute with TransUnion in January 2015. ECF Nos. 37, ¶ 28. HSBC received a second ACDV from TransUnion on January 28, 2015 and responded on January 29, 2015. ECF Nos. 62-10, ¶ 54; 62-9 at 5. Again, the ACDV record reflects that HSBC modified the Jacklings' account information, but again, it is not clear how. ECF No. 62-9 at 5.

## VI. Jackling's Complaint in this Court

Jackling filed his Complaint in this Court on March 16, 2015. ECF No. 1. The operative Third Amended Complaint asserts the following claims:

1. Willful violation of the FCRA based on the July 2014 dispute

2. Willful violation of the FCRA based on the December 2014 dispute

3. Willful violation of the FCRA based on the January 2015 dispute

4. Negligent violation of the FCRA based on the July 2014 dispute

5. Negligent violation of the FCRA based on the December 2014 dispute

6. Negligent violation of the FCRA based on the January 2015 dispute

7. Breach of contract

8. TILA violation

9. HAMP claim

ECF No. 37. The FCRA claims, though separated into six claims, are all based on the reporting of the 2010 forbearance payments and 2011 modification payments as reflected in the July 2014 TransUnion credit report.

HSBC now moves for summary judgment on all of Jackling's claims. ECF No. 62.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the nonmovant would bear the burden of proof at trial,

> **\*4** the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings. If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact. Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the

Case 6:19-cv-00608-MAD-TWD   Document 12   Filed 06/09/20   Page 17 of 107

Jackling v. HSBC Bank USA, N.A., Not Reported in Fed. Supp. (2019)

2019 WL 162743

record to carry its burden on summary judgment.

*Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (internal citations omitted). A mere scintilla of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The Court must resolve all genuinely disputed facts in favor of the nonmovant, and if the Court then determines that no rational jury could find in favor of the nonmovant, summary judgment in favor of the movant is appropriate. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II. Claims 1-6: Willful (Claims 1-3) and Negligent (Claims 4-6) Violation of the FCRA

Jackling's first six claims assert that HSBC willfully or negligently violated section 1681s–2(b) of the FCRA, which "imposes a duty upon furnishers of credit information [like HSBC] to investigate credit disputes" after receiving notice from a CRA. *Anthony v. GE Capital Retail Bank*, 321 F. Supp. 3d 469, 477 (S.D.N.Y. 2017). "While the Second Circuit has not yet defined the specific contours of a furnisher's investigatory responsibility under this statute, courts both within and outside the Circuit have assumed a reasonableness standard for judging the adequacy of the required investigation." *Dickman v. Verizon Comms., Inc.*, 876 F. Supp. 2d 166, 172 (E.D.N.Y. 2012).

Most courts agree that consumers have a private right of action for a furnisher's violation of section 1681s–2(b). *See Comunale v. Home Depot, U.S.A., Inc.*, 328 F. Supp. 3d 70, 80 (W.D.N.Y. 2018). To state a claim, a consumer must show that (1) a furnisher received notice of a credit dispute from a CRA (as opposed to from the consumer alone) and (2) the furnisher negligently or willfully failed to conduct a reasonable investigation. *Frederick v. Capital One Bank (USA), N.A.*, No. 14-CV-5460 (AJN), 2018 WL 1583289, at *6-7 (S.D.N.Y. Mar. 27, 2018).

### A. Whether HSBC Received Notice from a CRA

Here, Jackling's first and fourth claims are based on his July 2014 dispute, but Jackling seems to concede that HSBC did not receive notice of this dispute from TransUnion. ECF No. 69, ¶ 25. Since notice of the dispute must come from the

CRA, HSBC's motion for summary judgment is GRANTED as to Jackling's first and fourth claims. *Frederick*, 2018 WL 1583289, at *6.

Jackling's second, third, fifth, and sixth claims are based on his December 2014 and January 2015 disputes, and HSBC admittedly received notice of these disputes from TransUnion. ECF Nos. 62-10, ¶¶ 53-54, 62-9 at 4-5. The Court thus addresses the reasonableness of HSBC's investigation of these two disputes.

### B. Whether HSBC Conducted a Reasonable Investigation

Jackling's December 2014 and January 2015 disputes both challenged HSBC's reporting of the 2010 forbearance payments and the 2011 modification payments. The Court will address these two groups of payments in turn.

### 1. The 2010 Forbearance Payments

Jackling claims that a reasonable investigation would have revealed that HSBC promised not to report his 2010 forbearance payments as delinquent by executing the Altered Forbearance Agreement containing his handwritten changes to the "Credit Reporting" provision. ECF No. 69-25, ¶ 7. His contention that HSBC executed the Altered Forbearance Agreement is based on the presence of an unintelligible mark on HSBC's signature line and Jackling's belief that a woman named Rose Viana signed it on behalf of HSBC. ECF Nos. 69 at 3, 13.

**\*5** HSBC responds that no amount of investigation would have revealed this "promise" because HSBC never executed the Altered Forbearance Agreement. ECF No. 62-31 at 9; 71-2, ¶¶ 9-13; 71-3 at 13.

Jackling argues that whether Rose Viana signed the Altered Forbearance Agreement is a genuine issue of material fact that precludes summary judgment. The Court disagrees. Even assuming Rose Viana *did* sign the Altered Forbearance Agreement, HSBC's evidence shows that she had no authority to do so, and that she was not even an employee of HSBC, but rather worked for the servicer to which the Jacklings' loan was transferred in 2013. ECF Nos. 62-10, ¶¶ 17-18, 71-2, ¶¶ 4-13. Jackling presents no evidence to the contrary.

Case 6:19-cv-00608-MAD-TWD   Document 12   Filed 06/09/20   Page 18 of 107

**Jackling v. HSBC Bank USA, N.A., Not Reported in Fed. Supp. (2019)**

2019 WL 162743

Further, in contrast to his Declaration statement on summary judgment that Rose Viana signed the Altered Forbearance Agreement, Jackling's prior deposition testimony was that he did not know who put the unintelligible mark on the Altered Forbearance Agreement. ECF Nos. 71-1 at 7-8, 71-3 at 16. Jackling cannot "create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts [his] previous deposition testimony." *Hayes v. N.Y. City Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996).

Because Jackling has not shown a genuine issue of material fact as to whether HSBC executed the Altered Forbearance Agreement and thus promised not to report his 2010 forbearance payments as delinquent, there is likewise no genuine issue of material fact as to whether a reasonable investigation would have revealed that HSBC reported inaccurate information. Jackling thus cannot prevail on his FCRA claim as to the 2010 forbearance payments. *See Felts v. Wells Fargo Bank, Nat'l Ass'n*, 893 F.3d 1305, 1313 (11th Cir. 2018) (holding that, regardless of the nature of the investigation, a plaintiff asserting an FCRA claim cannot prevail without demonstrating that a reasonable investigation would have revealed that the furnisher had reported inaccurate information; otherwise, the plaintiff would be unable to demonstrate any injury); *Frederick*, 2018 WL 1583289, at *7 ("[W]hile it may be self-evident, if Plaintiff cannot show that any of the information was inaccurate, there is no harm."); *Podell v. Citicorp Diners Club, Inc.*, 914 F. Supp. 1025, 1036 (S.D.N.Y. 1996) (to prevail on an FCRA claim, a plaintiff "must prove that inaccurate information in a credit report caused him harm").

Accordingly, summary judgment is GRANTED in favor of HSBC as to the 2010 forbearance payments.

### 2. The 2011 Modification Payments

Jackling also claims that HSBC failed to reasonably investigate to ascertain the accuracy of its reporting of the 2011 modification payments as "unknown" or "late."

"Whether a defendant's investigation is reasonable is a factual question normally reserved for trial, but summary judgment is proper if the reasonableness of the defendant's procedures is beyond question and if the plaintiff has failed to adduce evidence that would tend to prove that the investigation was unreasonable." *Hudson v. Babilonia*, 192 F. Supp. 3d 274, 301 (D. Conn. 2016). Here, HSBC fails to show that its investigation was reasonable "beyond question" and Jackling presents evidence of unreasonableness.

**\*6** First, HSBC does not indicate whether it reviewed the Loan Modification Agreement as part of its investigation. The Loan Modification Agreement governed the Jacklings' payment obligations in 2011. Without knowing whether HSBC reviewed this central document, the Court cannot conclude that HSBC's investigation was reasonable "beyond question."

Second, HSBC does not specify what information it *did* review. HSBC's corporate representative, Denise Dickman, only vaguely explains that HSBC's investigator

> compared the information being reported by the CRA against HSBC's own records and, where appropriate, modified the information provided by the CRA to accurately reflect HSBC's own records. In each instance, HSBC conducted an investigation with respect to the disputed information, reviewed the information provided by the CRA, modified the information being furnished at the CRA to match HSBC's internal records, and reported its response to the CRAs as required by the FRCA. Thereafter, Trans Union reported the modified account information verified by HSBC.

ECF No. 62-10, ¶¶ 58-60. Dickman repeatedly references "information" without actually identifying what information HSBC reviewed and compared. Additionally, HSBC acknowledges that its investigation revealed "differences in the payment pattern being reported by TransUnion and HSBC's records concerning the actual payment pattern for the account," ECF No. 62-31 at 15-16; 62-1, ¶ 61, but HSBC does not clarify what those differences were or whether they related to the payments Jackling disputed. The Court cannot evaluate the reasonableness of HSBC's investigation without knowing what information HSBC reviewed. *See Jenkins v. AmeriCredit Fin. Servs., Inc.*, No. 14CV5687SJFAKT, 2017 WL 1325369, at *7 (E.D.N.Y. Feb. 14, 2017) (finding that questions of fact existed as to reasonableness of investigation

Case 6:19-cv-00608-MAD-TWD  Document 12  Filed 06/09/20  Page 19 of 107

Jackling v. HSBC Bank USA, N.A., Not Reported in Fed. Supp. (2019)

2019 WL 162743

where defendant failed to "detail the exact nature and scope" of the investigation); *Jensen v. Peoples Gas Light & Coke Co.*, No. 04 C 2945, 2005 WL 2007123, at *4 (N.D. Ill. Aug. 16, 2005)* ("Any determination of the reasonableness of [the furnisher's] investigation in light of the information it possessed requires knowledge of what information it did in fact possess.").

Third, HSBC's evidence is unclear as to how it modified the Jacklings' account in response to the ACDVs. Dickman's Declaration states only that "[t]he account information modification details are set forth in the ... ACDV[s]." ECF No. 62-10, ¶ 53, 57. But the ACDVs are not self-explanatory. Instead, they "contain many codes and abbreviations," making it "unclear what specific action [HSBC] took after receiving" them. *Trikas v. Universal Card Services Corp.*, 351 F. Supp. 2d 37, 44 (E.D.N.Y. 2005)* (acknowledging lack of clarity of ACDVs). HSBC's evidence is thus insufficient to warrant summary judgment. *See Robbins v. CitiMortgage, Inc.*, No. 16-CV-04732-LHK, 2017 WL 6513662, at *11 (N.D. Cal. Dec. 20, 2017)* (finding that the defendant-bank's evidence was insufficient to warrant summary judgment where the ACDVs "demonstrate[d] that an investigation took place, but they reveal[ed] almost nothing about what happened during the investigation").

Jackling also comes forward with his own evidence suggesting that HSBC's investigation was not reasonable. He submits HSBC's September 8, 2011 letter confirming that it removed the delinquencies related to the March and April 2011 payments to ensure that the Jackling's account was reporting as current and in good standing. ECF No. 69-13 at 2. He also submits a July 2017 credit report showing that the March and April 2011 payments were finally corrected to reflect a status of "ok." ECF No. 69, ¶ 26; 69-16 at 5. This evidence suggests that that HSBC agreed with Jackling that the reporting should be corrected—calling into question HSBC's failure to fix the reporting upon receiving the ACDVs in December 2014 and January 2015.

**\*7** Thus, HSBC is not entitled to summary judgment on the reasonableness of its investigation of the 2011 modification payments. The Court turns to whether there is a genuine issue of material fact as to Jackling's claims that HSBC's reporting and investigation caused him to suffer damages.

### C. Damages

To prevail on an FCRA claim, a plaintiff must prove either (1) that the defendant's negligent violation caused him actual

damages, in which case the plaintiff is entitled to recover those actual damages, or (2) that the defendant's violation was willful, in which case the plaintiff is entitled to recover actual damages, if any, or statutory damages, as well as punitive damages. *See Ritchie v. N. Leasing Sys., Inc.*, 14 F. Supp. 3d 229, 234, 240 (S.D.N.Y. 2014).*

### 1. Actual Damages (Claims 5 and 6) [4]

[4] Claim 4 also sought actual damages, but summary judgment has already been granted as to that claim.

Actual damages can include both economic damages stemming from the denial of credit and emotional damages. *See Frederick*, 2018 WL 1583289, at *11; *Caltabiano v. BSB Bank & Tr. Co.*, 387 F. Supp. 2d 135, 141 (E.D.N.Y. 2005).* Emotional damages may be freestanding and need not arise from the denial of credit, but they often do. *Wenning v. On-Site Manager, Inc.*, No. 14 CIV. 9693 (PAE), 2016 WL 3538379, at *19 (S.D.N.Y. June 22, 2016).* "[T]o recover actual damages, a plaintiff must establish a 'causal relationship between the violation of the statute and the loss of credit or other harm.' " *Frederick*, 2018 WL 1583289, at *11 (quoting *Burns v. Bank of Am.*, 655 F. Supp. 2d 240, 250 (S.D.N.Y. 2008) ).*

Here, Jackling claims that he suffered both economic and emotional damages, both stemming from the denial of credit. HSBC argues that Jackling cannot present sufficient admissible evidence of either types damages and cannot link any damages to HSBC's reporting.

#### a. Economic Damages

Jackling claims that he was denied credit on at least four occasions between 2014 and 2015:

1. Denial of an auto loan from Dorschel Toyota;

2. Denial of an auto loan from Affordable Auto;

3. Denial of a credit increase from Synchrony Bank;

4. Denial of an auto loan from Cortese Ford.

ECF No. 69, ¶ 27 (a)-(d).

The Affordable Auto and Synchrony Bank denials are supported only by Jackling's bare Declaration statements,

Case 6:19-cv-00608-MAD-TWD   Document 12   Filed 06/09/20   Page 20 of 107

Jackling v. HSBC Bank USA, N.A., Not Reported in Fed. Supp. (2019)

2019 WL 162743

which do not even say that the denials were based on TransUnion's credit report, let alone any inaccurate information reported by HSBC. This evidence is insufficient to survive summary judgment. *See McMillan v. Experian*, 170 F. Supp. 2d 278, 281 (D. Conn. 2001) (striking affidavit which failed to identify any basis for affiant's knowledge of why credit was denied); *Howell v. Equifax Info. Servs., LLC*, No. 1:14-CV-148 SNLJ, 2017 WL 76892, at *5 (E.D. Mo. Jan. 9, 2017) (granting summary judgment for defendant where plaintiff failed to present a denial letter or affidavit of car dealership employee and instead relied on only his own testimony and hearsay evidence). Summary judgment is thus GRANTED in favor of HSBC as to the Affordable Auto and Synchrony Bank denials.

The Dorschel Toyota and Cortese Ford denials are supported by four credit denial letters. HSBC argues that the credit denial letters are not authenticated and thus constitute inadmissible hearsay evidence which cannot be used to survive summary judgment. *See Gorman v. Experian Info. Sols., Inc.*, No. 07 CV 1846 (RPP), 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008) (noting that credit denial letters were inadmissible hearsay documents).

 **8** While the letters are admittedly unauthenticated, the Court has the discretion to consider them on summary judgment and exercises that discretion here, as there is no suggestion that they are actually inauthentic. *See Am. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, No. 02-CV-814C F, 2007 WL 2743449, at *3 (W.D.N.Y. Sept. 18, 2007) (explaining that the court has the discretion to consider unauthenticated evidence where it is apparent that the party may be able to authenticate the documents at trial); *Perpall v. Pavetek Corp.*, No. 12-CV-0336 (PKC), 2017 WL 1155764, *9 (E.D.N.Y. 2017) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."); *Perkins v. United States*, No. 16-CV-495V, 2018 WL 3548597, at *8 (W.D.N.Y. July 24, 2018) (explaining that Rule 56(c)(1) allows a party to object to summary judgment evidence on the basis that it "cannot be" presented in a form that "would be" admissible in evidence, suggesting that inadmissible materials may be considered on summary judgment as long as they "can be cleaned up at trial to remove any evidentiary infirmities").

HSBC further argues that the credit denial letters fail to establish a causal link to any inaccurate information reported by HSBC because they do not specifically mention HSBC or the information it reported. In support, HSBC relies on *Gorman*. But *Gorman* does not say that a credit denial letter must specifically mention the defendant-furnisher or the precise information it reported. *Gorman* held that the plaintiff failed to establish a causal link between the denial of credit and the defendant-CRA, Experian, because none of the credit denial letters in evidence relied on an Experian credit report in denying credit. *Id.* at *6-7. *Cf. Swontek v. Cont'l Cent. Credit Inc.*, No. CV-16-03602-PHX-DJH, 2018 U.S. Dist. LEXIS 166735, at *13 (D. Ariz. Sep. 27, 2018) (rejecting defendant's argument that credit denial letters were insufficient evidence because they did not specifically list the erroneously reported account as the culprit).

In cases finding no causal link between the credit denials and the inaccurate information, there has been no evidence *at all* to establish such a link. For example, in *Jenkins*, 2017 WL 1325369, at *8, there was no evidence that any party relied on the erroneous credit report in denying plaintiff a loan. Similarly, in *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 473 (2d Cir. 1995), there was no evidence that the erroneous credit report had been provided to any third parties. Here, in contrast, three of the four credit denial letters reference TransUnion's credit report. ECF No. 69-17 at 2, 69-20 at 2, 69-21 at 2.

HSBC also argues that Jackling failed to depose any of the prospective creditors to discern exactly why they denied him credit. But at least one court has held that credit denial letters, without additional testimony from the creditors, were sufficient to survive summary judgment. *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 968 (3d Cir. 1996) (holding that "[t]he district court erred by assuming that [plaintiff] could satisfy his burden only by introducing direct evidence that consideration of the inaccurate entry was crucial to the decision to deny credit. While [plaintiff's] case might have been stronger had he deposed or taken affidavits of those responsible for the decision, such evidence is not essential to make out a prima facie case pursuant to § 1681e(b).").

Admittedly, the credit denial letters do list numerous reasons, making the extent to which the denials were based on inaccurate information from HSBC unclear. However, Jackling is not required to "eliminate the possibility that 'correct adverse entries or any other factors' also entered into the decision to deny credit." *Frost v. Experian & TRW, Inc.*, No. 98 CIV. 2106 JGK JCP, 1999 WL 287373, at *8 (S.D.N.Y. May 6, 1999); *see also Fahey v. Experian Info. Sols., Inc.*, 571 F. Supp. 2d 1082, 1089 (E.D. Mo. 2008) ("[T]here is no

precedent supporting the conclusion that plaintiff bears the burden of proving that Experian's report was the sole cause of his inability to secure financing."); *Enwonwu v. Trans Union, LLC*, 364 F. Supp. 2d 1361, 1366 (N.D. Ga. 2005) ("Forcing a plaintiff affirmatively to rule out other explanations for the credit denial ignores the fact that decisions to deny credit will frequently have more than one cause. For example, in some instances the inaccurate entry and another factor may each, considered separately, be insufficient to have caused the denial of credit but when taken together are sufficient. Each may then be considered a substantial factor in bringing about the denial of credit and therefore a cause of plaintiff's injury.").

**\*9** Accordingly, as to the Dorschel Toyota and Cortese Ford denials, Jackling has presented sufficient evidence of economic damages to survive summary judgment, and summary judgment is DENIED to HSBC on those credit denials.

### b. Emotional Damages

Turning next to the emotional damages, Jackling claims that he suffered emotional distress, nervousness, sleeplessness, and other mental, emotional, and physical suffering. ECF No. 37, ¶¶ 34, 45, 51, 57, 62, 67, 72. He asserts that because he could not get credit, he was anxious, could not sleep at night, sometimes ate too much to alleviate stress, and gave up hobbies. ECF No. 69, ¶ 30. He also claims that being denied credit caused him humiliation, embarrassment, and sadness. ECF No. 69, ¶ 27(a), (c), (d).

HSBC argues that these claims cannot survive summary judgment because they are not corroborated or supported by specific, concrete evidence.

Courts disagree as to whether corroboration is necessary for an emotional damages claim to survive summary judgment. *See Wenning*, 2016 WL 3538379, at \*20 (noting split in authority and citing cases holding that, on the one hand, "conclusory," "unsupported," and "subjective" testimony is legally insufficient, and that, on the other hand, there is no statutory basis requiring corroboration).

Even absent a categorical requirement, however, corroboration is still a factor in evaluating whether an emotional damages claim is demonstrable enough to reach a jury. *Id.* at \*22. Other factors include "whether plaintiff's

testimony is conclusory or detailed; whether plaintiff's asserted distress was short-lived or long-lasting; and whether the emotional distress is linked to a credit denial or similarly adverse event." *Id.* at \*20. Courts also look to "outward manifestation of emotional distress," particularly as observed by others, *Howell*, 2017 WL 76892, at \*4, and whether the plaintiff sought medical treatment for the emotional distress. *See Okocha v. HSBC Bank USA, N.A.*, No. 08 CIV.8650(MHP), 2010 WL 5122614, at \*6 (S.D.N.Y. Dec. 14, 2010).

Here, Jackling's emotional damages evidence is conclusory. He claims that he experienced anxiousness, sleeplessness, embarrassment, etc., without detailed testimony as to "outward manifestations" of his distress. He submits a Declaration from his doctor, Jules Zysman, but that Declaration does not indicate that Jackling sought mental health care for emotional distress due to denial of credit. Rather, the Declaration discloses that Jackling had been a patient of Dr. Zysman's for almost 40 years, and that Jackling (who was in his late 70s) was suffering from various medical issues such as hypertension, diabetes, and depression. ECF No. 69-23. Dr. Zysman attests that some of Jackling's depression was due to the death of his wife, and that financial pressure exacerbated Jackling's conditions. *Id., see Frederick*, 2018 WL 1583289, at \*12 (holding that doctor's note did "not establish a causal connection and merely state[ed] that Plaintiff was under the care of a physician"); *Caltabiano*, 387 F. Supp. 2d at 142 (holding that the plaintiff failed to establish actual damages where he did not "provide[ ] any psychiatric or medical records to support that he has suffered emotional damages as a result of the Defendants' actions").

**\*10** Jackling's evidence shows that he was under great financial pressure for years due to his wife's illness, and that he spent nearly all of his savings caring for her in the last few years of her life. ECF No. 69, ¶ 28. But the evidence does not sufficiently link his emotional distress to any inaccurate information furnished by HSBC and is not sufficiently detailed to send to a jury.

Accordingly, summary judgment is GRANTED to HSBC as to emotional damages.

### 2. Willfulness (Claims 2 and 3) [5]

Case 6:19-cv-00608-MAD-TWD   Document 12   Filed 06/09/20   Page 22 of 107

Jackling v. HSBC Bank USA, N.A., Not Reported in Fed. Supp. (2019)

2019 WL 162743

5      Claim 1 also alleged a willful violation, but
       summary judgment has already been entered as to
       that claim.

"To establish that a violation of the FCRA was willful,
the 'plaintiff must show that a defendant knowingly and
intentionally committed an act in conscious disregard for the
rights of others, but need not show malice or evil motive.'
" *Jenkins*, 2017 WL 1325369, at *7 (quoting *Northrop v.
Hoffman of Simsbury, Inc.*, 12 F. App'x 44, 50 (2d Cir. 2001) ).

Courts in this Circuit have held that a defendant
acts willfully under the FCRA where the defendant
"intentionally misled consumers or concealed information
from them." ... In contrast, "the mere failure to correct
a plaintiff's inaccurate credit information, even after
notification of the inaccuracy does *not* constitute a willful
failure to comply with the FCRA."

*Id.* (quoting *George v. Equifax Mortg. Servs.*, No. 06-CV-971,
2010 WL 3937308, at *2 (E.D.N.Y. Oct. 5, 2010) ) (emphasis
in original).

Here, Jackling cannot show that HSBC willfully violated the
FCRA.

First, the ACDV forms reflect that HSBC promptly
investigated the disputes and responded to TransUnion within
a few days. ECF No. 62-9 at 4-5. Prompt investigation cuts
against a finding of willfulness. *See id.*

Second, Jackling's own evidence shows that HSBC
responded to his communications throughout the years and
ultimately (albeit belatedly) corrected its reporting. ECF No.
69, ¶ 26, 69-16 at 5. HSBC's responsiveness also cuts against
a finding of willfulness. *See Trikas*, 351 F. Supp. 2d at
44-45 (holding that a furnisher did not act willfully where
it "sent several letters to Plaintiff to address his concerns"
and "initiated its investigation almost immediately" after
receiving notices of dispute from CRAs).

Third, there is no evidence that HSBC "intentionally mislead
or concealed information" from Jackling. *George*, 2010 WL
3937308, at *2.

Finally, Jackling's Response in Opposition to HSBC's Motion
for Summary Judgment makes no argument that HSBC
willfully violated the FCRA, and his willfulness claims in his
Complaint did not allege any additional facts beyond those
contained in his negligence claims. Accordingly, summary

judgment is GRANTED in HSBC's favor as to Jackling's
second and third claims for willful violation of the FCRA.

To sum up the FCRA claims, summary judgment is
GRANTED in favor of HSBC as to Jackling's first and fourth
claims because HSBC did not receive notice of the July 2014
dispute at issue in those claims from a CRA.

Summary judgment is GRANTED in favor of HSBC as
to Jackling's second and third claims because he has not
shown that HSBC willfully failed to conduct a reasonable
investigation following receipt of the December 2014 and
January 2015 ACDVs.

As to Jackling's fifth and sixth claims, summary judgment
is GRANTED in favor of HSBC as to the 2010 forbearance
payments, and as to the issue of emotional damages.
Summary judgment is DENIED as to the limited issues of
whether HSBC reasonably investigated the 2011 modification
payments, and whether Jackling suffered economic damages
in the form of credit denials from Dorshcel Toyota and
Cortese Ford due to HSBC's reporting and investigation of
those payments following receipt of the December 2014 and
January 2015 ACDVs.

**III. Claim 7: Breach of Contract**
 *11   Jackling asserts that HSBC breached the Jacklings'
original loan documents by failing to credit him for a
$4,780.17 payment he allegedly made on December 23, 2010.
ECF No. 37 at 74-77. However, as HSBC explains, and
the payment history shows, Jackling did not make such a
payment. ECF No. 62-10, ¶¶ 61-67. Rather, HSBC advanced
$4,780.17 to pay property taxes. *Id.* Jackling separately paid
the property taxes himself, and HSBC consequently received
a refund. *Id.* HSBC then zeroed-out the advance balance it
had created after advancing the $4,780.17. *Id.*

Jackling also claims that HSBC breached the Loan
Modification Agreement by improperly capitalizing
$2,682.96 in unpaid interest. ECF No. 37, ¶ 78. However,
the capitalization of the $2,682.96 was a *term* of the Loan
Modification Agreement that Jackling signed, ECF No.
62-10, ¶ 62, and thus cannot be a breach.

In any case, Jackling makes no arguments as to his breach
of contract claim in his Response in Opposition to HSBC's
Motion for Summary Judgment. Accordingly, summary
judgment is GRANTED in favor of HSBC as to Jackling's
seventh claim.

Case 6:19-cv-00608-MAD-TWD  Document 12  Filed 06/09/20  Page 23 of 107

Jackling v. HSBC Bank USA, N.A., Not Reported in Fed. Supp. (2019)

2019 WL 162743

## IV. Claim 8: Violation of TILA

Jackling claims that HSBC violated 15 U.S.C. § 1638(f) of TILA by failing to send him his monthly mortgage statements between August 2014 and March 2016, during the pendency of this lawsuit. ECF No. 37, ¶¶ 80-85. He argues that he is entitled to actual or statutory damages. ECF No. 69-25, ¶¶ 17-18.

HSBC admits that it did not send him statements during those months but argues that it is entitled to summary judgment as a matter of law because TILA does not allow for statutory damages for violations of § 1638(f) and because Jackling cannot show detrimental reliance to entitle him to actual damages. Indeed, Jackling was able to pay his mortgage for each of the months that he did not receive the statements. ECF No. 62-31 at 27. Because Jackling presents no allegations, arguments, or evidence as to actual damages, nor any legal authority entitling him to statutory damages, summary judgment is GRANTED in favor of HSBC as to Jackling's eighth claim. See *Marais v. Reimer Law Co.*, No. 2:17-CV-922, 2018 WL 1911251, at *2 (S.D. Ohio Apr. 23, 2018) ("Defendants are correct that statutory damages are not available for claims brought for violations of TILA under 15 U.S.C. 1638(f).").

## V. Claim 9: Relief under HAMP

Jackling claims that he is entitled to certain relief under HAMP, such as a reduction in his principal, but cites no specific provisions of HAMP supposedly entitling him to such relief. ECF No. 37, ¶¶ 86-88. HSBC attests that it did not participate in HAMP and so any HAMP claims are not applicable to it. ECF Nos. 62-1, ¶¶ 76-68, 62-10, ¶ 68. Jackling does not dispute this contention in his response to HSBC's Statement of Undisputed Material Facts. ECF No. 69-24, ¶ 39. Accordingly, summary judgment is GRANTED in favor of HSBC as to Jackling's ninth claim.

## CONCLUSION

For the foregoing reasons, HSBC's Motion for Summary Judgment (ECF No. 62) is GRANTED and judgment is ENTERED in favor of HSBC on Jackling's first, second, third, fourth, seventh, eighth, and ninth claims.

**\*12**  As to Jackling's fifth and sixth claims, summary judgment is GRANTED in favor of HSBC as to the 2010 forbearance payments, and as to the issue of emotional damages. Summary judgment is DENIED as to the limited issues of whether HSBC reasonably investigated the 2011 modification payments following receipt of the December 2014 and January 2015 ACDVs, and whether Jackling suffered economic damages in the form of credit denials from Dorshcel Toyota and Cortese Ford due to HSBC's reporting and investigation of those payments.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 162743

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 31106934
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Scott R. REDHEAD, Plaintiff,

v.

WINSTON & WINSTON, P.C., Arthur Winston, Jay
Winston and Bank of America, N.A., Defendants.

No. 01 Civ. 11475(DLC).
|
Sept. 20, 2002.

**Synopsis**

Debtor sued bank and its attorneys for violation of Fair
Debt Collection Practices Act (FDCPA) and Fair Credit
Reporting Act (FCRA), and related tort and contract claims.
On attorneys' motion to dismiss, the District Court, Cote,
J., held that: (1) Firm did not violate FDCPA; (2) no private
right action existed for firm's alleged violations of FCRA;
(3) firm did not breach contract; (4) firm could not be held
liable to debtor for professional negligence; and (5) complaint
failed to allege fraud with requisite particularity.

Motion granted.

West Headnotes (5)

**[1]** **Finance, Banking, and Credit** 🔑 **Debt
collection practices**

Law firm representing creditor could not be
held liable, under Fair Debt Collection Practices
Act (FDCPA), for creditor's alleged breach of
settlement agreement to cause debtor's credit
report to reflect that debt had been paid and that
debtor had top rating; there was no allegation
that firm had communicated or threatened to
communicate any credit information, or that
it had engaged in any false representation or
deception to collect debt. Consumer Credit
Protection Act, § 807(8, 10), as amended, 15
U.S.C.A. § 1692e(8, 10).

10 Cases that cite this headnote

**[2]** **Finance, Banking, and Credit** 🔑 **Credit
reporting**

Debtor had no private cause of action against
creditor or creditor's counsel for their alleged
violations of provision of Fair Credit Reporting
Act (FCRA) imposing duty on furnishers of
credit information to provide consumer reporting
agencies with accurate information. Consumer
Credit Protection Act, § 623(a, d), as amended,
15 U.S.C.A. § 1681s-2(a, d).

46 Cases that cite this headnote

**[3]** **Attorneys and Legal Services** 🔑 **Evidence**

Under New York law, law firm could not be held
personally liable for client's alleged breach of
settlement agreement which firm had negotiated
for client, absent evidence firm had assumed
personal liability.

1 Cases that cite this headnote

**[4]** **Attorneys and Legal Services** 🔑 **Evidence**

Under New York law, law firm for creditor
could not be held liable to debtor for negligence,
based on creditor's alleged breach of settlement
agreement which firm had negotiated for it,
absent evidence of attorney-client relationship
between firm and debtor.

3 Cases that cite this headnote

**[5]** **Federal Civil Procedure** 🔑 **Fraud, mistake
and condition of mind**

Fraud complaint against law firm, seeking to
hold it liable for inducing plaintiff to enter into
settlement agreement which firm's client had
then allegedly breached, failed to allege fraud
with requisite particularity; complaint failed
to allege any particular statements or explain why
they should be taken as fraudulent. Fed.Rules
Civ.Proc.Rule 9(b), 28 U.S.C.A.

1 Cases that cite this headnote

**Attorneys and Law Firms**

Adam J. Fishbein, Attorney at Law, Cedarhurst, NY, for Plaintiff.

Janice J. DiGennaro, Douglas Tischler, Rivkin Radler LLP, Uniondale, NY, for Defendants Winston & Winston, P.C., Arthur Winston and Jay Winston.

*OPINION AND ORDER*

COTE, J.

 **\*1**  Plaintiff Scott R. Redhead ("Redhead") brings this action against defendants the Bank of America, N.A. (the "Bank") and its counsel Winston & Winston, P.C., Arthur Winston, and Jay Winston (the "Winston Defendants"), alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 18 U.S.C. § 1692 *et seq.,* and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.,* as well as breach of contract, negligence, fraud, and assault. The Winston Defendants now move to dismiss Redhead's amended complaint as against them for lack of subject matter jurisdiction, failure to state a claim, and failure to plead fraud with sufficient particularity under Rules 12(b) (1), 12(b)(6), and 9(b), Fed.R.Civ.P., respectively. Redhead cross-moves for leave to file a second amended complaint pursuant to Rule 15, Fed.R.Civ.P. For the reasons stated, the Winston Defendants' motion is granted and Redhead's motion is denied.

Background

The following facts are as alleged in Redhead's amended complaint unless otherwise noted. Redhead is a resident of New York. Defendants Arthur and Jay Winston are lawyers at the law firm of Winston & Winston, P.C., located in New York. The Bank is a national banking association with its principal place of business in Delaware.

On January 21, 2000, the Winston Defendants filed an action in the Civil Court of the City of New York on behalf of the Bank to collect credit card debt that the Bank alleged was owed to it by Redhead. On May 23, 2000, Redhead and the Bank entered into a Stipulation of Settlement (the "Stipulation of Settlement"), which is attached to the amended complaint, under which the Bank agreed *inter alia* to reimburse Redhead

in the amount of $118.00 for overpayment and to "report to any credit reporting agencies that they have reported to update [*sic* ] and correct [Redhead's] credit report to reflect a zero '0' balance and 'R1' rating." It is not clear from Redhead's amended complaint whether the Winston Defendants were involved in the negotiations leading to the Stipulation of Settlement. In their motion papers, however, the Winston Defendants have stated that they were involved in those negotiations.

By letter dated September 5, 2000, also attached to the amended complaint, the Bank informed Redhead that "as of today's date we are changing our records to show your account closed R1 and zero Balance [*sic* ] with the local and national credit reporting agencies." Despite this representation and apparently unsatisfied with the Bank's performance under the Stipulation of Settlement, in December 2000, Redhead filed an action in the Civil Court of the City of New York against the Bank and the Winston Defendants, alleging that they had breached the terms of the Stipulation of Settlement by failing to repair his credit rating. When, on December 19, 2000, Redhead and an unidentified friend allegedly attempted to serve the Civil Court complaint on the Winston Defendants at their office, Arthur and Jay Winston and one "Alex" allegedly threatened Redhead and his friend with physical violence. Redhead states that he fled the office. The amended complaint states that Redhead "continued to prevail upon the Winston [D]efendants to cause plaintiff's credit reports to be updated accordingly," but that "Bank of America failed to update plaintiff's credit reports." [1]

[1]     According to documents supplied by the Winston Defendants, by Order dated January 23, 2001, the Civil Court dismissed Redhead's complaint without prejudice to repleading in the Supreme Court claims unrelated to the Stipulation of Settlement.

 **\*2**  Redhead filed the instant action on December 14, 2001, alleging violations of the FDCPA and assault. Redhead filed an amended complaint on February 7, 2002, adding a claim under the FCRA, as well as breach of contract, negligence, and fraud. The time for the Bank to respond to the plaintiff's pleadings has been extended to a time following the entry of this Opinion.

With respect to Redhead's claims under the FDCPA, paragraph 1.9 of the amended complaint states:

Defendants violated the FDCPA. Defendants' violations include, but are not limited to, the following:

(a) The defendant violated 15 U.S.C. § 1692e(8) by communicating credit information which should be known to be false.

(b) The defendant violated 15 U.S.C. § 1692e(10) by using false deceptive and misleading means in connection with the collection of an alleged debt.

The amended complaint does not specify to which "defendant" it is referring in paragraph 1.9. With respect to Redhead's claims under the FCRA, the amended complaint states: "This is an action for damages brought by an individual consumer for defendants' violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq." The amended complaint does not specify which sections of the FCRA the Winston Defendants or the Bank allegedly violated. In alleging fraud against the Winston Defendants, the amended complaint states: "Defendants induced plaintiff to agree to a stipulation whereby defendants would cause plaintiff's credit reports to reflect a zero balance and a top credit rating. Plaintiff relied upon defendants' fraudulent representations and agreed to sign the stipulation."

Discussion

A court may dismiss an action pursuant to Rule 12(b)(6) only if "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997) (citation omitted). The court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Id.* The court is generally prohibited from considering matters outside the pleadings. *Tewksbury v. Ottaway Newspapers,* 192 F.3d 322, 325 n. 1 (2d Cir.1999).

I. Redhead's FDCPA Claim

[1]    The purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). To this end, "[t]he FDCPA establishes certain rights for consumers whose debts are placed in the hands of professional debt collectors for collection, and requires that such debt collectors

advise the consumers whose debts they seek to collect of specified rights." *Kropelnicki v. Siegel,* 290 F.3d 118, 127 (2d Cir.2002) (citation omitted). The FDCPA sets forth examples of particular practices that debt collectors are forbidden to employ, *see* 15 U.S.C. § 1692e. Specifically, Section 1692e(8) forbids "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8). Section 1692e(10) forbids "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10).

**\*3**  Redhead's claim against the Winston Defendants under the FDCPA appears to be that by acting as counsel for the Bank in a debt collection action that led to a settlement that was subsequently breached by the Bank, the Winston Defendants engaged in conduct in violation of the FDCPA. Specifically, Redhead's amended complaint alleges that the Winston Defendants' conduct violated Sections 1692e(8) and 1692e(10) of the FDCPA. Redhead has failed to allege any facts, however, establishing that the Winston Defendants communicated or threatened to communicate any credit information concerning him. Nor does Redhead allege any facts establishing that the Winston Defendants engaged in any false representation or deception to collect a debt from him. In sum, Redhead has failed to identify and the Court is unaware of any provision of the FDCPA under which the Winston Defendants should be held liable for the Bank's alleged breach of the Stipulation of Settlement as it is described in Redhead's amended complaint.

II. Redhead's FCRA Claim

[2]    The FCRA was enacted "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit ... in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681b. The FCRA places distinct obligations on three types of entities: consumer reporting agencies, users of consumer reports, and furnishers of information to consumer reporting agencies. *See* 15 U.S.C. § 1681, *et seq.; Aklagi v. Nationscredit Financial Services Corp.,* 196 F.Supp.2d 1186, 1192 (D.Kan.2002); *Thomasson v. Bank One, Louisiana, N.A.,* 137 F.Supp.2d 721, 722 (E.D.La.2001).

Case 6:19-cv-00608-MAD-TWD   Document 12   Filed 06/09/20   Page 27 of 107
Redhead v. Winston & Winston, P.C., Not Reported in F.Supp.2d (2002)
2002 WL 31106934

Redhead has not specified into which of the above three categories the Winston Defendants fall. Even when construed broadly, Redhead's amended complaint fails to allege any facts establishing that the Winston Defendants constitute a "consumer reporting agency" as that term is defined in Section 1681f of the FCRA, 15 U.S.C. § 1681a(f), [2] or "users of consumer reports" as that term is used, but not defined, in Section 1681m of the FCRA, 15 U.S.C. § 1681m. *See Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 48–49 (2d Cir.1997) (noting that the FCRA does not define "users of information" and declining to offer a "categorical definition" of the term because defendant automobile dealership clearly qualified as such a user).

[2]    Section 1681a(f) states:
       The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.
       15 U.S.C. § 1681a(f).

Redhead's amended complaint may, however, allege that the Winston Defendants are "furnishers of information" to consumer reporting agencies as that term is used, but not defined, in the FCRA, and that they have failed to fulfill their duties as furnishers of information under the FCRA. 15 U.S.C. § 1681 *et seq.* Specifically, the amended complaint states that Redhead "continued to prevail upon the Winston [D]efendants to cause [Redhead's] credit reports to be updated."

**\*4** The FCRA imposes two duties on furnishers of information, codified at 15 U.S.C. §§ 1681s–2(a) and (b). The category of duties in subsection (a) relates to the furnishers' duty to report accurate information and their ongoing duty to correct inaccurate information. Section 1681s–2(a) provides in relevant part as follows:

A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate....

A person shall not furnish information relating to a consumer to any consumer reporting agency if (i) the person has been notified by the consumer ... that specific information is inaccurate; and (ii) the information is, in fact, inaccurate....

A person who ... has furnished to a consumer reporting agency information that the person determines is not complete or accurate, shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate.

15 U.S.C. §§ 1681s–2(a)(1) and (2).

The category of duties in subsection (b) governs the furnishers' duty once notice is received from a credit reporting agency that there is a dispute as to the completeness or accuracy of the information provided to that reporting agency. Subsection (b) states as follows:

After receiving notice [from a credit reporting agency] pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency; and

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

15 U.S.C. § 1681s–2(b)(1).

There is no private cause of action under Section 1681s–2(a), for the FCRA limits the enforcement of this subsection

to government agencies and officials. 15 U.S.C. § 1681s–2(d); *see also Nelson v. Chase Manhattan Mortgage Corp.,* 282 F.3d 1057, 1059 (9th Cir.2002); *Aklagi v. Nationscredit Financial Services Corp.,* 196 F.Supp.2d 1186, 1192 (D.Kan.2002); *Hasvold v. First USA Bank, N.A.,* 194 F.Supp.2d 1228, 1234 (D.Wyo.2002); *Scott v. Amex/ Centurion S & T,* 2001 WL 1645362, at *4 (N.D.Tex. Dec.18, 2001); *Fino v. Key Bank of New York,* No. 00 Civ. 375E, 2001 WL 849700, at *4 (W.D.Pa. July 27, 2001); *Yelder v. Credit Bureau of Montgomery, L.L.C.,* 131 F.Supp.2d 1275, 1283 (M.D.Ala.2001); *Quigley v. Pennsylvania Higher Education Assistance Agency,* No. 00 Civ. 1661, 2000 WL 1721069, at *2 (N.D.Cal. Nov. 8, 2000); *Olexy v. Interstate Assurance Co.,* 113 F.Supp.2d 1045, 1047 (S.D.Miss.2000).

 *5 Although there has been some disagreement, the majority of courts who have considered the issue have concluded that consumers may pursue claims for willful or negligent noncompliance with Section 1681s–2(b). *See, e.g., Nelson,* 282 F.3d at 1058; *Aklagi,* 196 F.Supp.2d at 1193; *Hasvold,* 194 F.Supp.2d at 1236; *Scott,* 2001 WL 1645362, at *4; *Fino,* 2001 WL 849700, at *5; *Wexler v. Banc of America Auto Finance Corp.,* No. 00 Civ. 865, 2001 WL 428155, at *2 (N.D.Ill. Apr. 26, 2001); *Thomasson v. Bank One, Louisiana, N.A.,* 137 F.Supp.2d 721, 723 (E.D.La.2001) (collecting cases); *Whitesides v. Equifax Credit Info. Servs., Inc. .,* 125 F.Supp.2d 807, 812 (W.D.La.2000); *McMillan v. Experian Info. Servs., Inc.,* 119 F.Supp.2d 84, 88 (D.Conn.2000); *Olexy,* 113 F.Supp.2d at 1047–48; *but see Carney v. Experian Info. Solutions, Inc.,* 57 F.Supp.2d 496 (W.D.Tenn.1999). Those courts that have concluded that a private right of action exists under Section 1681s–2(b) have required a plaintiff to show that the furnisher received notice from a consumer reporting agency, as opposed to the plaintiff alone, that the credit information is disputed. *See, e.g., Young v. Equifax Credit Info. Servs., Inc .,*—F.3d—, 294 F.3d 631, 2002 WL 1277584, at *7 (5th Cir.2002). Since Redhead's amended complaint appears to claim a violation of subsection (a) rather than (b), it is unnecessary for this Court to determine whether a private right of action exists under subsection (b).

Broadly construed, Redhead's allegations in the amended complaint better fit Section 1681s–2(a). Redhead alleges that the Winston Defendants failed to "cause" his credit reports to be corrected. Because there is no private right of action under subsection (a), Redhead's claims pursuant to the FCRA must be dismissed.

## III. Redhead's State Law Claims

### A. Redhead's Breach of Contract Claim

 **[3]** Redhead alleges that the Winston Defendants breached the Stipulation of Settlement by failing to update his credit information. The Winston Defendants, however, were not a party to the Stipulation of Settlement. In essence, Redhead seeks to hold them liable for an alleged breach of contract by their client. Under New York law, however, the Winston Defendants cannot be held personally liable under a contract negotiated for a client unless they personally assumed liability. *See Four Finger Art Factory, Inc. v. Dinicola,* 99 Civ. 1259, 2001 WL 21248, at *4 (S.D .N.Y. Jan 9, 2001); *Sefi Fabricators, Inc. v. Tillim,* 79 Misc.2d 213, 360 N.Y.S.2d 146, 147 (App. Term 1973) (per curiam); *see also Aetna Casualty and Surety Co. v. Hambly Constr. Co.,* 65 A.D.2d 612, 409 N.Y.S.2d 552, 553 (2d Dep't 1978). Having failed to allege any facts establishing that the Winston Defendants personally assumed liability under the Stipulation of Settlement, Redhead's breach of contract claim against the Winston Defendants must be dismissed.

### B. Redhead's Negligence Claim

 **[4]** Redhead alleges that the Winston Defendants were negligent for failing to update his credit reports. Under New York law, however, it is well settled that "before a party may recover in tort for pecuniary loss sustained as a result of [a legal professional's] negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity.... Such a requirement is necessary in order to provide fair and manageable bounds to what otherwise could prove to be limitless liability." *Parrott v. Coopers & Lybrand, L.L.P.,* 95 N.Y.2d 479, 483, 718 N.Y.S.2d 709, 741 N.E.2d 506 (2000) (citation omitted). *See also National Westminster Bank USA v. Weksel,* 124 A.D.2d 144, 511 N.Y.S.2d 626, 628 (1st Dep't 1987) ("[I]t is well settled that an attorney may not be held liable for negligence in the provision of professional services adversely affecting one with whom the attorney is not in contractual privity."). Because Redhead has failed to allege any facts establishing an attorney-client relationship between him and the Winston Defendants, his negligence claim against them must be dismissed.

### C. Redhead's Fraud Claim

 *6 **[5]** Rule 9(b), Fed.R.Civ.P., requires that when alleging fraud "the circumstances constituting fraud ... must be stated

with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *Id.* "To satisfy this requirement, a plaintiff should specify the time, place, speaker, and content of the alleged misrepresentations. In addition, the complaint should explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Caputo v. Pfizer, Inc.,* 267 F.3d 181, 191 (2d Cir.2001) (citations and alteration omitted).

Redhead's amended complaint fails to allege any particularities with respect to its allegations of fraud. It merely states that "[d]efendants induced plaintiff to agree" to the Stipulation of Settlement and that Redhead "relied upon defendants' fraudulent misrepresentations and agreed to sign the stipulation." The amended complaint does not explain who caused the inducement, when and where they did so, what they said, why their statements should be taken as fraudulent, or how he was harmed by the alleged misrepresentations. Redhead's claim of fraud against the Winston Defendants is dismissed.

D. Redhead's Assault Claim
To establish a claim for assault under New York law, Redhead must show "an intentional placing of another person in fear of imminent harmful or offensive contact." *Girden v. Sandals Int'l,* 262 F.3d 195, 203 (2d Cir.2001) (citation omitted) The Amended Complaint alleges that on December 19, 2000, when Redhead attempted to serve the Winston Defendants with a summons and complaint, Arthur and Jay Winston and "Alex" made "threatening physical gestures ... to attempt to persuade [him] from serving the defendants." This led Redhead to "fear that there would be an imminent battery upon his person."

Although Redhead's amended complaint may allege sufficient facts to establish an assault claim against the Winston Defendants, this is Redhead's only remaining claim in the instant action and is entirely distinct from the claims he has asserted against the Bank. Pursuant to 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction" over supplemental claims if it "has dismissed all claims over which it has original jurisdiction." "[T]he discretion implicit in the word 'may' in subdivision (c) of § 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants." *Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994). Here, Redhead's assault claim

bears little if any relation to his dispute with the Bank, and since this litigation is in its initial stages, the Court declines to exercise supplemental jurisdiction over it.

III. Redhead's Cross–Motion for Leave to Amend
*7 Rule 15, Fed.R.Civ.P., governs the amendment of pleadings. Rule 15(a) instructs that leave to amend should be "freely given." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 18 (2d Cir.1997) (citation omitted). Leave to amend should be denied, however, where the proposed amendment would be futile, if defendants have demonstrated undue delay, bad faith, or dilatory motive, or where defendants would suffer undue prejudice. *Dluhos v. Floating and Abandoned Vessel,* 162 F.3d 63, 69 (2d Cir.1998). Where, as here, "a cross-motion for leave to file an amended complaint is made in response to a motion to dismiss under Fed.R.Civ.P. 12(b)(6), leave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, *i.e.,* if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." *Milanese v. Rust–Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001).

Nothing in Redhead's proposed second amended complaint, even when broadly construed, will enable his FDCPA, FCRA, breach of contract, fraud, or negligence claims to survive dismissal. With respect to his FDCPA claim, Redhead's proposed second amended complaint alleges that sometime after May 2000, a company named "Total Debt Management" attempted to collect from him the debt that was released by the Stipulation of Settlement. Total Debt Management is not a party to this action and Redhead does not allege that it is associated in any way with the Winston Defendants. This new allegation fails to make the Winston Defendants liable under the FDCPA.

With respect to his FCRA claim, Redhead's proposed second amended complaint alleges that, "[u]pon information and belief, the Winston [D]efendants are users of consumer credit information." This, however, is a legal conclusion unsupported by any alleged facts and cannot prevent dismissal. *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) ("Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." (citation and alteration omitted)). At any rate, even if the Winston Defendants were users of consumer credit information for purposes of FCRA analysis, Redhead is still not entitled to bring a private cause of action against them under the FCRA.

With respect to his breach of contract and fraud claims, in his proposed second amended complaint, Redhead merely merges his fraud allegations into those appearing under his breach of contract claim. This saves neither cause of action.

The proposed second amended complaint amends the negligence claim to include details concerning certain credit cards which were denied to Redhead. This does not revive the claim.

Conclusion

For the reasons stated, the Winston Defendants' motion is granted and Redhead's motion is denied. Redhead's assault claim is dismissed without prejudice to its refiling in state court.

 **\*8**  SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 31106934

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

2010 WL 5122614
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Emanuel Osita OKOCHA, Plaintiff,

v.

HSBC BANK USA, N.A., et al., Defendants.

No. 08 Civ. 8650(MHP).
|
Dec. 14, 2010.

**MEMORANDUM AND ORDER**

MARILYN HALL PATEL, District Judge. [1]

[1]     The Honorable Marilyn Hall Patel, United States District Court for the Northern District of California, sitting by designation.

**\*1** Plaintiff Emanuel Osita Okocha brought this action against HSBC Bank USA, N.A., HSBC Bank Nevada, N.A., HSBC Card Services, Inc., and HSBC Card Services (II), Inc., (collectively, "HSBC" or "defendants") for their alleged mishandling of his deposit and overdraft accounts as well as related correspondence with credit reporting agencies. The matter proceeded to a two-day jury trial commencing December 7, 2010. At the close of evidence, defendants moved for judgment as a matter of law, which the court granted, indicating that a written order would follow. Having considered the parties' arguments and submissions, and for the reasons stated below, the court enters the following memorandum and order.

*Background*

The factual background of this action is set forth more fully in the court's March 25, 2010 order on defendants' motion for summary judgment. *See Okocha v. HSBC Bank USA, N.A., 700 F.Supp.2d 369 (S.D.N.Y.2010)* (Kaplan, J.). [2] The court previously dismissed fifteen of plaintiff s nineteen claims in their entirety and dismissed in part plaintiff's remaining four claims to the extent they reached conduct occurring outside the applicable limitations period. *Id.* This matter proceeded to jury trial on four claims: (1) claim 1, under the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq.,* for conduct occurring on or after October 9, 2007; (2) claim

2, under the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1632, 1666, for conduct occurring on or after October 9, 2007; (3) claim 5, under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s–2(b), for conduct occurring on or after October 9, 2006; and (4) claim 15, under New York law, for negligent handling of deposit account disputes on or after October 9, 2007 and for negligent handling of overdraft account disputes on or after October 9, 2005.

[2]     On November 24, 2010, this case was reassigned to the undersigned from Judge Kaplan. *See* Docket No. 82.

At trial, plaintiff testified on his own behalf. He called only one other witness in his case-in-chief, his friend Dr. Emmanuel Nwokedi, who testified in his lay capacity as to plaintiff's purported emotional distress. Defendants presented three HSBC employees in their case-in-chief. [3] Deborah Falbo, a Compliance Officer with HSBC Bank USA, and Pamela Foster, Department Manager at HSBC Personal Financial Services, testified as to the terms and conditions underlying plaintiff's deposit and overdraft accounts as well as HSBC's customer service records regarding those accounts. Theresa Nylund, a Back Office Representative at HSBC Card Services, testified as to HSBC's procedures for investigating disputes between customers and credit reporting agencies. At the close of evidence on December 8, 2010, defendants moved for judgment as a matter of law, which the court granted for the reasons stated below.

[3]     In order to accommodate Dr. Nwokedi's schedule, defendants agreed to present two of their three witnesses before plaintiff rested his case. In doing so, defendants adequately preserved their right under Fed. R Civ. P. 50(a) to move for judgment as a matter of law at the conclusion of plaintiff s case-in-chief. Nevertheless, the court grants the motion even when considering the testimony of defendants' witnesses.

*Legal Standard*

Under Federal Rule of Civil Procedure 50, a court may grant judgment as a matter of law on any claim for which "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). In ruling on a motion for judgment as a matter of law pursuant to Rule 50, a court must consider all evidence presented, drawing all reasonable inferences in favor of the nonmoving party, without making credibility determinations

or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In evaluating this evidence without making credibility determinations, the court must "disregard any evidence favorable to the moving party which the jury is not required to believe." *Id.* at 151.

*Discussion*

I. Claim 1: EFTA

**\*2** EFTA provides a "basic framework establishing the rights, liabilities and responsibilities of participants" in electronic banking. *See* 15 U.S.C. § 1693(b). Plaintiff argues that defendants violated EFTA by repeatedly debiting his deposit account in order to offset a disputed amount due on his overdraft account. At issue are defendants' duties regarding "preauthorized electronic transfers" under §§ 1693e & 1693k, as well as the procedures it must follow for handling disputed electronic fund transfers under § 1693f. [4]

[4]  The court has serious doubts as to whether the § 1693 f issue could be submitted to the jury, given that the complaint makes no mention of this section and contains no allegations that defendants failed to meet its procedural obligations under EFTA.

Section 1693k prohibits a creditor from "condition[ing] the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." Section 1693e only permits "preauthorized electronic fund transfers" if the consumer's authorization is in writing and made available to the consumer upon request. 15 U.S.C. § 1693e(a). A consumer may stop payment of a preauthorized electronic fund transfer by notifying the financial institution orally or in writing three or more business days before the scheduled date of such transfer. *Id.* Plaintiff argues that defendants have violated these provisions by continuing to debit his deposit account to pay off his overdraft account, notwithstanding his oral and written requests [5] that defendants cease debiting his account. *See* Docket No. 68 (Pl's Trial Brief) at 6.

[5]  Plaintiff testified to submitting written notice to defendants on a number of occasions. Only one, however, was written during the limitations period. Although plaintiff attempted to introduce the letters he purportedly wrote to HSBC, the court excluded them on the basis of hearsay and lack

of foundation. An August 12, 2008 letter may be considered for notice purposes only, and it was apparently received by defendants. A response dated September 3, 2008 was sent by HSBC to plaintiff, apparently prompted by plaintiff's August 12 letter and copied to the comptroller of currency as referenced in HSBC's letter.

> Plaintiff did little to tie up these loose ends in his testimony. Nevertheless, the court takes into account this "notice" and HSBC's response. Despite this consideration, for the reasons explained herein, it does not save plaintiff's EFTA claim.

There are several problems with plaintiff's EFTA claim. Most notably, the debits at issue are not "preauthorized electronic fund transfers." A "preauthorized electronic fund transfer" is defined as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(9). Although the deposit account agreement authorizes defendants to use funds in the deposit account to pay off debts owed to HSBC, such authorization is not designed "to recur at substantially regular intervals." HSBC may have debited plaintiff's account on several occasions to offset the balance on his overdraft account, but plaintiff has provided no evidence that these offsets occurred, for example, at weekly, monthly, or annual intervals. The provisions related to "preauthorized electronic fund transfers" were aimed to protect "consumers who arrange for regular payments (such as insurance premiums or utility bills) to be deducted automatically from their bank accounts." S. Rep. 95–915, at 15 (1978). EFTA ensures that consumers only automatically pay their bills if they opt in to doing so, *see* §§ 1693e(a); 1693k(1); that they are informed of any variation in the amounts being automatically deducted, *see* § 1693e(b), and that they can opt out of such automatic payments at any time, *see* § 1693e(a). The deposit account agreement authorizes defendants to use funds available in that account to cover amounts due in other accounts; it does not arrange for any payments to occur at substantially regular intervals.

Moreover, the debits at issue here are not "electronic fund transfers" for purposes of the EFTA. Regulation E, which implements EFTA, "identifies certain transfers which, while literally electronic transfers of funds, are not 'electronic fund transfers' for purposes of the EFTA." *Krutchkoff v. Fleet Bank, N.A.,* 960 F.Supp. 541, 544 (D.Conn.1996) (concluding that transfers between customer's credit card, checking and line of credit accounts were not "electronic fund transfers"). Regulation E provides:

*3 The term electronic fund transfer does not include ... [a]ny transfer of funds under an agreement between a consumer and a financial institution which provides that the institution will initiate individual transfers without a specific request from the consumer; [b]etween a consumer's accounts within the financial institution ...

12 C.F.R. § 205.3(c)(5). The debits at issue here consisted of transfers from one of plaintiffs HSBC accounts (the deposit account) in order to cover an amount due under another HSBC account (the overdraft account) and were performed pursuant to an agreement between plaintiff and HSBC allowing such transfers without a specific customer request. As the court has previously held, plaintiff is bound by the tenns of the deposit account agreement. *Okocha,* 700 F.Supp.2d at 372 ("[P]laintiff is bound by the terms of that Deposit Account agreement with respect to those claims that relate to the allegedly unauthorized debiting of the Deposit Account."). The deposit account agreement provides: "If you owe the Bank money, the Bank can use the money in your account to pay the debt, even if withdrawing the money causes an interest penalty or you have a joint account. If the Bank charges your account, the Bank will send you a notice." Accordingly, the transfer of funds was under an agreement falling squarely within the exclusions of Regulation E.

Because the debits at issue here are not "electronic fund transfers," plaintiff's arguments regarding § 1693f's mandatory error resolution procedures also fail. *See Krutchkoff,* 960 F.Supp. at 544 (dismissing § 1693f claim). Even if the debits did fall under EFTA, plaintiff has adduced no evidence that defendants in any way failed to comply with the technical requirements of § 1693f.

Accordingly, there is no legally sufficient basis for plaintiff's EFTA claim.

## II. Claim 2: TILA
Plaintiff claims that defendants misrepresented the amount of over-limit and late-payment fees that plaintiff would be charged for use of the overdraft account. He has presented, however, no evidence indicating that defendants failed to adequately disclose these fees.

To the extent that plaintiff's claim falls under 15 U.S.C. § 1666,[6] he also has failed to show a violation of TILA,[7] Under that provision, if an obligor believes that a billing statement contains a "billing error," he may send the creditor a written notice setting forth that belief, indicating the amount of the error and the reasons supporting his belief that an error exists. If the creditor receives such a notice within 60 days of transmitting the statement of account, TILA imposes two separate obligations upon the creditor; (1) within 30 days, it must send a written acknowledgment that it has received the notice; and (2) within 90 days or two complete billing cycles, whichever is shorter, it must investigate the matter and either make appropriate corrections in the obligor's account or send a written explanation of its belief that the original statement sent to the obligor was correct. The creditor must send its explanation before making any attempt to collect the disputed amount. *See* 15 U.S.C, § 1666(a); *Am. Express Co. v. Koerner,* 452 U.S. 233, 235–38, 101 S.Ct. 2281, 68 L.Ed.2d 803 (1981).

6    The complaint makes no reference to § 1666 or the procedural obligations contained therein. The court's March 25, 2010 order notes that plaintiff alleges a § 1666 violation for the first time in his summary judgment response brief. *Okocha,* 700 F.Supp.2d at 373. Nonetheless, defendants have proceeded under the assumption that § 1666 remains at issue, and the court will address plaintiff's arguments on the merits.

7    Section 1666 falls under a specific part of TILA known as the Fair Credit Billing Act, Pub.L. No. 93–495, tit. III, § 301, 88 Stat. 1500, 1510–11 (1974).

*4 To succeed on this claim, plaintiff must show (1) the existence of a billing error, (2) timely notification of the billing error, and (3) failure of the bank issuing the card to comply with the procedural requirements of § 1666. *Cunningham v. Bank One,* 487 F.Supp.2d 1189, 1191 (W.D.Wash.2007). Plaintiff has not introduced any written notice that would trigger defendant's procedural obligations under TILA. *See Owusu v. N.Y. State Ins.,* 655 F.Supp.2d 308, 321 (S.D.N.Y.2009) (rejecting § 1666 claim where plaintiff "presents no evidence that he ever notified HSBC that he was not receiving account statements"). Even assuming that he did provide such notice, he also has failed to make any showing

Okocha v. HSBC Bank USA, N.A., Not Reported in F.Supp.2d (2010)

2010 WL 5122614

that HSBC failed to investigate his dispute or otherwise comply with the requirements of the statute.

Lastly, the court has serious doubts that the challenged conduct—misrepresented overlimit and late payment fees—constitutes a "billing error" for purposes of § 1666. The statute provides seven categories of cognizable "billing errors," only three of which are potentially relevant here:

(1) A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement.

(2) A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.

...

(5) A computation error or similar error of an accounting nature of the creditor on a statement.

15 U.S.C. § 1666(b). At least one court has held that improperly disclosed over-limit and late payment fees do not fall within these definitions. *Esquibel v. Chase Manhattan Bank USA, N.A.,* 487 F.Supp.2d 818 (S.D.Tex.2007), *aff'd* 276 Fed.Appx. 393 (5th Cir.2008). [8] An over-limit fee is defined elsewhere in TILA as "[a]ny fee imposed *in connection with* an extension of credit in excess of the amount of credit authorized to be extended with respect to such account," strongly suggesting that the over-limit fee is not itself an "extension of credit" under the first two definitions above. 15 U.S.C. § 1637(c)(1)(B)(iii) (emphasis added); *Esquibel,* 48 F.Supp.2d at 829 ("[O]ver-the-limit fees are something other than extensions of credit. They are assessed *in connection with* extensions of credit") (emphasis in original). "A creditor 'extends credit to an individual ... when it opens or renews an account, as well as when the cardholder actually uses the credit card to make purchases.' " *Id.* (quoting *Koerner,* 452 U.S. at 241). "The assessment of a penalty for exceeding the authorized credit limit or for failing to make a timely payment is not a purchase to which the right to defer payment attaches." *Id.*

[8]   There is a split among district courts regarding the similar issue of whether finance charges are "billing errors" under § 1666. Most courts to have addressed the issue have held that they are not, because "finance charges" are defined in the statute as merely "incidental" to an "extension of

credit." *See Hill v. Chase Bank USA, N.A.,* 2010 WL 107192, at * 6 (N.D.Ind.2010); *Langenfeld v. Chase Bank USA, N.A.,* 537 F.Supp.2d 1181 (N.D.Okla.2008); *Cunningham,* 487 F.Supp.2d at 1195–96;*Esquibel,* 487 F.Supp.2d at 828. *But see Raney v. First Nat'l Bank of Neb., Inc.,* No. 06–8–DLB, 2006 WL 2588105, at * 3 (E.D.Ky.Sept.8, 2006) ("[B]ecause the provisions of TILA are interpreted liberally, the Court concludes that allegedly improper finance charges may qualify as billing errors for purposes of § 1666(b)."); *Eicken v. USAA Federal Sav. Bank,* No. H–05–4139, 2006 WL 1663371, at * 2 (S.D.Tex. June 12, 2006). The implementing regulations, however, exclude over-limit and late payment fees from the definition of "finance charge." 12 C.F.R. § 226.4(c)(2); *see Esquibel,* 487 F.Supp.2d at 828.

Moreover, improperly disclosed over-limit and late payment fees do not appear to be the type of "computation error" envisioned by the third definition of "billing error." As one court persuasively reasoned:

> **\*5** It must be remembered that the dispute process set up by § 1666(a) forces a creditor to timely and adequately respond to a computational error identified by the obligor. This necessarily contemplates that a creditor has made a specific computational or accounting mistake on a particular statement, not a global mistake that will infinitely impact the current balance owed and therefore result in a never-ending "computation" error. Further, it is nearly impossible for a creditor to undo the allegedly "incorrect" finance charges imposed for the life of the account and respond appropriately within the required time frame.

*Langenfeld,* 537 F.Supp.2d at 1201. Plaintiff is not disputing a computation error regarding fees on a particular statement or arguing that defendants should have corrected that statement. Instead, he makes a more global argument—albeit obliquely at best—that the over-limit and late payment fees associated with his overdraft account were improperly disclosed.

Plaintiff has not provided evidence that is legally sufficient to establish any of the elements of his claim under 15 U.S.C. § 1666.

### III. Claim 3: FCRA

The Fair Credit Reporting Act was enacted to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy. *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 52, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007). The Act imposes duties both on credit reporting agencies and on the creditors who furnish information to credit reporting agencies. At issue in this case are a furnisher's duty to reasonably investigate disputed information contained in a credit report. *See, e.g, Chiang v. Verizon New England,* 595 F.3d 26, 37 (1st Cir.2010); *Johnson v. MBNA America Bank,* 357 F.3d 426, 432–33 (4th Cir.2004). If a consumer notifies a credit reporting agency that he or she disputes the accuracy of an item in his file, the Act requires the agency to notify the furnisher of the dispute. 15 U.S.C. § 1681i(a) (2). Upon receiving this notice, the furnisher must (1) conduct an investigation with respect to the disputed information; (2) review all relevant information provided to it by the credit reporting agency; (3) report the results of the investigation to the credit reporting agency; and (4) if the investigation finds that the information is incomplete or inaccurate, report those results to all of the major credit reporting agencies. 15 U.S.C. §§ 1681s–2(b)(1)-(2).

"The FCRA creates a private right of action against credit reporting agencies for the negligent, *see* 15 U.S.C. § 1681*o*, or willful, *see id.* § 1681n, violation of any duty imposed under the statute." *Caseila v. Equifax Credit Info. Serv's.,* 56 F.3d 469, 473 (2d Cir.1995). In order to recover under a negligence theory, plaintiff must establish actual damages attributable to defendants' unreasonable investigation. *Burns v. Bank of America,* 655 F.Supp.2d 240, 250 (S.D.N.Y.2008). If plaintiff establishes that defendants' violation was willful, he need not show actual damages and is entitled to statutory and punitive damages. *See id.*

  *\*6 Plaintiff's FCRA claim fails for several reasons. Perhaps most puzzlingly, plaintiff presented *no* witnesses in his case-in-chief concerning HSBC's investigation of his credit agency dispute. He made no attempt to call any of defendants' employees as witnesses in his case-in-chief. Although one of *defendants'* witnesses testified to HSBC's credit report dispute procedures, even if plaintiff is given the benefit of this additional witness, he did not elicit any evidence

on cross-examination that sufficiently supported his claims. Ms. Nylund's testimony in no way establishes that HSBC's investigation was objectively unreasonable in light of what it was told by the credit bureau. *See Chiang,* 595 F.3d at 38 ("[T]he central inquiry when assessing a consumer's claim under § 1681 s–2(b) is 'whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute.'" (quoting *Gorman v. Wolpoff,* 584 F.3d 1147, 1157 (9th Cir.2009))). Even if testimony might arguably suggest that defendants' investigation was somewhat brief, it comes nowhere near establishing that HSBC knowingly and intentionally violated the FCRA or acted with reckless disregard for its duties under the statute. Accordingly, plaintiff has presented no evidence of willfulness. *See Safeco,* 551 U.S. at 57.

Nor has plaintiff presented legally sufficient evidence of actual damages. "To obtain an award of actual damages under the FCRA, Plaintiff [ ] must present evidence of a causal relation between the violation of the statute and the loss of credit, or some other harm." *Burns,* 655 F.Supp.2d at 250 (citation omitted). Plaintiff must provide at least some evidence that his denial of consumer credit or similar lost opportunities are attributable to defendants' failure to correct the furnished information after receiving notice of the dispute. Plaintiff has provided no admissible evidence establishing that he was denied credit—or any other opportunity—as a result of uncorrected information contained within his credit report. *See Gorman v. Experian Info. Sys.,* 2008 WL 4934047, at \*9 (S.D.N.Y. Nov.19, 2008) ("Plaintiff has offered no evidence that the lenders denied his mortgage applications based on any information provided by HSBC, either directly or indirectly."). He has not demonstrated that any potential creditor even *saw* his report, let alone that he was denied credit on that basis.

Although actual damages under the FCRA may encompass pain and suffering, plaintiff has not demonstrated that any emotional distress he experienced is fairly attributable to defendants' unreasonable investigation of his dispute. Firstly, plaintiff must present concrete evidence of such distress (e.g., medical reports), and his own conclusory allegations are insufficient. *Burns,* 655 F.Supp.2d at 51 (citing *Denius v. Dunlap,* 330 F.3d 919, 930 (7th Cir.2003) (plaintiff's "bare allegations that he was 'embarrassed' and 'humiliated' were insufficient to justify sending the issue to the jury")). Even if the brief testimony of his friend, Dr. Nwokedi, sufficiently corroborate plaintiff's own testimony regarding his pain and

suffering, he still has failed to link such distress with the release of inaccurate information to creditors. As the Second Circuit has observed:

> **\*7** No rational trier of fact could infer from this record that any potential creditor or other person in appellant's community learned of any harmful information from appellees. Casella's argument boils down to the bare contention that he is entitled to damages for pain and suffering simply because he knew of an inaccurate and potentially damaging item in his credit report. We are unaware of any case extending FCRA damages that far ... and we decline to reach that result here ... [W]e do not believe a plaintiff can recover for pain and suffering when he has failed to show that any creditor or other person ever learned of the derogatory information from a credit reporting agency.

*Casella,* 56 F.3d at 475. Plaintiff has produced no admissible evidence that a creditor became aware of his debt and delinquency on the overdraft account. Accordingly, he has not established the requisite causation between any malfeasance by defendants and his own purported pain and suffering.

Because there is no legally sufficient evidence of defendant's unreasonable investigation under § 1681s–2(b), of defendants' willful violation of the statute, or of any actual damages suffered by plaintiff, claim 5 must be dismissed.

IV. Claim 15: Negligence

"It is well established that before a defendant may be held liable for negligence it must be shown that the defendant owes a duty to the plaintiff." *Pulka v. Edelman,* 40 N.Y.2d 781, 782, 390 N.Y.S.2d 393, 358 N.E.2d 1019 (1976). Defendants cite a long string of cases concluding that a banking relationship with a debtor does not normally give rise to a tort duty on the part of the creditor. *See* Docket No. 74 (Defts' Amended Trial Brief) at 20–21. Plaintiff has never articulated any

basis for concluding that defendants owed plaintiff a duty of reasonable care under New York law, notwithstanding counsel's representations that he would provide case law supporting such a duty. Although tort duty might conceivably arise from statutory duties imposed by federal law, *see Gaft v. Mitsubishi Motor Credit,* No. 07–CV–527 (NG)(LB), 2009 WL 3148764, at *12 (E.D.N.Y. Sept. 29, 2009), or from some explicit representation by HSBC, *see Jones v. Commerce Bancorp, Inc.,* No. 06 Civ. 835(HB), 2006 WL 1409492, at *2 (S.D.N.Y. May 23, 2006), it is not the court's responsibility to concoct such a theory on plaintiff's behalf. To the extent that state law tort duties might arise under the federal statutes discussed above, however, the court notes that plaintiff has failed to establish a violation of those duties.

Even if such a duty existed, the record is utterly devoid of any proof that defendant acted objectively unreasonably. Plaintiff's state law negligence claim is limited to HSBC's general internal systems of review regarding account disputes, and does not encompass investigation of credit report disputes. *See Okocha,* 700 F.Supp.2d at 377 (state claims regarding such investigations are preempted by the FCRA). Again, plaintiff called no witness who could testify as to HSBC's internal review procedures, and to the extent that the court considers defendants' case-in-chief, the testimony at trial lacks any indication that defendants failed to do something that a reasonably prudent person would have done when handling a dispute concerning a debt arising over ten years earlier.

**\*8** Accordingly, plaintiff's negligence claim lacked sufficient legal and evidentiary support to properly submit to the jury.

*Conclusion*

For the foregoing reasons, defendants' motion for judgment as a matter of the law pursuant to Rule 50 is GRANTED, and plaintiff's remaining claims are DISMISSED. The clerk of the court is directed to CLOSE this case.

IT IS SO ORDERED.

All Citations

Not Reported in F.Supp.2d, 2010 WL 5122614

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:19-cv-00608-MAD-TWD Document 12 Filed 06/09/20 Page 37 of 107

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

2016 WL 1241531
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Patricia J. RITCHIE, Plaintiff,

v.

NORTHERN LEASING
SYSTEMS, INC. et al., Defendants.

12-cv-4992 (KBF)

|

Signed 03/28/2016

**Attorneys and Law Firms**

Andrey Strutinskiy, Krishnan Shanker Chittur, Chittur &
Associates, P.C., Joseph Robert Sahid, Law Offices of Joseph
R. Sahid, New York, NY, for Plaintiff.

Robert D. Lillienstein, Alexandra Pearl Kolod, Jordan Daniel
Greenberger, Scott Evan Silberfein, Moses & Singer LLP,
Thomas J. Kavaler, Cahill Gordon & Reindel LLP, New York,
NY, for Defendants.

OPINION & ORDER

KATHERINE B. FORREST, District Judge

*1 This case has been pending for over three and a half years.
During that time, it has consumed extraordinary judicial
resources and no doubt significant resources from the parties
as well. There was a prolonged period before operative
pleadings were finalized and there were numerous discovery
motions. Little in this case was accomplished without direct
judicial intervention and oversight. Having now had the
benefit of the parties' best collection of record evidence on
these motions for summary judgment, it is clear that this case
should have never been brought. Indeed, it is clear that the
narrative which this Court repeatedly told as to what this
case involved, was (kindly put) without evidentiary support.

Plaintiff's core allegation is that she was dunned and sued
for a debt that she did not owe. Indeed, she has argued that
she could not possibly owe the debt as the documentation
underlying the obligation was based on a forgery. According
to plaintiff, she was dunned and sued by an unscrupulous
company that knew the lease that formed the basis for its
alleged entitlement to the debt had been forged. Of course, an

essential and implicit point in this story is that plaintiff never
owed the debt in the first instance. The undisputed facts in the
record tell a far different story.

The record leaves no doubt that plaintiff applied to lease
equipment, signed documentation agreeing to make such
payments, submitted bank account information to allow
payments to be taken directly, made payments for an extended
period of time, and used the equipment. The record also
reveals that what happened next was due to unique and
personal circumstances that plaintiff alone controlled: she
closed up the business for which she used the equipment,
returned the equipment to the wrong company, and stopped
making payments for the equipment. The debt collection calls
and suit followed.

All of plaintiff's twelve myriad causes of action—sounding in
civil RICO, fraud, and state and federal fair credit statutes—
stem from five core allegations:

1) That defendants' letters and phone calls to her contained
   the false allegation that she owed them money; [1]

2) That defendants wrongfully deducted money from her
   bank account; [2]

3) That defendants impermissibly pulled her credit
   information; [3]

4) That defendants furnished false information about her
   account to a credit reporting agency; [4] and

5) That defendants' New York Civil Court ("NYCC")
   lawsuit against her contained false allegations and was
   designed to extort money from her; [5]

[1]    This is the basis of the RICO claim (based on
       predicate acts of federal mail and wire fraud) and
       the GBL § 349 claim.

[2]    This is the basis of the RICO claim based on the
       predicate act of federal wire fraud.

[3]    This is the basis of the federal FCRA claim (Counts
       III and IV), the NYFCRA claim (Counts VII, VIII,
       IX, and X), and the GBL § 349 claim.

[4]    This is the basis of the federal FCRA claim (Counts
       V and VI) and the GBL § 349 claim.

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

5       This is the basis of the RICO claim (based
        on predicate acts of Hobbs Act and New York
        extortion statutes) and the GBL § 349 claim.

 **\*2** The facts proffered by plaintiff on the motions before
this Court do not support anything close to the claims alleged.
There is, for instance, no record evidence to raise a triable
issue as to major aspects of the RICO or common-law fraud
claims. Alleging those claims on the true facts was frivolous.
The other claims—there are ten in total, including the New
York General Business Law § 349 claim and other statutory
claims—are similarly unsupportable. Defendants have moved
for summary judgment on all of plaintiff's affirmative claims
—and the Court grants that motion now. The Court also
accordingly denies plaintiff's motion for partial summary
judgment on the affirmative claims relating to the federal and
state fair credit laws. However, plaintiff's motion for summary
judgment on the counterclaim is granted as unopposed.

I. FACTUAL BACKGROUND
The following facts are not in dispute unless stated
otherwise. 6

6       The Court has also considered defendants' motion
        to strike. As to any challenged Rule 56.1 statements
        or counterstatements or exhibits that are relevant
        to the court's opinion, the Court addresses them
        individually and ignores inadmissible statements.
        As to the other challenged items, the Court finds
        that they are not relevant to its decision.

   A. Plaintiff's Application for Credit Card Swiping
   Equipment
From approximately 2007 through 2009, plaintiff Patricia
Ritchie operated a legal document preparation business called
"Divorce Document Assistance." (Defs.' Local R. 56.1 Stmt.
of Material Facts Not in Dispute ("Defs.' 56.1") ¶ 10.)
In October 2008, plaintiff received an offer in the mail
from a company called Merchant Made Easy ("MME"),
inviting her to apply for credit card processing services and
a credit card machine for her business. (Defs.' 56.1 ¶ 15.)
After a telephone conversation with Fred Cox, an MME
representative, plaintiff received a Merchant Processing
Application (the "Application"), and reviewed its contents.
(Ritchie Dep., Def's 56.1 Ex. 2, ("Ritchie Dep.") at Tr.
186:9-17.) The Application bore the logo of iPayment Inc.
The Application was prepared by a "Fred Cox" and sent to
Ritchie via MME's fax; the fax header stated "Merchants

Made Easy." (Defs.' 56.1 ¶ 22, Ex. 4, ("Application") at
0030.) On October 13, 2008, plaintiff filled out and signed the
Application in her own handwriting. (Id. at 0032.)

The Application provides for the provision of equipment
over a "Lease Term" of 48 months for a "Total monthly
lease charge" of "\$54.00 w/o Tax." 7 (Defs.' 56.1 ¶ 22;
Application at 0031.) The Application further provides that
if the "merchant" (e.g. the individual who would be using
the leased equipment in his or her business, here plaintiff)
chooses to "receive products and/or services offered under
one or more of the Third Party Agreements referenced in the
Program Guide, they hereby acknowledge and agree that the
executed Signature page of the application shall also serve
as a signature page for each of the respective Third Party
Agreement(s) ..." (Application at 0032.) The Application
provides specific authorization for iPayment to obtain credit
and financial information relating to Ritchie, perform credit
checks and obtain other necessary financial information. (Id.
at 0032.)

7       The Application also states the lease is non-
        cancelable; plaintiff states that she initialed this
        term, but then whited out her initials. (Ritchie Dep.
        Tr. 201:20-202:21; Application at 0031.)

The Application bears the name and logo of the company
iPayment, Inc., "a registered ISO / MSP of Wells Fargo Bank,
N.A., Walnut Creek, CA." (Id. at 0030.) Other than the fax
header indicating that it was sent to plaintiff by Merchants
Made Easy, the Application does not mention MME, LFG, or
Northern. (Id. at 021-0024.)

Plaintiff faxed the completed Application to Cox, the
representative from MME. (Defs.' 56.1 ¶¶ 17, 21.) Along with
her Application, plaintiff also sent a copy of a voided check
from her Bank of America business account for deduction
of monthly lease payments. (Defs.' 56.1 ¶¶ 13, 21, 23;
Application at 0034.)

   B. The Lease
 **\*3** The cornerstone of plaintiff's case has always been that
the lease obligation defendants used as the basis for debt
collection was forged and without legal effect. That lease
originated with MME, who provided it to defendants Lease
Financing Group ("LFG") and Northern Leasing Systems
("Northern"). MME is an independent sales organization
("ISO") authorized to offer equipment leases on behalf of
defendant LFG, an equipment finance lessor that specializes

Case 6:19-cv-00608-MAD-TWD   Document 12   Filed 06/09/20   Page 39 of 107

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

in equipment such as credit card swiping machines, (Defs.' 56.1 ¶¶ 1, 3-4), MME and LFG have an independent contractor relationship. (Defs.' 56.1 ¶ 6.) Northern services leases on behalf of LFG. (Pl.'s Local R. 56.1 Stmt. of Material Facts Not in Dispute ("Pl.'s 56.1") ¶ 4.) Defendant Jay Cohen is the CEO of Northern and defendant Ricardo Brown is its Legal Recovery Director. (Answer to SAC, ECF No. 118, ¶¶ 9, 12.)

When MME originates a lease and submits it to LFG, it makes several representations and warranties, including that the signatures on the lease are "genuine and duly authorized." (Defs.' 56.1 ¶ 6.) When LFG issues an equipment finance lease to a lessee—usually a business entity who is offering its own customers the option of using a credit card machine—it requires a personal guarantor, usually a principal of the lessee. (Defs.' 56.1 ¶ 3.)

On or about December 8, 2008, MME sent to LFG a three-page equipment finance lease and guarantee ("the Lease") relating to equipment to be provided to plaintiff Ritchie. (Defs.' 56.1 ¶ 23.) The Lease is for a Nurit 8010 credit card swiping machine, and bears plaintiff's name and address [8] as the sole lessee and personal guarantor and LFG as the lessor. (Defs.' 56.1 ¶¶ 25-26.) It also contains information similar to that on the Application which plaintiff had filled out, including her social security number, bank account and bank routing numbers, and provides for a base monthly payment of $54, plus taxes and fees, and a term of 48 months. (Defs.' 56.1 ¶¶ 27, 28.) The Lease has two handwritten signature pages on it: in the space for "Lessee #1 Signature" located over the print name "PATRICIA RITCHIE" on page one and in the space for "Guarantor Signature" on page two. (Defs.' 56.1 ¶ 29.) It is undisputed that these signatures are not plaintiff's. Put otherwise, it is accepted for purposes of this motion that they were forged; while plaintiff filled out an Application for the same equipment at the same price and according to the same terms, she did not execute the Lease. At the same time that it received the Lease, Northern also received a copy of plaintiff's Application and a voided check associated with plaintiff's bank account. (Defs.' Rule 56.1 Counterstatement of Material Facts ("Defs.' Counter Stmt.") ¶ 23-26.)

[8]     During the relevant period, plaintiff's address did not change. (Ritchie Dep. 8:20-24; 9:22-24.)

After receiving the Lease, Northern/LFG requested and obtained plaintiff's credit report from Experian, a credit reporting agency ("CRA"). (Defs.' 56.1 ¶ 34; Pl.'s 56.1 ¶ 81.)

Northern/LFG then obtained plaintiff's credit score. (Pl.'s 56.1 ¶¶ 40-41.) Northern/LFG did not provide plaintiff notice of these actions. (Pl.'s 56.1 ¶ 88.) On December 11, 2008, LFG approved the Lease. It then paid MME an acquisition fee of $1,747.22. (Defs.' 56.1 ¶ 37.)

C. Plaintiff's Subsequent Actions and Inaction

As mentioned, the driving force behind plaintiff's claims is that her signatures on the Lease were forged. (SAC ¶ 16.) Although plaintiff admits that the signatures on the Application and voided check were genuine, she claims that she never signed the subsequent lease with LFG. A key factual question is whether defendants knew the Lease documents were forged. There is no record evidence that they had any such knowledge, nor is there circumstantial proof from which a reasonably juror could draw a rational inference that they did.

*4  Although LFG never received the original executed Lease, and therefore never had an "ink" signature, (Defs.' Counter Stmt. ¶ 21), it is undisputed that MME made a representation to LFG that Lease document was genuine. (Defs.' 56.1 ¶ 30.) It is also undisputed that LFG/ Northern fund about 3,500 to 4,000 leases a month.

Plaintiff first learned of the forged lease in connection with the debt collection suit defendants filed against her in February 2011. She notified defendants that she believed the Lease to be a forgery when she filed her Answer to that suit. (Defs.' 56.1 ¶ 44, 89.) There is no evidence in the record that defendants had any knowledge of the forged nature of the lease prior to that time.

To a large extent, discussed further below, the issue of the forgery is a classic red herring, as plaintiff's payment obligations attached in connection with the Application she executed. Moreover, even plaintiff accepted that she was a lessee and had related lease obligations in connection with the equipment she received, albeit with MME, not LFG. Plaintiff admits in her Complaint that she "leased a point-of-sale machine from a company called 'Merchants Made Easy.'" (SAC ¶ 23.) She also asserts that she "believed that she could cancel the said lease with MME at any time without any penalties." (Pl.'s Counter Statement of Material Facts (ECF No. 212), ¶ 3.)

It is undisputed that the equipment that plaintiff applied for was delivered to her home address. (Defs.' 56.1 ¶ 38.) She kept the machine in her possession until 2010. In the interim,

Case 6:19-cv-00608-MAD-TWD Document 12 Filed 06/09/20 Page 40 of 107

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

she used the machine to process credit card transactions. (Defs.' 56.1 ¶¶ 40-41.) For thirteen months (January 2009 through January 2010), LFG debited funds from plaintiff's Bank of America account, totaling $1,027.92. (Defs.' 56.1 ¶ 45.) Plaintiff states that she "understood that the debits were from some company affiliated with MME and authorized to receive and administer the monthly payments debited from her account on behalf of MME." (Pl.'s Response to Defs.' 56.1 ¶ 46.) Plaintiff stated at her deposition that as of at least as of May 2009, she understood that the bank deductions came from LFG, not MME. (Ritchie Dep. Tr. 253:2-5; 249:2-250:14.) Plaintiff testified at her deposition that she attempted to call Fred Cox, the MME representative she had spoken to before regarding the application for the equipment, regarding this change but was never able to reach him. (Defs.' Resp. to Pl.'s 56.1 ¶ 73; Ritchie Dep. Tr. 259:2-260:6.)

In February 2010, plaintiff stopped operating her business. On February 11, 2010, she closed her bank account. (Defs.' 56.1 ¶¶ 51-52.) Plaintiff claims that around that time, she mailed the machine to an address for MME that she found on the Better Business Bureau website, along with a letter canceling the lease. (Defs.' 56.1 ¶ 88 (quoting Pl.'s Civil Court Answer ¶ 29).) There is no evidence in the record that plaintiff ever received a confirmation of the equipment return or lease cancellation.

LFG unsuccessfully attempted to debit plaintiff's account on February 16, 2010, and learned that the account was closed. (Defs.' 56.1 ¶ 54.) Soon thereafter, Northern began making numerous attempts to collect on the account. (Defs.' 56.1 ¶¶ 57-59.) There is no question that many of these attempts reached plaintiff. Northern contacted plaintiff by phone and mail. (Defs.' 56.1 ¶ 56.) Plaintiff acknowledges she received the calls; however, she would either hang up or tell the caller not to call anymore. She never told any caller that someone had forged her signature on the lease. (Defs.' 56.1 ¶ 58.) Defendant's log book included entries for the numerous phone calls, including one dated June 2, 2010 at 4:27 p.m. accompanied by the note "Contact Promise to Pay,[ ]pg sd busn closed will look into lease trans and cb for pymnt." (Defs.' 56.1 ¶ 77; id. Ex. 13 at 3.) Plaintiff states she cannot remember this conversation, (Ritchie Dep. Tr. 257:10-22), and disputes the veracity of this specific entry on the grounds that Northern made audio recordings of all calls, but had not produced this particular call during discovery. (Pl.'s Resp. to Defs.' 56.1 ¶ 77.) [9]

[9]    According to defendants, not "every call was recorded," and "If systems are down, recordings are not made, of course, but we try to record every call." (Kravic Dep., Def.'s 56.1 Ex. 9, Tr. 83:2-5.)

 **5**  Northern also mailed four invoices from February to June 2010 to Divorce Document Assistance to plaintiff's home address. Plaintiff admits that she received each of these invoices. (Defs.' 56.1 ¶ 59.) She also admits that defendants mailed to her home address at least ten letters regarding the Lease. (SAC ¶ 54b-k.) The letters and calls included notices stating that failure to respond with payment would result in legal action. (Defs.' 56.1 ¶ 80.)

Despite knowledge of the bank account debits and receipt of the calls and letters, plaintiff took no action. (Defs.' 56.1 ¶¶ 44, 47, 50; Ritchie Dep. Tr. 245:20-25.) [10]  Plaintiff asserts that she did not respond to these requests for payment because she was overwhelmed with a number of personal issues including a cancer diagnosis, the death of her niece, and work. (SAC ¶ 24; Ritchie Dep. Tr. 246:12-21.) She testified that she took no action even when she received the calls because:

> I didn't want to talk to them. I – the bills that I was getting are in various amounts and, during that time, I was also going through some – a very, very hard time in my life, and that wasn't that important to me. These bills that were coming from this Lease Finance Group weren't – they just weren't that important.

(Ritchie Dep. Tr. 246:2-11.)

[10]    Plaintiff asserted in her Complaint that at this point she "categorically informed defendants that she had never signed any lease with them and demanded that they stop the harassment," (SAC ¶ 25), but now conceded that this is not true, as she did not communicate her allegation of forgery to defendants until May 2011 when she filed her Answer and Counterclaim in NYCC.

D. Experian Charge-off and New York City Civil Court Lawsuit

In August 2010, December 2010, and February 2011, Northern / LFG again accessed plaintiff's consumer credit report from Experian. (Pl.'s 56.1 ¶ 56.) On September 1, 2010, LFG made an adverse entry on plaintiff's consumer credit report that it had "charged off" $1,836 that plaintiff owed. (Pl.'s 56.1 ¶¶ 89, 90.) Northern /LFG then terminated plaintiff's account as a write-off. (Pl.'s 56.1 ¶ 90.)

On February 16, 2011, LFG commenced an action against plaintiff in New York City Civil Court,[11] alleging that plaintiff breached her lease by failing to make payments due. (Defs.' 56.1 ¶ 87.) LFG's Complaint was filed by its attorney, Joseph Sussman and his law firm, Joseph I. Sussman, P.C., and verified by Northern's Legal Collections Supervisor Robert Taylor. Plaintiff served her Answer on May 12, 2011, claiming that she had never seen the Lease before. She also filed a Counterclaim asserting fraud, Fair Credit Reporting Act and Fair Debt Collection Protection Act claims. (Defs.' 56.1 ¶ 88; Civil Court Answer & Counterclaim ("Civ. Ct. Answer") (Defs.' 56.1 Ex. 4) ¶¶ 20-21.) Plaintiff stated in her Answer that she became aware of the debits in May 2010. (Defs.' 56.1 ¶ 88; Civ. Ct. Answer ¶ 28.)

[11]    The case, <u>Lease Financing Group, LLC v. Patricia J. Ritchie</u>, Index No. 006956/2011, remains pending.

On or about April 3, 2012, plaintiff wrote a letter to Experian, disputing the adverse entry on her credit report from LFG. (Pl.'s 56.1 ¶ 91.) She also sent a copy of that letter to LFG. (Defs.' Resp. to Pl.'s 56.1 ¶¶ 92-93.) There is no record evidence that Experian contacted any defendant with a copy of plaintiff's April 2012 letter.

However, later in April 2012, Experian did send to Northern a computerized dispute form known as an Automated Consumer Dispute Verification ("ACDV"). (Defs.' Resp. to Pl.'s 56.1 ¶ 93.) The ACDV form contained the following information: "NEVER HAD AN ACCT WITH THIS COMPANY HER LEASE WAS WITH MERCHANT MADE EASY AND WAS PAID AND CLOSED SATISFACTORILY." (Defs.' 56.1 Ex. 31; Kravic Decl., ECF No. 190, ¶¶ 73, 75.)

**\*6**  Northern's log book for plaintiff's account recorded this in an entry dated April 17, 2012 at 10:05 a.m., stating:

> RCVD EXPERIAN AUTOMATED CONSUMER DISPUTE VERIFICATION (ACDV) REGARDING C/O REPORTED; DISPUTE CODE IS SHOWN AS 1:

NOT HIS.HERS. PG STATES 'NEVER HAD AN ACCT WITH THIS COMPANY HER LEASE WAS WITH MERCHANT MADE EASY AND WAS PAID AND CLOSED SATISFACTORILY'

(Defs.' 56.1, Ex. 13 at 1.) The next entry was on the same date at 10:08 a.m., stating that:

> ACDV INVESTIGATION: REVIEWED NOTES. PG IS IN THE SUIT PROCESS PG IS DISPUTING LEASE. RESPONDING TO ACDV: CHANGE DATA AS SHOWN TO ADD COMMENT STATING ACCT INFO IS DISPUTED BY CONSUMER.

(Defs.' 56.1, Ex. 13 at 1.)

E. <u>The Instant Action</u>

Plaintiff filed the instant suit in June 2012, asserting federal Fair Credit Reporting Act ("FCRA") and New York Fair Credit Reporting Act ("NYFCRA") claims against Northern, LFG, Brown, Taylor, and John Does. (ECF No. 1.) The Hon. Kenneth M. Karas, to whom this case was originally assigned, granted leave to amend; plaintiff filed an Amended Complaint in November 2012, alleging the same causes of action against the same defendants as in the original Complaint. (ECF No. 8.) Defendants moved to dismiss, and on March 31, 2014, Judge Karas partially granted the motion, and dismissed without prejudice (1) the counts alleging negligent violations of the FCRA, for failure to allege actual damages, and (2) the action with respect to John Doe defendants. (ECF No. 22.)

In May 2014, defendants filed and Answer and Counterclaim. (ECF No. 27.) The Counterclaim alleged that plaintiff breached the lease guarantee by failing to pay after February 2010, when she closed her bank account.

In December 2014, plaintiff moved to amend the First Amended Complaint, which defendants opposed. On March 25, 2015, this action and a related case, <u>Angermeir v. Cohen</u>, 12 Civ. 55, were reassigned to the undersigned. The Court granted plaintiff's motion to amend in April 2015. (ECF No. 106.) Plaintiffs filed the Second Amended Complaint on May 14, 2015. (ECF No. 112.) Defendants timely answered and

2016 WL 1241531

again asserted a breach-of-guarantee counterclaim. (ECF No. 118.)

Plaintiff's Second Amended Complaint is substantially broader than her prior complaints. It added defendants Jay Cohen, Joseph Sussman, and Joseph Sussman P.C. It also asserted a number of new claims under RICO, New York GBL § 349, and common law fraud. (See SAC.)

In her RICO claim plaintiff alleges that defendants operated an enterprise whose activities constituted a racketeering scheme. Specifically, she alleges the following actions in furtherance of the scheme:

- That defendants committed mail fraud by 1) sending the summons and complaint for a lawsuit that contained false assertions against her, and 2) mailing her letters falsely asserting that she owed them money;

- That defendants committed wire fraud by 1) pulling plaintiff's consumer credit report four times, 2) calling her and falsely asserting that she owed them money, and 3) deducting money from her bank account; and

- That defendants committed extortion by commencing a lawsuit against plaintiff designed to extort undeserved sums of money from her.

*7 In addition, plaintiff also alleges a RICO conspiracy on the part of all defendants.

Plaintiff's claims of violations of federal and state fair credit reporting laws are based on defendants' allegedly (1) pulling her credit report for an impermissible purpose, (2) failing to provide her with required notice in connection with pulling her report, (3) failing to perform an adequate investigation after learning that she was disputing the authenticity of the Lease, and (4) reporting an unwarranted charge-off to the credit reporting agency. Allegations (1) and (3) comprise the basis for the federal FCRA claims, while allegations (1), (2), (3), and (4) all comprise the basis for the NYFCRA claims.[12]

[12]   Plaintiff has asserted willful and negligent violations of both federal and state statutes. The SAC re-pleads the negligence actions under the FCRA that were previously dismissed without prejudice for failure to allege actual damages, as it now includes a listing of actual damages. (SAC ¶ 37).

Plaintiff's GBL § 349 claim is based on the assertion that defendants have a practice of unlawfully pulling consumer credit reports, making false accusations in lawsuits, and making repetitive and dunning collection calls.

Finally, plaintiff alleges a general common-law fraud claim.

## II. STANDARD OF REVIEW

### A. Summary Judgment
"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23.

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations omitted). In addition, "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks and citation omitted).

### B. Civil RICO
The RICO statute provides that, "Any person injured in his business or property by reason of a [RICO] violation" may bring suit and recover treble damages and attorneys' fees and costs. 18 U.S.C. § 1964(c). To support a civil RICO claim, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima,

Case 6:19-cv-00608-MAD-TWD   Document 12   Filed 06/09/20   Page 43 of 107

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). To avoid summary judgment here, plaintiff must raise a triable issue as to one of these elements.

**\*8** Pertinent to the determination of this motion are the definitions of "racketeering activity" and injury. See 18 U.S.C. §§ 1951, 1961(a), (b). Turning to the first of these, "racketeering activity" is defined by the nature, quantum and relatedness of specified activity. Mail and wire fraud as well as extortion are among the types of possible predicate acts, see 18 U.S.C. § 1961(a), (b), and they are the type alleged by plaintiff here. The quantum and relatedness requirements are referred to together in the concept of a RICO "pattern" of activity. H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989) ("[T]o prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.") A pattern of activity requires more than a single, isolated predicate act, and there must be a showing of relationship between predicate acts. Id., 439 U.S. at 240. This requires that the acts have the "same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events." Id.; see also United States v. Eppolito, 543 U.S. 25, 57 (2d Cir. 2008) ("To prove relatedness, the government [or plaintiff] may show either that the individual predicate acts were directly related to each other or that they were related to the enterprise in a way that made them indirectly connected to each other." (internal quotation marks omitted)). In addition, the conduct must be continuing. H.J. Inc., 492 U.S. at 241 ("'Continuity' is both a closed-and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."). Put otherwise, a single completed act that is unlikely to recur cannot support a RICO claim. See GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 466 (2d Cir. 1995).

Thus, for plaintiff to survive summary judgment, she must (1) raise a triable issue as to more than a single claim of extortion or mail/wire fraud, (2) raise a triable issue as to their relatedness, and (3) raise a triable issue on the question of whether they amount to or pose a threat of continued criminal activity. H.J. Inc., 492 U.S. at 239.

Turning to RICO injury, to support a civil RICO claim, a plaintiff must demonstrate that "he has been injured in his business or property by the conduct constituting the violation." Sedima, 473 U.S. at 496; see also 18 U.S.C. § 1964.

This requires a showing of "compensable injury," defined as "harm caused by predicate acts sufficiently related to constitute a pattern." Sedima, 473 U.S. at 497. To survive this motion for summary judgment, plaintiff must only raise a triable issue as to her RICO injury.

Plaintiff also alleges RICO conspiracy. RICO conspiracy requires "[intent] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." Baisch v. Gallina, 346 F.3d 366, 376-77 (2d Cir. 2003). However, a RICO conspiracy claim requires proper pleading of a substantive RICO allegation. First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 182 (2d Cir. 2004). Finally, when a plaintiff seeks a civil cause of action based on RICO conspiracy, "an injury from an overt act is necessary and sufficient to establish civil standing." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990).

### C. FCRA

The federal Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., aims to ensure "that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). The FCRA "places distinct obligations on three types of entities: consumer reporting agencies, users of consumer reports, and furnishers of information to consumer reporting agencies." O'Diah v. New York City, No. 02 Civ. 274 (DLC), 2002 WL 1941179, at \*12 (S.D.N.Y. Aug. 21, 2002). Defendants in this action are both users of consumer reports and furnishers of information.

A users of consumer report must not:

[U]se or obtain a consumer report for any purpose unless—

(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and

(2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

**\*9** 15 U.S.C. § 1681b(f)

Case 6:19-cv-00608-MAD-TWD Document 12 Filed 06/09/20 Page 44 of 107

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

Furnishers of information to CRAs must abide by the following rules:

> After receiving notice [from a credit reporting agency] pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—
>
> (A) conduct an investigation with respect to the disputed information;
>
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
>
> (C) report the results of the investigation to the consumer reporting agency; and
>
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

15 U.S.C. § 1681s–2(b)(1).

The FCRA attaches civil liability for willful noncompliance, [13] 15 U.S.C. § 1681n, as well as negligent failure to comply, 15 U.S.C. § 1681*o*. Damages for willful noncompliance include actual damages not to exceed $1,000, punitive damages, and attorney's fees and costs. 15 U.S.C. § 1681n. Damages for negligent noncompliance include uncapped actual damages and costs and attorney's fees and costs. 15 U.S.C. § 1681*o*.

[13]   Under the FCRA, willful noncompliance also encompasses reckless violations. Safeco Ins. Co. v. Am. V. Burr, 551 U.S. 47, 57 (2007).

The FCRA also has two express preemption sections, 15 U.S.C.A. § 1681t and 15 U.S.C. § 1681h(e). Section 1681t expressly preempts state laws that relate to section 1681s-2, which regulates obligations relating to furnishers of information under, and several subsections of § 1681m, which regulates notice obligations of users of information. Section 1681h(e) provides that various actions, including negligence actions, cannot be brought based on information disclosed pursuant to § 1681m and certain other FCRA provisions.

## D. NYFCRA

The New York Fair Credit Reporting Act also provides a private right of action for both willful and negligent noncompliance. Willful noncompliance gives rise to actual damages, punitive damages, and attorney's fees and costs. N.Y. Gen. Bus. Law § 380-l. Negligent noncompliance gives rise to actual damages and attorney's fees and costs. N.Y. Gen. Bus. Law § 380-m.

The relevant sections of the New York FCRA in this action are those establishing obligations for users of consumer credit reports and furnishers of information to CRAs. Plaintiff allege that defendants violated N.Y. Gen. Bus. Law § 380-b(b), which provides that

> No person shall request a consumer report, other than an investigative consumer report, in connection with an application made after the effective date of this article, for credit, employment, insurance, or rental or lease of residences, unless the applicant is first informed in writing or in the same manner in which the application is made that (i) a consumer report may be requested in connection with such application, and (ii) the applicant upon request will be informed whether or not a consumer report was requested, and if such report was requested, informed of the name and address of the consumer reporting agency that furnished the report.

**\*10** Thus, while the "permissible purpose" provision of the NYFCRA applies to the CRA and not to the user of information, N.Y. Gen. Bus. Law. § 380-b(a), the NYFCRA also requires notice to the applicant "in writing or in the same manner in which the application is made" if a report is requested, N.Y. Gen. Bus. Law § 380-b(b), a provision that is not in the federal FCRA.

As to furnishers of information, the NYFCRA prohibits the knowing and willful introduction of "false information into a consumer reporting agency's files for the purpose of

Case 6:19-cv-00608-MAD-TWD   Document 12   Filed 06/09/20   Page 45 of 107

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

wrongfully damaging or wrongfully enhancing the credit information of any individual." N.Y. Gen. Bus. Law § 380-o.

E. New York Gen. Bus. Law § 349

New York's GBL § 349 is a part of the New York Consumer Protection Act, "enacted to provide consumers with a means of redress for injuries caused by unlawfully deceptive acts and practices." Goshen v. Mut. Life Ins. Co. of New York, 98 N.Y.2d 314, 323 (2002). A GBL § 349 claim requires that "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (quoting Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940, 944 (2012)). The consumer does not need to be an individual, as a business can bring suit under GBL § 349 against competitors. Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995). The definition of "deceptive acts and practices" is an objective one "limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26 (1995).

III. DISCUSSION

This case presents an all too familiar situation in which there is a direct correlation between the number of claims and their weakness. Here, plaintiff has asserted twelve different causes of action. All fail. The Court first addresses the RICO and fraud claims as their deficiencies share certain similar characteristics. Then the Court turns to the remaining claims.

To summarize, the RICO and fraud claims fail for the simple reason that plaintiff has not raised a triable issue on the critical element of intent. But in addition, the claims fail because they both rely on assertions of fraud and yet there is no triable issue as to any false or misleading statement on which plaintiff relied to her detriment. In terms of extortion, she has failed to raise a triable issue on the requirement of a wrongful taking of her property. Finally, she has failed to raise a triable issue that she has suffered the type of injury necessary to support a RICO claim.

A. Requisite Intent

Plaintiff's RICO claim, which relies on predicate acts of mail/wire fraud and extortion, as well as her common law fraud claim, each require a showing of specific intent. United States v. Regan, 937 F.2d 823, 827 (2d Cir.)amended, 946 F.2d 188 (2d Cir. 1991) (holding that mail and wire fraud are "specific intent crimes," requiring proof that defendants had "a conscious and knowing intent to defraud"); United States v. Scacchetti, 668 F. 2d 643, 649 (2d Cir. 1982) (noting that to have a "wrongful purpose" in connection with extortion requires intent); Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 599 (2d Cir. 1991) ("Under New York Law, a common law fraud claim requires proof that plaintiff justifiably relied on a false representation of material fact made by defendant with intent to deceive, and that plaintiff was damaged thereby." (emphasis added)).

*11  In an attempt to raise a triable issue on this element, plaintiff has put forward two facts: (1) that the lease the MME provided to LFG was a forgery, and (2) that the leasing costs for the equipment far exceeded its value. Neither point assists plaintiff. From these, argues plaintiff, a rational juror may infer sufficient wrongful intent to raise a triable issue. Plaintiff is incorrect.

The Court turns first to the forgery. As previewed above, the lack of an authentic signature by the plaintiff on the lease document sent by MME to LFG is the centerpiece of her case. Even assuming that is true—which the Court does for purposes of this motion—that fact alone fails to raise a triable issue as to intent for any predicate act or common law fraud. The record is clear that the derivation of forgery was MME —a non-party in this case. It was then transferred to LFG. To raise a triable issue as to LFG's intent, either to defraud or seek her property in a wrongful manner, plaintiff must proffer some evidence from which a rational juror could infer that LFG had, should have had or could have had some knowledge that MME's representation as to authenticity was false. She has not done so. Indeed, there is no evidence that, prior to the time that she filed her answer in the collection suit, defendants knew or could have known the lease was forged.

It is uncontested that the documentation MME provided to LFG contained plaintiff's true name, address, social security number, and bank account information; it is also uncontested that as part of the transfer of the lease to LFG, MME provided a representation as to the authenticity of the documentation. It is further uncontested that over the period of time plaintiff possessed, used and made monthly payments on the equipment, she did not raise any issue regarding the legitimacy of the lease relationship. [14] Thus, on the issue of intent, the forgery does not alone raise a triable issue. [15]

Case 6:19-cv-00608-MAD-TWD   Document 12   Filed 06/09/20   Page 46 of 107

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

14  Defendants have argued that, in any event, the federal Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 and the New York State Electronic Signatures and Records Act, N.Y. Tech. Law § 304, provide that an electronic signature has the same effect as an ink signature. Plaintiff does not respond to this point in her papers.

15  Plaintiff argues that defendants knew or should have known that the lease was forged LFG/ Northern did not have a physical "ink" copy of the lease. Plaintiff infers bad faith from this. But plaintiff fails to present any evidence that by its nature a non-original copy of a lease is suggestive of forgery. The absence of an original of the lease is insufficient to raise a triable issue on the question of intent.

The Court turns next to the question of the cost/value differential. Plaintiff has proffered evidence that the leased equipment retails for less than one-third the amount that LFG/ Northern paid to MME to acquire the lease. According to plaintiff, this fact alone supports an inference of fraudulent intent and wrongful conduct by defendants. On the facts as developed in the record on this motion, the Court disagrees.

It ought to come as no surprise that leases for commercial goods may ultimately result in profit to the lessor, sometimes a substantial profit. There is nothing unlawful with profit, even substantial profit. By definition, profit for an equipment lease may mean that income received exceeds all-in cost. Such a structure—which is all that plaintiff alleges here—is no more than a statement as to how leasing typically works. It is certainly true that there may be instances in which cost/ price differential may provide some indication of unlawful scheme; but more than the mere fact of profit is needed and that is all that plaintiff has proffered here.

**\*12**  Missing the key intent element to support the predicate acts for her RICO claim, or her common law fraud claim, these claims must be dismissed. It goes without saying that as she cannot make out this element, she never gets to the additional and also dispositive issue of lacking a RICO pattern. 16

16  The Court need not separately reach the pattern issue as the failure on intent is sufficient to support dismissal. However, it is absolutely clear that in

all events plaintiff alleges a single act that forms the basis of her claims: an attempt to collect on a debt to her; that claim is tied to her assertion of the forged lease. There is no circumstance under which this single act—even when accomplished by way of multiple telephone communications and a debt collection lawsuit—constitutes a "pattern" of conduct. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989); GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 466 (2d Cir. 1995).

B. Mail/Wire Fraud Predicate Acts

Plaintiff has also failed to proffer evidence to raise a triable issue relating to the predicate acts of mail/wire fraud or her common law fraud claim for an additional, independent reason. She has failed to proffer any evidence of a false or misleading statement or omission on which she relied. See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP, 806 F.3d 71, 87 (2d Cir. 2015) (holding that plaintiffs in mail fraud cases must establish that defendants' alleged misrepresentation was the but-for and proximate cause of plaintiffs' injury, which usually requires proof of reliance).

According to plaintiff, defendants' fraudulent act consists of their seeking payment on a debt supported by a forged lease. Notably, plaintiff concedes that she signed the Application pursuant to which she initially agreed to lease the equipment for the lease amount defendants later sought to collect. Her claim requires that this Court ignore the Application, assume that the payment obligation is only supported by the forged lease, and further and most importantly find a triable issue as to whether defendants knew or had reason to know of that forgery. She has raised a triable issue on none of these questions. Most importantly, and sufficient for resolution of this motion, is the lack of a triable issue as to the latter question.

But even if we assume that the debt was not due and owing, plaintiff has failed to raise a triable issue on the question of reliance. In this regard, she has utterly failed to demonstrate that she relied to her detriment on defendants' collection efforts by way of the telephone calls, letters or lawsuit, and their repeated assertion of the debt due.

Plaintiff does not oppose defendants' motion on this issue, but rather asserts that reliance is unnecessary. While a mail or wire fraud action need not allege first-person reliance by the plaintiff herself, it does need to show that "someone

2016 WL 1241531

—whether the plaintiffs themselves or third parties—relied on the defendant's misrepresentations." Sergeants Benevolent Ass'n, 806 F.3d at 87 (citing Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 658 (2008)). Plaintiff fails to proffer any facts suggesting that anyone relied on defendants' alleged fraud with respect to the NYCC Complaint, a requirement under Bridge, 553 U.S. at 685. In fact, she concedes that she ignored defendants' efforts until she was sued, at which time she answered the lawsuit and denied any payment obligation.

### C. Lack of Wrongful Extortionate Act

*13  Plaintiff's claim of extortion as a predicate act fails for an additional reason. As discussed above, such a claim requires a showing of specific intent as to which there is no triable issue here. Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951; N.Y. Penal Law § 155.05. "Wrongful use" in this context is defined as "obtaining money or a thing of value from another by use of threats to reputation only if the defendant has no plausible claim of right to the money demanded or if there is no nexus between the threat and the defendant's claim." United States v. Jackson, 196 F.3d 383, 387 (2d Cir. 1999); see alsoDeFalco v. Bernas, 244 F.3d 286, 318 (2d Cir. 2001). Here, the allegedly extortionate acts were the debt collection telephone calls, letters and suit. But, if plaintiffs were seeking payments to which they were entitled, their actions were not wrongful. United States v. Clemente, 640 F.2d 1069, 1077 (2d Cir. 1981) ("[T]he use of fear of economic loss to obtain property to which one is not entitled is wrongful. It is obvious that the use of fear of financial injury is not inherently wrongful."). As discussed above and throughout, there is no evidence that defendants knew that they were not entitled to the amounts sought. United States v. Scacchetti, 668 F.2d 643, 649 (2d Cir. 1982) (noting that the "wrongful use" element requires requisite intent).

To the extent that the debt collection suit is an alleged extortionate act, the claim must also fail. The law is clear that litigation—even if frivolous or malicious—cannot constitute extortion.

There are sound policy reasons against recognizing the instigation of meritless litigation as a RICO predicate act. Recognizing such litigation as a predicate RICO act would give complainants unprecedented access to federal courts and the treble damage remedy authorized under RICO. Such a significant extension of RICO's reach is best made, if at all, by Congress. Moreover, allowing these suits to proceed as RICO suits risks chilling parties' resort to the judicial system to resolve their disputes.

FindTheBest.com, Inc. v. Lumen View Tech. LLC, 20 F. Supp. 3d 451, 457 (S.D.N.Y. 2014). Numerous courts that have considered the same issue agree. Seeid. (collecting cases); see also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n, 776 F.3d 1343, 1349 (Fed. Cir. 2014), cert. denied, 136 S. Ct. 119, 193 L. Ed. 2d 208 (2015) ("Treating meritless litigation as a form of extortion punishable under RICO would substantially chill even valid court petitioning."); Deck v. Engineered Laminates, 349 F.3d 1253, 1258 (10th Cir. 2003) ("Extortion is the antithesis of litigation as a means of resolving disputes. To promote social stability, we encourage resort to the courts rather than resort to force and violence. Yet recognizing abusive litigation as a form of extortion would subject almost any unsuccessful lawsuit to a colorable extortion (and often a RICO) claim."); United States v. Pendergraft, 297 F.3d 1198, 1207-08 (11th Cir. 2002) (holding that threats to sue, "even if made in bad faith and supported by false affidavits, was not 'wrongful' within the meaning of the Hobbs Act" because, inter alia, "[c]riminalizing false testimony via the Hobbs Act would expand the scope of witness liability" beyond what Congress intended); Vemco, Inc. v. Camardella, 23 F.3d 129, 134 (6th Cir.1994) ("A threat of litigation if a party fails to fulfill even a fraudulent contract ... does not constitute extortion."); I.S. Joseph Co. v. J. Lauritzen A/S, 751 F.2d 265, 267 (8th Cir. 1984) (holding that bad-faith suits "may be tortious under state law, but we decline to expand the federal extortion statute to include it a crime"). ButseeLiving Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 365 (9th Cir. 2005) (noting that the RICO statute "provides that conduct relating to prior litigation may constitute racketeering activity. 18 U.S.C. § 1961(1)(B) (defining racketeering activity as including an act indictable under 18 U.S.C. § 1512, which relates to tampering with a witness, victim, or informant)").

### D. Lack of RICO Injury

Case 6:19-cv-00608-MAD-TWD Document 12 Filed 06/09/20 Page 48 of 107

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

**\*14** There are additional reasons why plaintiff's RICO claims fail. As discussed above, injury in an essential element of a RICO claim. A person can only seek civil remedy for a RICO violation if he has been "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964. Injury proximately caused by a predicate act is central to whether a plaintiff has standing to assert a RICO claim. Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990) ("The RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence.")

Plaintiff has failed to raise a triable issue as to RICO injury. While she was subject to debt collection telephone calls, letters and a collection suit, there is no evidence that she suffered any actual injury. She testified that she took no action in response to the letters and telephone calls and concedes that she ignored all mailings and would hang up or tell the callers to stop calling. (Defs.' 56.1 ¶ 58.) There is no evidence that defendants' actions resulted in payment. Thus, the only injury is the personal experience of harassment plaintiff felt. But this is not cognizable injury for purposes of a RICO claim.[17] See 18 U.S.C.A. § 1964; Gotlin ex rel. County of Richmond v. Lederman, 483 Fed. Appx. 583, 586 (2d Cir. 2012) ("[I]njuries [that] are personal in nature do not constitute injury to 'business or property' as those terms are used in RICO." (internal citations omitted)).

[17] Plaintiff alleges that she was injured by defendants' lawsuit because she paid court fees in order to file her Answer and Counterclaim in the NYCC action. To the extent that this constitutes RICO injury, the extortion claim based on the NYCC suit fails for the reasons stated above.

### E. Lack of RICO Conspiracy

Because plaintiff has failed to plead any substantive RICO claim, her RICO conspiracy claim also fails. See First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 182 (2d Cir. 2004); Discon, Inc. v. NYNEX Corp., 93 F.3d 1055 (2d Cir. 1966), vacated on other grounds, 525 U.S. 128 (1998) (a RICO conspiracy claim "necessarily must fail if the substantive claims are themselves deficient"). Furthermore, plaintiff's lack of injury means she does not have standing for the substantive as well as the conspiracy claims based on civil RICO. See Hecht v. Commerce Clearing House, Inc., 897 F.2d at 25 (2d Cir. 1990).

### F. FCRA Claims

Plaintiff asserts a number of claims (Counts III-X) based on federal and state fair credit reporting statutes. None withstands scrutiny.

As a threshold matter, none of the individual defendants Cohen, Brown, Taylor, and Sussman (or his firm) accessed plaintiff's credit report, and never furnished any information about her to any credit reporting agency. (Defs.' 56.1 ¶¶ 93-94.) There is no triable issue as to any of these defendants on these claims.

Moreover, to the extent that plaintiff's theory as to them has morphed into a type of conspiracy theory, it must fail. There is no "catch-all" civil conspiracy statute under federal law and she has failed to raise a triable issue as to civil conspiracy under state law. Under New York law, a plaintiff alleging civil conspiracy must show "(1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage." Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986). To survive summary judgment here, plaintiff must raise a triable issue as to these elements and she has failed to do so with regard to these individual defendants. Accordingly, Counts III-IX are dismissed against the individual defendants.

**\*15** The Court turns to plaintiff's remaining federal fair credit reporting claims with regard to the corporate defendants.

#### 1. FCRA impermissible access

Plaintiff alleges that defendants willfully or negligently violated the FCRA by accessing her credit report without a permissible purpose. 15 U.S.C. § 1681b. However, the undisputed evidence demonstrates that defendants intended to use plaintiff's credit information for a permissible purpose each time they pulled her report.

A party is not liable under the FCRA if it obtains consumer information for a purpose enumerated in 15 U.S.C.A. § 1681b(a), such as when the party

[I]ntends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension

2016 WL 1241531

of credit to, or review or collection of an account of, the consumer" and when the party "has a legitimate business need for the information— (i) in connection with a business transaction that is initiated by the consumer; or (ii) to review an account to determine whether the consumer continues to meet the terms of the account."

15 U.S.C. § 1681b(a). The statute's plain language indicates that if the party obtaining the report had the intent to use it for one of the specified permissible purposes, there has been no violation of the FCRA. Braun v. Client Servs. Inc., 14 F. Supp. 3d 391, 396 (S.D.N.Y. 2014) ("To state a claim for willful or negligent acquisition of a credit report under the FCRA, a plaintiff must allege facts showing each of the following: (i) there was a consumer report; (ii) the defendants used or obtained it; (iii) the defendants did so without a permissible statutory purpose, and (iv) the defendants acted with the specified culpable mental state." (quoting King v. Equable Ascent Fin., LLC, No. 12 Civ. 443 (CCE), 2013 WL 2474377, at *2 (M.D.N.C. June 10, 2013))). The fact that plaintiff did not in fact have an account with defendants is irrelevant if defendants had the intent to use the report for a permissible purpose. See Trikas v. Universal Card Servs. Corp., 351 F. Supp. 2d 37, 42 (E.D.N.Y. 2005) (holding that as long as defendant intended to use the report for a permissible purpose, the fact that consumer account was left open in error was irrelevant); Perretta v. Capital Acquisitions & Mgmt. Co., No. 02 Civ. 5561 (RMW), 2003 WL 21383757, at *5, n.7 (N.D. Cal. May 5, 2003) (holding that the FCRA "does not appear to require the existence of a debtor-creditor relationship for a party to lawfully acquire a consumer report").

Plaintiff does not dispute that LFG intended to use plaintiff's credit report to attempt to collect on her account on August 20, 2010, December 8, 2010, and February 7, 2011. (Def's 56.1 ¶¶ 34, 56.) This is enumerated as a permissible purpose under 15 U.S.C. § 1681b(a). See also Huertas v. Galaxy Asset Mgmt., 641 F.3d 28, 34 (3d Cir. 2011); Betz v. Jefferson Capital Sys., LLC, 68 F. Supp. 3d 130, 134 (D.D.C. 2014) ("It is well settled that a debt collector need not verify a debt prior to collection ... or seeking a credit report." (internal citations omitted)); Stonehart v. Rosenthal, No. 01 Civ. 651 (SAS), 2001 WL 910771, at *4 (S.D.N.Y. Aug. 13, 2001) (holding that "debt collection for accounts other than pure 'credit transactions' may constitute a permissible purpose under section 1681b").

**\*16** Plaintiff argues that defendants' initial December 2008 use of the credit report was for an impermissible purpose— funding the ISO—in December 2008. However, there is no

question that another purpose of the December 2008 credit report pull was to decide whether or not to price the lease —in other words, collecting "information in connection with a credit transaction involving the consumer." 15 U.S.C. § 1681b(a); Braun, 14 F. Supp. 3d at 166; see also Nasca v.J.P. Morgan Chase Bank, N.A., No. 06 Civ. 3472 (SHS), 2007 WL 678407 at *1 (S.D.N.Y. 2007) (noting that if "[a] credit transaction is not initiated by the consumer, the credit report may be issued only if 'the transaction consists of a firm offer of credit .... '") Plaintiff cites to Northern's Rule 30(b)(6) deposition and suggests that defendants only used the credit report to determine what to pay MME. (Pl.'s Resp. to Defs.' 56.1 ¶¶ 33-35.) However, as defendants point out, the witness unequivocally stated that "Northern Leasing uses the credit scores for ... making a determination whether to fund the lease or not." (Kravic Dep., Lillienstein Decl. ECF No. 217, Ex. 1, Tr. 52:22-53:15.) The fact that defendants used the credit report both for pricing the lease and for determining how much to fund the ISO does not make the obtaining the credit report impermissible. Therefore, plaintiff's claim under FCRA's § 1681b fails as a matter of law.

### 2. FCRA obligation as furnisher of information

The FCRA imposes civil liability on parties who furnish information to CRAs who fail to fulfill statutory obligations after they receive a disputed report from the CRA. However, the obligations only attach "[a]fter receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency." 15 U.S.C. § 1681s–2(b)(1). [18] In turn, section 1681i(a)(2) provides that a CRA must "provide notification of the dispute to any person who provided any item of information in dispute." 15 U.S.C. § 1681i(a)(2).

[18] Section § 1681s-2(b) is distinct from § 1681s-2(a), which imposes an affirmative obligation to correct and update information. There is no private right of action under § 1681s-2(a); nor does plaintiff plead a cause of action under that statute. See Longman v. Wachovia Bank, N.A., 702 F.3d 148, 151 (2d Cir. 2012) ("[T]there is no private cause of action for violations of § 1681s–2(a)."); see also Seamans v. Temple Univ., 744 F.3d 853, 867 (3d Cir. 2014) ("In other words, the fact that a furnisher is affirmatively obligated to flag an account as

2016 WL 1241531

disputed under § 1681s–2(a) does not undermine the conclusion that a *failure* to flag the account as disputed also constitutes a material inaccuracy under § 1681s–2(b).").

The statute is "quite clear" that a violation can occur only if it "post-dat[es] the furnisher's receipt of a report from the credit reporting agency. If Congress had meant to create liability for violations once the furnisher had notice from any source of the existence of a dispute, it would have been a simple matter to say so." Elmore v. N. Fork Bancorporation, Inc., 325 F. Supp. 2d 336, 340 (S.D.N.Y. 2004) (emphasis in original). Plaintiff alleges that defendants failed to investigate after they received her letter disputing her credit report. However, the record evidence does not show that the Experian, the CRA to whom plaintiff sent her letter, ever forwarded the letter to defendants—the crucial step that triggers defendants' obligations under 15 U.S.C. § 1681s-2(b)(1). SeeElmore, 325 F. Supp. at 340; seealsoMarkovskaya v. Am. Home Mortgage Servicing, Inc., 867 F. Supp. 2d 340, 344 (E.D.N.Y. 2012); Nguyen v. Ridgewood Sav. Bank, No. 14-CV-1058 MKB, 2015 WL 2354308, at *8 (E.D.N.Y. May 15, 2015); Redhead v. Winston & Winston, P.C., No. 01 Civ. 11475 (DLC), 2002 WL 31106934, at *5 (S.D.N.Y. Sept. 20, 2002). Instead, defendants only had an obligation to investigate after they received a notice of dispute from Experian; in this case, that occurred on April 17, 2012, after Experian sent an ADCV regarding plaintiff to defendants, not when they received a letter directly from plaintiff. (Defs.' 56.1, Ex. 13, at 1; id. Ex. 31.)

**\*17**  Under § 1681s-2(b), defendants had an obligation to 1) "conduct an investigation with respect to the disputed information," 2) "review all relevant information provided by the CRA," 3) "report the results of the investigation to the [CRA]," and 4) "if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs]" that had received the information. 15 U.S.C. § 1681s-2(b)(1). There is no record evidence suggesting that defendants failed to meet these obligations. It is undisputed that the ACDV form contained statement about plaintiff's account: "NEVER HAD AN ACCT WITH THIS COMPANY HER LEASE WAS WITH MERCHANT MADE EASY AND WAS PAID AND CLOSED SATISFACTORILY." (Defs.' 56.1 Ex. 31; Kravic Decl., ECF No. 190, ¶¶ 73, 75.) The fact that plaintiff was making this allegation, of course, was true. Upon receiving the ACDV, defendants understood that plaintiff's account was in the "suit process" and that plaintiff contested the charges; defendants then responded to Experian

confirming that there was indeed a dispute on plaintiff's account. (Defs.' 56.1, Ex. 13 at 1.) Plaintiff has not alleged that the ACDV contained any incomplete or inaccurate information; therefore, defendants met their obligation when they confirmed the facts in the ACDV—that plaintiff was disputing her account. SeeSeamans v. Temple Univ., 744 F.3d 853, 867 (3d Cir. 2014) ("[A] private cause of action arises under 15 U.S.C. § 1681s–2(b) when, having received notice of a consumer's potentially meritorious dispute, a furnisher subsequently fails to report that the claim is disputed.").

Plaintiff also contends that LFG's log report indicating that an employee opened the ACDV entry at 10:15 a.m. and closed out of the response entry at 10:17 a.m. is probative of its failure to investigate. (See Def's 56.1 Ex. 13 at 1.) Yet the fact that an employee took two minutes to look up plaintiff's information, discover that her account was indeed in the lawsuit process, and report that fact as consistent with her disputing the account does not suggest a violation of § 1681s-2(b)(1). LFG's verification that the account was in dispute, in this case, satisfied its obligations as a matter of law.

Finally, plaintiff appears to maintain that defendants should have asked Experian to delete the charge-off after learning of her disputed claim. (Comp. ¶ 119.) That is not the obligation imposed by the FCRA, which simply requires the furnisher of information to investigate, and to report information from the investigation. 15 U.S.C. § 1681s–2(b)(1); see also Saunders v. Branch Banking And Trust Co. Of VA, 526 F.3d 142, 149 (4th Cir. 2008) ("[Section] 1681s–2(b) ... imposes an obligation to review the previously disclosed information and report whether it was 'incomplete or inaccurate' upon receipt of a notice of dispute from a CRA."). [19] Because the information contained in the ACDV—that the account was in dispute and that plaintiff claims her lease was with MME and was closed satisfactorily—was accurate, defendants had no further obligations to report further information to Experian. [20]

[19]     In fact, some courts have held that failing to report a meritless dispute would not necessarily give rise to liability under § 1681s–2(b) because "reporting an actual debt without noting that it is disputed is unlikely to be materially misleading." See, e.g., Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1163 (9th Cir. 2009).

[20]     LFG also did not report to Experian information aimed to negate or cast doubt on plaintiff's claim

Case 6:19-cv-00608-MAD-TWD Document 12 Filed 06/09/20 Page 51 of 107

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

that she "never had an [account]" – for example, it did not send to Experian a copy of its lawsuit, or any other information challenging plaintiff's allegations such as its call logs and letters sent to plaintiff's address.

### G. NYFCRA claims

Plaintiff also alleges violations of two provisions under the NYFCRA: 1) that defendants pulled plaintiff's consumer credit report without giving her required notice, and 2) that defendants furnished incorrect information to a CRA. Plaintiff also incorporates these allegations into her GBL § 349 claim for deceptive practices.[21]

[21] Plaintiff alleges that 1) that defendants' unauthorized pulling of plaintiff's consumer credit reports without notice, and 2) that defendants "trash[ed]" plaintiff's consumer credit report," and thus violated GBL § 349.

In substance, these NYFCRA allegations largely mirror the causes of action under the federal FCRA, and they fail for similar reasons. Below, this Court addresses issues unique the New York statute.

**\*18** Defendants argue that plaintiff's NYFCRA claims fail as a matter of law because the NYFCRA only provide a remedy to New York consumers, and because plaintiff is a California resident, she cannot recover. Plaintiff does not oppose the merits of this argument; accordingly, the Court finds in favor of defendants on that issue.[22] The Court need not reach the merits of the residency argument, however, as it finds for defendants on both NYFCRA claims because they are preempted by the federal FCRA. NYFCRA's notice provision, § 380-b(b), and furnisher of information provision, § 380-o, both set out obligations for users and furnishers of information that impinge on federal provisions that the FCRA expressly preempts.

[22] Plaintiff only argues that this Court allowed her to amend her Complaint to add these claims— and ipso facto, has ruled that the claims are viable as a matter of law. This is not so. The Court explicitly reserved a ruling on the viability of these claims until summary judgment, stating, "if it's true as a matter of law, and there is support for the defense's arguments as to 349 of the GBL and 380 of the GBL, if the facts don't show that there's any there-there in terms of being able to meet

the legal requirements, these will be [t]hrown out on summary judgment." (Tr. Apr. 16, 2015, ECF No. 70 in Angermier v. Cohen, 12 Civ. 55, at 4-5 (emphasis added).)

The FCRA has two express provisions for preemption. One provision provides:

No requirement or prohibition may be imposed under the laws of any State—

(1) with respect to any subject matter regulated under

[...]

(C) subsections (a) and (b) of section 1681m of this title, relating to the duties of a person who takes any adverse action with respect to a consumer;

[...]

(F) section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies

[...]

(I) section 1681m(h) of this title, relating to the duties of users of consumer reports to provide notice with respect to terms in certain credit transactions;

15 U.S.C. § 1681t(b).

Another provision provides that:

> [N]o consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false

Case 6:19-cv-00608-MAD-TWD  Document 12  Filed 06/09/20  Page 52 of 107

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

information furnished with malice or
willful intent to injure such consumer.

15 U.S.C. § 1681h(e). The Second Circuit has held that these
two preemption provisions are "not in conflict" with each
other. MacPherson v. JPMorgan Chase Bank, N.A., 665 F.3d
45, 47-48 (2d Cir. 2011). In addition, § 1681t(b) does not only
preempt state statutes, but also state common law. Id. at 47
(citing Premium Mortgage Corp. v. Equifax, Inc., 583 F.3d
103 (2d Cir. 2009)).

### 1. Preemption of Section 380-o

State laws that impose obligations on "furnishers of
information to consumer reporting agencies" are preempted
by the FCRA. Section 1681s-2 of the FCRA, which sets
forth responsibilities for furnishers, is specifically listed as
preempting state laws impinging on the same subject. 15
U.S.C. § 1681t(1)(F); Galper v. JP Morgan Chase Bank, N.A.,
802 F.3d 437, 446 (2d Cir. 2015) ("[W]e hold that § 1681t(b)
(1)(F) preempts only those claims that concern a furnisher's
responsibilities.").

Plaintiff brings a claim under the NYFCRA's reporting
provision, N.Y. Gen. Bus. Law § 380-o, which prohibits
furnishers from introducing false information to CRAs.[23]
Plaintiff's claim under § 380-o addresses the very "same
subject matter"— responsibilities of furnishers of information
—as her federal FCPA claim under section 1681s-2(b).
(See SAC ¶ 138 (alleging that defendants "introduced false
information concerning Ms. Ritchie" into the CRA's files and
"willfully refused to retract such false information, or even
investigate Ms. Ritchie's assertions" that the information is
false"). As the Second Circuit held in Galper, section 1681s-2
preempts claims that "concerns a furnisher's responsibilities."
Galper, 802 F.3d at 446. Since section 380-o of the NYFCRA
squarely addresses a furnisher's responsibilities, it is therefore
preempted by the federal statute.[24]

[23]    In any event, plaintiff's claims based on this
        NYFCRA claim largely mirror her federal claim,
        which for the reasons stated above, fail as
        a matter of law. The only difference between
        plaintiff's state and federal claims as to defendants'
        obligations as a furnisher of information is that
        under the state claim, plaintiff also alleges that

defendants unlawfully reported that LFG charged
off $1,836, which plaintiff claims was based on
false information. However, plaintiff fails to state
a cause of action under N.Y. Gen. Bus. Law
§ 380-o, which requires "knowing and willful
introduction of false information" for the purpose
of wrongfully damaging" credit. As the charge-
off happened in September 2010, months before
plaintiff ever contacted either Experian or any
defendant regarding the debt, there is no evidence
that defendants knowingly and willfully introduced
false information in order to damage plaintiff's
credit.

[24]    Although the Second Circuit held in Scott v. Real
        Estate Fin. Grp., 183 F.3d 97, 100 (2d Cir. 1999)
        that "[t]he New York statutes relevant to a false
        pretenses claim contain language similar to that of
        the parallel federal provisions ... [t]herefore, the
        two statutes must be construed in the same way,"
        the issue of preemption was not under review.
        The comparison that the Scott Court drew was
        between "15 U.S.C. §§ 1681b(3), 1681q (pre-1996
        amendments version) [and] ... N.Y. Gen. Bus. L.
        §§ 380-b(a)(3), 380-o." Id. Neither § 1681b nor §
        1681q are listed as FCRA provisions that preempt
        state laws under § 1681t(1).

**\*19** In addition, to the extent that the GBL § 349 claim
and common law fraud claim are based on defendants'
obligations as furnishers of information to CRAs, they are
also preempted. SeeMacPherson v. JP Morgan Chase Bank,
N.A., No. 09 Civ. 1774 (AWT), 2010 WL 3081278, at
\*4 (D. Conn. Aug. 5, 2010)aff'd sub nom.Macpherson v.
JPMorgan Chase Bank, N.A., 665 F.3d 45 (2d Cir. 2011);
Gross v.Washington Mut., Inc., No. 06 Civ. 4340 (RLC),
2007 WL 1404435, at \*4 (S.D.N.Y. May 10, 2007)) (noting
that the FCRA mandates "complete preemption of state law
claims arising out of consumer disputes with furnishers of
information" (internal quotations omitted)). Plaintiff did not
oppose defendant's motion for summary judgment on this
basis.

### 2. Preemption of Section 380-b(b)

The NYFCRA also requires that an applicant for credit must
be given notice if her consumer report may be requested.
N.Y. Gen. Bus. Law § 380-b(b).[25] Defendants acknowledge

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

that they did not provide such notice to plaintiff. (Pl.'s 56.1 ¶ 88.) [26]

25    Plaintiff also refers to the "permissible use" portion of § 380-b, but § 380-b only imposes an obligation on the part of the CRA to only furnish consumer credit information "to a person whom it has reason to believe intends to use the information" for a permissible purpose; this statute does not discuss obligations of recipients of that information. N.Y. Gen. Bus. Law § 380-b(a). Because defendants are not CRAs, and are thus not covered by § 380-b(a), we need only reach the question of whether the notice provision, § 380-b(b), applies.

26    Defendant's argument for summary judgment on the basis that § 380-b(b) does not protect plaintiff because she did not actually make an application for credit is unpersuasive and foreclosed by the undisputed facts in this case. The Court is persuaded by plaintiff's reading of the statute, which states that "No person shall request a consumer report ... in connection with an application made after the effective date of this article, for credit, employment, insurance, or rental or lease of residences, unless the applicant is first informed in writing ...." N.Y. Gen. Bus. Law § 380-b(b) (emphasis added). There is no dispute that plaintiff did apply for credit—as she submitted an application to MME. Furthermore, the Pietrafesa case cited by defendants is inapplicable here, as it concerned the conduct of a credit report aggregator who provided aggregate reports to a third party, not in response to any "application for credit" by the subject of the report or anyone else. Pietrafesa v. First Am. Real Estate Info. Servs., Inc., No. 1:05-CV-1450, 2007 WL 710197, at *6 (N.D.N.Y. Mar. 6, 2007). Indeed, defendant's position—that plaintiff cannot simultaneously allege that she did not apply for credit under the Lease and that she did make an application for credit—is rather disingenuous, as defendants try to take advantage of the same.

However, the federal FCRA statute already sets forth notice obligations for users of consumer credit information. Specifically, section 1681m(a) of the FCRA requires that a user of consumer credit information must "provide oral, written, or electronic notice" to a consumer if it takes "any adverse action with respect to any consumer that is based

in whole or in part on any information contained in a consumer report." The FCRA expressly preempts state laws "with respect to any subject matter regulated under" section 1681m(a), which concern "duties of a person who takes any adverse action with respect to a consumer." 15 U.S.C. § 1681m(a). The question is, therefore, whether NYFCRA's § 380-b(b), which require notice to the consumer whenever a consumer credit report may be requested, is pre-empted by the federal FCRA's notice requirement under 15 U.S.C. § 1681m(a), which only requires notice only if adverse action is taken based on the contents of the report received.

*20  A close reading at the plain wording of both statutes indicates that the answer is yes. [27] The subtitle for § 1681m is the "requirements on users of consumer reports." 15 U.S.C. § 1681m. Subsection (a) specifically discusses those requirements with respect to notice, and requires notice only if the user of the credit report took adverse action based on the reported information. 15 U.S.C. § 1681m(a). Similarly, NYFCRA § 380-b(b)'s subject matter is a user of credit information's duty to provide notice—and that is the subject matter of plaintiff's cause of action. As discussed above, FCRA's § 1681t(b) "expresses Congress's intent to preempt claims which are with respect to any subject matter regulated under" section 1681m(a). Galper, 802 F.3d at 445. The federal statute therefore preempts plaintiff's claim under NYFCRA § 380-b(b), because the state claim impinges on the "subject matter" of the federal statute

27    The Court may resolve preemption issues sua sponte if the material facts are undisputed and the question is purely one of law. Island Park, LLC v. CSX Transp., 559 F.3d 96, 100-01 (2d Cir. 2009); Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury, 445 F.3d 136, 141 (2d Cir. 2006) (Sotomayor, J.) (partially affirming district court's sua sponte grant of summary judgment on preemption grounds). The Court also provided parties an opportunity to brief the preemption issue. (See Feb. 4, 2016 Order, ECF No. 260.)

Beyond the "subject matter" preemption that FCRA § 1681t(1) establishes, the federal and state notice provisions create obligations that actually conflict with each other in several ways. In Safeco Ins. Co. of Am. v. Burr, the Supreme Court ruled that the notice requirement under FCRA § 1681m is limited to "only when the adverse action is based in whole or in part on a consumer report" and not "when a business acts adversely merely after consulting a report." 551 U.S.

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1241531

47, 63-64 (2007). The Court reasoned that "not all adverse actions require notice" and "the duty report arises from some practical consequence of reading the report." Id. The NYFCRA provision, on the other hand, broadens the notice requirement to categorically require users of information to provide notice whenever "a consumer report may be requested in connection with" an initial application for credit. N.Y. Gen. Bus. Law § 380-b(b). This broadening is in conflict with duties contemplated by the federal statute, which sets out a much narrower burden.

It is also unlikely that Congress intended FCRA § 1681m(a), the federal notice provision, to be substantially made broader by patchwork state statutes, especially since it specifically listed § 1681m(a) as one of the provisions that would preempt state statutes on the same subject matter. See Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1172 (9th Cir. 2009) ("[T]here is evidence that the statutory scheme [of the FCRA], which establishes national requirements and preempts most state regulation, was motivated at least in part by a desire for uniformity of reporting obligations"); Willey v. J.P. Morgan Chase, N.A., No. 09 Civ. 1397(CM), 2009 WL 1938987, at *8 (S.D.N.Y. July 7, 2009) (holding that § 1681t(1) "implies broad preemption of state law claims is more consistent with Congress'[s] intent" in enacting the FCRA).

In addition, adjacent subsections of the New York statute also contravene the FCRA by narrowing its notice obligations. Subsection (c) of the NYFCRA notice requirement states that "subsequent consumer reports ... may be requested or utilized in connection with an update, renewal, or extension of the credit ... [with] no notice to the consumer ... at the time such subsequent report is requested." N.Y. Gen. Bus. Law § 380-b(c). However, the federal notice provision is stricter, requiring notice to the consumer whenever there is "adverse action"—including upon subsequent updates and renewals. Safeco, 551 U.S. at 67 (holding that the "adverse action" upon renewal occurs if the renewal rate is adverse when compared to "the previous rate or charge"). This is further evidence that the NYFCRA's notice provision asserted by plaintiff is preempted by § 1681m(a) of the FCRA.

**\*21** For the same reasons, the portions of the GBL § 349 and fraud claims that pertain to responsibilities of furnishers of information and notice requirements for users of credit reports are also preempted. We turn to plaintiff's other theories under GBL § 349 below.

**H. GBL § 349 claims**

N.Y. Gen. Bus. Law § 349 claim requires that "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (quoting Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940, 944 (2012)). Consumer-oriented conduct must "have a broad impact on consumers at large." New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 320 (1995). Plaintiff asserts that defendants violated GBL § 349 by unlawfully pulling consumer credit reports, making false accusations in lawsuits, and making and sending repetitive dunning calls and letters.

Plaintiff does not oppose defendant's argument for dismissal on the bases that 1) she was not deceived by defendants' alleged conduct, and 2) the alleged actions do not constitute consumer-oriented conduct;[28] she has therefore abandoned her claim. Robinson v. Am. Int'l Grp., Inc., No. 08 Civ. 1724 (LAK), 2009 WL 3154312, at *4 (S.D.N.Y. Sept. 30, 2009) aff'd sub nom. Robinson v. Am. Int'l Grp., 396 F. App'x 781 (2d Cir. 2010). The Court reviews the claim pursuant to Fed. R. Civ. R. 56(c)(3) and considers facts set forth by defendants as undisputed. Plaintiff fails to satisfy crucial elements of a GBL § 349 claim.

| 28 | Plaintiff belatedly moves for summary judgment on her GBL § 349 claim in her opposition brief to defendants' motion to strike. This, of course, is impermissible, as plaintiff chose to forgo moving on this claim in her partial summary judgment motion three-and-a-half months prior, and chose to ignore defendants' summary judgment motion on this issue. Moreover, even in her belated motion, plaintiff does not substantively contest the fact that her dispute with defendants is not "consumer-oriented"; she merely asserts that "the material concerning other lawsuits show that Defendants' conduct at issue is a general practice affecting other consumers." (Pl.'s Br. in Opp. to Def's Mot. to Strike, ECF No. 240, at 21.) This conclusory statement cannot save her claim. |

First, plaintiff has not proffered any evidence that plaintiff suffered injury as a result of defendants' allegedly deceptive practices. Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26 (1995) (holding that a GBL § 349 plaintiff "must show that the defendant engaged in a material deceptive act or practice that

Case 6:19-cv-00608-MAD-TWD Document 12 Filed 06/09/20 Page 55 of 107

Ritchie v. Northern Leasing Systems, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1241531

caused actual, although not necessarily pecuniary, harm"). Specifically, "in order to have been injured by the defendant's deceptive act, a plaintiff must have been personally misled or deceived." LaCourte v. JP Morgan Chase & Co., No. 12 Civ. 9453 (JSR), 2013 WL 4830935, at *10 (S.D.N.Y. Sept. 4, 2013). Plaintiff herself admits that she was not deceived by defendants—she consciously ignored defendants' phone calls and letters, and answered the lawsuit by asserting forgery and counterclaims against defendant. She was also aware of, and disputed, the entries made in her credit report. Therefore, plaintiff's GBL § 349 claims must be dismissed.

**\*22** Second, the GBL § 349 claim fails because there is no record evidence suggesting that defendants' alleged practices broadly impact consumers at large, a requirement under the statute. Although some of these alleged practices theoretically under difference circumstances could be of a type that broadly impact consumers, see, e.g., Mayfield v. Asta Funding, Inc., 95 F. Supp. 3d 685, 700 (S.D.N.Y. 2015), plaintiff has failed to put forth evidence that they do so here. [29] While plaintiff need not bring evidence of "a repetition or pattern of deceptive behavior," she does need to show that there is a broader impact. Oswego, 85 N.Y.2d at 25. The alleged conduct in this action is "unique as to the parties" and there is no evidence that defendants makes systematic misrepresentations in the same manner as is alleged here. Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 64 (2d Cir. 2010); see also Euchner-USA, Inc. v. Hartford Cas. Ins. Co., 754 F.3d 136, 143 (2d Cir. 2014); DeAngelis v. Corzine, 17 F. Supp. 3d 270, 284 (S.D.N.Y. 2014).

[29] Plaintiffs allege that defendants violated GBL § 349 by alleging false information in the lawsuit against her. Although it is clear that Northern has sued other individuals in New York courts, there is no record evidence that defendants made false statements in those suits. The merely filing of claims is insufficient to support the cause of action plaintiff pled under GBL § 349.
Plaintiff also acknowledged that documents from other lawsuits—the admissibility of which this Court has serious doubt—are not proffered for the truth of the matter but rather "to prove the fact that Defendants received them." (Pl.'s Opp. Br. to Def.'s Mot. to Strike at 17-19.) This eliminates any triable issue on the consumer-oriented nature of defendants' alleged statements against her in her lawsuit.

I. Counterclaim

Defendants did not oppose plaintiff's motion for summary judgment on the Counterclaim. Plaintiff argues that because she never signed the lease in question, she is not bound by its guarantees. Defendants agrees that for the purposes of their own summary judgment motion, they do not contest plaintiff's assertion that she did not sign the lease in question. (Defs.' Br. ISO Mot. Summ. J., ECF No. 197, at 1, n.2.) Because plaintiff is not bound by the lease terms, plaintiff's motion for summary judgment on the Counterclaim is GRANTED.

IV. CONCLUSION [30]

[30] There are a number of additional arguments, many of which are quite confused and poorly briefed. To the extent that they are intelligible, the Court has reviewed them and found them to be without merit.

For the reasons set forth above, defendants' motion for summary judgment is GRANTED in its entirety. Plaintiff's partial motion for summary judgment on the FCRA and NYFCRA are DENIED; her motion for summary judgment on the Counterclaim is GRANTED. Because the Court has resolved the case on summary judgment, defendants' Daubert motion and motions in limine are moot. The Clerk of Court is directed to terminate the motions at ECF Nos. 184, 189, 224, 247, and 255, and to terminate this action.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1241531

---

2015 WL 3463433
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kaysi LENT, Plaintiff,
v.
CCNH, INC. d/b/a Cortland Care Center, Defendant.

No. 5:13–CV–942 (MAD/ATB).
|
Signed June 1, 2015.

**Attorneys and Law Firms**

The Lama Law Firm, LLP, Luciano L. Lama, Esq., of Counsel, Ithaca, NY, for Plaintiff.

CCNH, Inc., Cortland, NY.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

*1 On August 8, 2013, Plaintiff filed this action alleging that Defendant CCNH, Inc. ("CCNH") discriminated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), New York Executive Law § 296 (the New York Human Rights Law ("NYHRL")), and New York Civil Rights Law ("NYCRL") § 40–c and intentionally inflicted emotional distress on her, by virtue of CCNH's failure to take action when Plaintiff notified it that one of its employees, Jeffrey S. Greene, [1] harassed, sexually abused, and raped her. *See* Dkt. No. 1 at 1–11 ("Complaint"). CCNH has failed to answer or move against the Complaint, or to otherwise appear in this action. Currently before the Court is Plaintiff's unopposed amended motion for default judgment. *See* Dkt. No. 29.

[1]   On December 12, 2013, the Court granted Plaintiff's notice of voluntary dismissal of Defendant Jeffrey S. Greene, pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure. Dkt. No. 26. The case caption has been amended accordingly.

**II. BACKGROUND**

Plaintiff alleges that between October 24, 2007 and January of 2009, while both she and Greene were employed by CCNH, Greene cornered her on a daily basis in a locked closet on CCNH's premises and forced her to touch his genitals, perform oral sex, and engage in sexual intercourse. Complaint at ¶¶ 10–12. At the time the sexual abuse began, Plaintiff was sixteen years old. *Id.* at ¶ 13. On January 22, 2009, Plaintiff was admitted to Cortland Regional Medical Center after a suicide attempt following an argument with Mr. Greene. *Id.* at ¶ 15; Dkt. No. 1 at 13–16. The Cortland Regional Medical Center Emergency Department Report states as follows:

Kaysi is a 17–year–old female brought into the Emergency Department by her mother with the chief complaint of overdose. The patient was brought in by her mother after she told her mother she took 12 ibuprofen of 200 mg. The patient states she took these about an hour prior to coming into the Emergency Department. She denies any nausea or vomiting. No pain. The patient states that she was feeling at the time that she wanted to hurt herself. She states she does not feel this way at this time. The patient did have an argument with her current boyfriend who is 43–years–old and a coworker at a local nursing home. The patient's mother states that she only found out about this today as the patient told her mother that her boyfriend had broken up with her. She states she did not know that this man was her daughter's boyfriend. The patient states that she knows the age of consent is 17 in the state of New York and "so they cannot get in trouble for this." She was very concerned though that this man would get into trouble for this relationship with her and states this is why she took the ibuprofen.

Dkt. No. 1 at 15.

Thereafter, on January 28, 2009, Plaintiff's mother informed Plaintiff's supervisor at CCNH, Sharon Breed, of the sexual assault allegations made by Plaintiff against Greene. Complaint at ¶ 16. Breed informed Plaintiff that she did not believe the accusations, refused to transfer Plaintiff to a shift that was different from Greene's, and advised Plaintiff not to file a report with CCNH's human resources department regarding her allegations. *Id.* at ¶ 17. On February 15, 2009, Greene was transferred to a different shift for reasons other than Plaintiff's request. *Id.* at ¶ 18. In May of 2009, Breed informed Plaintiff that Greene would be transferred back to Plaintiff's shift and that, if Plaintiff was not agreeable

to this, Plaintiff should quit her job. *Id.* at ¶¶ 19–20. On May 15, 2009, three days before Greene was scheduled to be transferred back to Plaintiff's shift, Plaintiff resigned her position. *Id.* at ¶ 21. At some point in 2009, Greene was indicted by the Grand Jury of Cortland County on three counts of Criminal Sexual Act in the Third Degree, three counts of Rape in the Third Degree, and one count of Endangering the Welfare of a Child. *Id.* at ¶ 22; Dkt. No. 1 at 29–35. On April 26, 2010, Greene was convicted of two counts of Endangering the Welfare of a Child and sentenced to three years probation. Complaint at ¶ 23; Dkt. No. 1 at 37–39.

**\*2** Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination under Title VII. Complaint at ¶ 25. In a June 6, 2013 letter, the EEOC found that Plaintiff "was subject to a hostile work environment in that she was sexually harassed and constructively discharged after complaining about the harassment/hostile work environment." Complaint at ¶ 26; Dkt. No. 1 at 96–99.

Plaintiff commenced this action on August 8, 2013 by filing a Complaint against CCNH and Greene. *See* Dkt. No. 1. Plaintiff completed service of the Summons and Complaint on CCNH on September 25, 2013. *See* Dkt. Nos. 5, 7. To date, CCNH has not filed an answer or motion in response to the Complaint.

On October 18, 2013, pursuant to Rule 55(a) of the Federal Rules of Civil Procedure, Plaintiff requested an entry of default against CCNH. *See* Dkt. No. 10. On October 21, 2013, the Clerk of the Court entered a default against CCNH. *See* Dkt. No. 11. On November 20, 2013, Plaintiff filed her initial motion seeking a default judgment against CCNH pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure. *See* Dkt. No. 18. On September 8, 2014, the Court issued an order denying without prejudice Plaintiff's initial motion for default judgment and ordered Plaintiff to file a certificate of service demonstrating that Plaintiff's motion had been served on CCNH. *See* Dkt. No. 28. The Court also notified Plaintiff that the record as of the date of the Court's Order was insufficient to permit a determination on damages without a hearing, should the Court grant Plaintiff's motion for default judgment. *Id.* at 2 n.2. On September 11, 2014, Plaintiff filed an amended motion for default judgment, which included a certificate of service attesting that the motion had been served on CCNH. *See* Dkt. Nos. 29, 30, 31, 32, 33. CCNH has not responded to the motion.

## III. DISCUSSION

### A. Entry of default judgment

"Rule 55(b) of the Federal Rules of Civil Procedure provides that when a party moves for judgment against an adverse party who has failed to answer or otherwise appear in the action, the court may enter judgment against the defaulting party." *Coated Fabrics Co. v. Mirle Corp.,* No. 06–CV–5415, 2008 WL 163598, *4 (E.D.N.Y. Jan. 16, 2008) (citing Fed.R.Civ.P. 55(b)). "That rule, in tandem with the Northern District of New York Local Rule 55.2, sets forth certain procedural prerequisites that must be met before a default judgment may be entered...." *Pert 35, Inc. v. Amari Aviation Ltd.,* No. 09–CV–0448, 2010 WL 1257949, *3 (N.D.N.Y. Mar. 5, 2010). More specifically, in order to grant a plaintiff's motion for default judgment, the plaintiff must satisfy the following requirements: "1) show that the defendant was properly served with a summons and complaint; 2) obtain the entry of default; and 3) provide an affidavit setting forth the salient facts including, if the defendant is a person, showing that he or she is not an infant or incompetent, or a member of the United States Military Service." *Id.* (citing Fed.R.Civ.P. 55(b) (2); N.Y.N.D. L.R. 55.1 and 55.2) (other citation omitted).

**\*3** "When a default judgment is entered, the defendant's failure to respond constitutes an admission of the well-pleaded factual allegations in the complaint, except as to claims relating to damages." *Coated Fabrics Co.,* 2008 WL 163598, at *4 (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir.1992); *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir.1981)). In determining whether to enter a default judgment, the Second Circuit has cautioned that defaults are not favored, and "doubts are to be resolved in favor of a trial on the merits." *Meehan v. Snow,* 652 F.2d 274, 277 (2d Cir.1981) (citations omitted). While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] ... delay and clog its calendar," it has held that the district court must balance that interest with its responsibility to "afford[ ] litigants a reasonable chance to be heard." *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 96 (2d Cir.1993) (citations omitted). Thus, in light of the "oft-stated preference for resolving disputes on the merits," default judgments "are generally disfavored." *Id.* at 95–96 (citations omitted). Accordingly, simply because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right. *See Erwin DeMarino Trucking Co. v. Jackson,* 838 F.Supp.

160, 162 (S.D.N.Y.1993) (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice").

In considering a motion for default judgment, the Court is guided by the same three factors that apply to a motion to set aside entry of a default judgment. *See Enron Oil Corp.,* 10 F.3d at 96; *Rodriguez v. Almighty Cleaning, Inc.,* 784 F.Supp.2d 114, 123 (E.D.N.Y.2011) (citations omitted). Specifically, the court considers "(1) 'whether the defendant's default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment.' " *Rodriguez,* 784 F.Supp.2d at 123 (quoting *Mason Tenders Dist. Council Welfare Fund v. Duce Constr. Corp.,* No. 02 Civ 9044, 2003 WL 1960584, *2 (S.D.N.Y. Apr. 25, 2003)). "[B]ecause defaults are generally disfavored and are reserved for rare occasions, when doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party." *Enron Oil Corp.,* 10 F.3d at 96.

Here, Plaintiff has satisfied the procedural prerequisites for obtaining a default judgment. Plaintiff has properly served CCNH with the Complaint, obtained an entry of default, and provided an affidavit setting forth all of the requirements set forth above. *See* Dkt. No. 18–3. As such, the Court analyzes the three factors that guide a court's determination of whether to grant a default judgment below.

## B. Willfulness

**\*4** "When a defendant is continually and 'entirely unresponsive,' [the] defendant's failure to respond is considered willful." *Trs. of the Pavers & Rd. Builders Dist. Council Welfare Fund v. JREM Constr. Corp.,* No. 12–CV–3877, 2013 WL 618738, *3 (E.D.N.Y. Jan. 28, 2013) (quoting *Bridge Oil Ltd. v. Emerald Reefer Lines, LLC,* No. 06 Civ. 14226, 2008 WL 5560868, *2 (S.D.N.Y. Oct. 27, 2008)). Thus, as to the first factor, the continual failure of CCNH to respond to the Complaint sufficiently demonstrates willfulness. *See E. Sav. Bank, FSB v. Beach,* No. 13–CV–0341, 2014 WL 923151, *5 (E.D.N.Y. Mar. 10, 2014); *Indymac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.,* No. 07 Civ. 6865, 2007 WL 4468652, *1 (S.D.N.Y. Dec. 20, 2007). Plaintiff submitted an Affidavit of Service demonstrating that the Summons and Complaint were served on CCNH through the New York State Department of State on September 10, 2013, and that the Summons and Complaint were sent by first class mail to CCNH on September 25, 2013. *See* Dkt. Nos.

32–2, 32–3. CCNH neither answered nor responded in any way to the Complaint, nor did it request an extension of time to respond, and the time to do so has expired. In addition, Plaintiff has provided the Court with a Certificate of Service indicating that CCNH was served with the Notice of Motion for Default Judgment and the associated exhibits. *See* Dkt. No. 33. CCNH did not respond to the motion. There is no indication that CCNH's failure to respond to the Complaint, as well as the Motion for Default Judgment, despite being properly served, was anything but deliberate.

## C. Meritorious Defense

Turning to the next factor, the Court must consider whether CCNH has a meritorious defense. Where a defendant fails to answer the complaint, courts are unable to make a determination whether the defendant has a meritorious defense. *See Empire State Carpenters Welfare Fund v. Darken Architectural Wood,* No. CV 11–46, 2012 WL 194075, *3 (E.D.N.Y. Jan. 17, 2012). "[A]ccordingly, this factor weighs in favor of granting a default judgment." *Joseph v. HDMJ Rest., Inc.,* 970 F.Supp.2d 131, 143 (E.D.N.Y.2013) (citations omitted). Although CCNH's default constitutes an admission of all the factual allegations in the Complaint as they relate to liability, Plaintiff must nevertheless demonstrate that the uncontested allegations set forth valid claims. *See Said v. SBS Elecs., Inc.,* No. CV 08–3067, 2010 WL 1265186, *2 (E.D.N.Y. Feb. 24, 2010) ("With respect to liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action."). The Court will examine each of Plaintiff's claims in turn.

### 1. Title VII & NYHRL Claims

As an initial matter, the Court notes that the same standard is used when analyzing Title VII and NYSHRL claims. *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir.2007); *Mandell v. Cnty. of Suffolk,* 316 F.3d 368, 377 (2d Cir.2003). Discrimination claims under Title VII are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792 (1973). It is the plaintiff's burden to establish a prima facie case of discrimination. *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir.2001); *Lewis v. Erie Cnty. Med. Ctr. Corp.,* 907 F.Supp.2d 336, 346 (W.D.N.Y.2012). A prima facie case of discrimination consists of four elements the plaintiff must allege: "(1) she falls within a protected class, (2) she was performing

her duties satisfactorily, (3) she was subject to an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination." *Lewis, 907 F.Supp.2d at 346.* Once established, a rebuttable presumption of discrimination arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Byrnie, 243 F .3d at 102; Lewis, 907 F.Supp.2d at 346.* Based on the allegations in the Complaint, Plaintiff asserts claims under Title VII for hostile work environment discrimination and retaliation.

*a. Hostile Work Environment*

**\*5** Title VII makes it " 'an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)). "[T]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent ' "to strike at the entire spectrum of disparate treatment of men and women" ' in employment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64 (1986) (quoting *L.A. Dep't of Water & Power v. Manhart,* 435 U.S. 702, 707 n.13 (1978)). In order to demonstrate a hostile work environment, a plaintiff must establish: "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002) (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)); *see also Harris,* 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview.").

The inquiry has objective and subjective elements: " 'the misconduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive.' " *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir.2003) (quoting *Alfano,* 294 F.3d at 374). Factors such as frequency of the discriminatory conduct, its severity, and whether it humiliates or physically threatens an employee or unreasonably interferes with an employee's work performance are used to determine whether an environment is sufficiently hostile. *Id.* (citing *Harris,* 510 U.S. at 23). "As

a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' " *Alfano,* 294 F.3d at 374 (quoting *Perry,* 115 F.3d at 149). "Finally, it is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Id.* (quoting *Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir.2001)).

In this case, Plaintiff alleges that her co-worker, Mr. Greene, harassed, sexually abused, and raped her over a nearly two-year period. The Court accepts these allegations from the Complaint and Exhibits as true for the purposes of this motion for default judgment. *See Greyhound Exhibitgroup, Inc.,* 973 F.2d at 158. When Plaintiff informed her supervisor of Mr. Greene's conduct, her supervisor stated that she did not believe the accusations, refused to transfer Plaintiff to another shift, and advised Plaintiff not to file a report with CCNH's human resources department. Thereafter, Plaintiff's supervisor informed Plaintiff that if she did not want to work on the same shift as Mr. Greene, she should quit her job. Notably, the EEOC determined after investigation that Plaintiff was subject to a hostile work environment. As a result, Plaintiff resigned her position at CCNH. Such actions go far beyond merely offensive conduct and are sufficient for a reasonable person to find her work environment abusive and hostile in violation of Title VII. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995) ("[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability."), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998).

**\*6** Plaintiff subjectively perceived her work environment to be hostile, as evidenced by her complaints about the unlawful behavior. Further, by complaining about her treatment in the workplace to her supervisor, Plaintiff made it sufficiently clear that Mr. Greene's behavior was negatively affecting her work environment.

Once a plaintiff has established the existence of a hostile workplace, she must then demonstrate that the harassing conduct which created the hostile situation should be imputed to the employer. *Alfano,* 294 F.3d at 373. "The standards for assessing vicarious liability differ depending on the status of the alleged harasser." *Brown v. City of N.Y.,* No. 11 Civ. 2915, 2013 WL 3789091, \*12 (S.D.N.Y. July 19, 2013). When the alleged harasser "is in a supervisory position over the

2015 WL 3463433

plaintiff, the objectionable conduct is automatically imputed to the employer." *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 103 (2d Cir.2010). By contrast, if the alleged harasser is a co-worker, "an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.' " *Perry,* 115 F.3d at 149 (quoting *Karibian v. Columbia Univ.,* 14 F.3d 773, 780 (2d Cir.1994)).

Here, Plaintiff has alleged that her supervisor at CCNH was made aware of the harassment but did nothing about it. Although an employer may raise an affirmative defense if the employer exercised reasonable care to prevent and correct any harassing behavior and the employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer, such a defense is unavailable when a tangible employment action is taken. *Ellerth,* 524 U.S. at 765; *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.,* 555 U.S. 271, 278 (2009). This defense is unavailable in these circumstances because Plaintiff was constructively discharged after complaining about Mr. Greene's conduct when her supervisor informed her to quit if she did not desire to work the same shift as Mr. Greene. Based on each of the foregoing factors, Plaintiff has sufficiently stated the elements of a valid claim for hostile work environment under Title VII.

### b. Retaliation

The clause in the section of Title VII which addresses retaliation states that it is " 'an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII]." *Crawford,* 555 U.S. at 274 (quoting 42 U.S.C. § 2000e–3(a)). To establish a prima facie case for retaliation, a plaintiff must show that " '(1) [the employee] engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse [employment] action; and (4) there was a causal connection between the protected activity and that adverse action.' " *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir.2013) (quoting *Lore v. City of Syracuse,* 670 F.3d 127, 157 (2d Cir.2012)).

**\*7** "A plaintiff engages in 'protected activity' when she (1) opposes employment practices prohibited under Title VII; (2) makes a charge of discrimination; or (3) participates in an investigation, proceeding or hearing arising under Title VII." *Bundschuh v. Inn on the Lake Hudson Hotels, LLC,* 914 F.Supp.2d 395, 405 (W.D.N.Y.2012) (citations omitted).

"[I]n order to constitute a protected activity for purposes of a retaliation claim, the complaint must be related to discrimination on a basis prohibited by Title VII." *Bennett v. Hofstra Univ.,* 842 F.Supp.2d 489, 500 (E.D.N.Y.2012) (citations omitted). Informal protests of discrimination, such as " 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges' " include recognized forms of protected activity. *Matima v. Celli,* 228 F.3d 68, 78–79 (2d Cir.2000) (quoting *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990)). Here, Plaintiff was engaged in a protected activity when she complained to her supervisor about Mr. Greene's discriminatory and harassing behavior. Further, Plaintiff's complaint to her supervisor is sufficient to satisfy the "general corporate knowledge" standard for the knowledge element of a retaliation claim. *See Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 210 (2d Cir.2006) (quoting *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir.2000)).

As to the third element in the prima facie case for retaliation, " 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Id.* at 207 (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)). Unlike a disparate treatment claim under Title VII, a retaliation claim " 'is *not* limited to discriminatory actions that affect the terms and conditions of employment.' " *Id.* (quoting *White,* 548 U.S. at 64). " '[T]here are no bright-line rules' with respect to what constitutes an adverse employment action for purposes of a retaliation claim, and therefore 'courts must pore over each case to determine whether the challenged employment action reaches the level of "adverse." ' " *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 721 (2d Cir.2010) (quoting *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997)).

Plaintiff alleges that she was constructively discharged of her employment. "Constructive discharge is considered an adverse employment action sufficient to support a retaliation claim." *Dall v. St. Catherine of Siena Med. Ctr.,* 966 F.Supp.2d 167, 194 (E.D.N.Y.2013). "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry,* 336 F.3d at 151–52 (citing *Kirsch v. Fleet St., Ltd.,* 148 F.3d

2015 WL 3463433

149, 161 (2d Cir.1998)). Constructive discharge "requires a 'further showing' beyond what is necessary to establish a hostile work environment or retaliation claim, such that resignation qualified as a fitting response." *Bundschuh,* 914 F.Supp.2d at 408 (quoting *Pa. State Police v. Suders,* 542 U.S. 129, 134 (2004)).

**\*8** "[W]orking conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Terry,* 336 F.3d at 152 (quoting *Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir.1996)). "An employee need not show that an employer acted with the specific intent to cause the employee to resign; rather, she need only show that the employer's actions were 'deliberate and not merely negligent or ineffective.' " *Bader v. Special Metals Corp.,* 985 F.Supp.2d 291, 309 (N.D .N.Y.2013) (quoting *Petrosino v. Bell Atl.,* 385 F.3d 210, 229–30 (2d Cir.2004)); *see also Farren v. Shaw Envtl., Inc.,* 852 F.Supp.2d 352, 362 (W.D.N.Y.2012) ("If a plaintiff cannot show specific intent on the part of the employer, he or she is required to at least demonstrate that an employer['s] actions are deliberate, not merely negligent or ineffective." (citations omitted)).

As to causation, Title VII is violated when a retaliatory motive plays a part in the adverse employment action, even if it was not the sole cause for the action and objectively valid reasons for the discharge exist. *Hicks v. Baines,* 593 F.3d 159, 164–65 (2d Cir.2010).

Here, Plaintiff alleges that she complained about Mr. Greene's sexually abusive conduct to her supervisor, who informed her to quit if she did not want to continue working with Mr. Greene. As such, the Complaint adequately alleges constructive discharge. As noted above, the EEOC also found that Plaintiff had been constructively discharged. Finally, the Complaint also sufficiently alleges, both directly and indirectly, a causal connection between the protected activity and adverse action. Thus, Plaintiff has sufficiently alleged the elements for a valid claim of retaliation under Title VII.

Furthermore, because the same standard is used to evaluate Title VII and NYSHR claims, Plaintiff has sufficiently alleged violations of NYSHR § 296. [2]

[2]   The Court notes that Plaintiff's claims under the NYSHRL were timely filed, as the three-year statute of limitations was tolled during the

pendency of Plaintiff's complaint with the EEOC. *See Martinez–Tolentino v. Buffalo State Coll.,* 277 A.D.2d 899, 899 (4th Dep't 2000). While the exact dates pertaining to Plaintiff's EEOC complaint are unclear, it appears that Plaintiff timely filed her complaint with the EEOC at some point prior to April 27, 2010, less than one year after the alleged discriminatory acts. *See* Dkt. No. 1 at 56 (describing EEOC hearing on Plaintiff's complaint held on that date). The statute of limitations was then tolled while Plaintiff's EEOC complaint was pending, until June 6, 2013, when the EEOC issued its notice of right to sue. *See* Dkt. No. 1 at 96–99. Plaintiff's filing of her claim on August 8, 2013 was therefore well within the three-year statute of limitations. Furthermore, there is no evidence that Plaintiff's EEOC complaint was untimely, and Plaintiff filed her Title VII claims within ninety days of receiving the EEOC's notice of right to sue.

**2. NYCRL § 40–c**

Section 40–c of the NYCRL provides, in relevant part, that "[n]o person shall, because of ... sex ... be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state." N.Y. Civ. Rights Law § 40–c. "A valid cause of action based on a violation of section 296 of the New York Executive Law exposes the defendant to civil penalties under Section 40–c of the New York Civil Rights Law, recoverable by the person aggrieved." *Ganzy v. Allen Christian Sch.,* 995 F.Supp. 340, 350 (E.D.N.Y.1998) (citing N.Y. Civ. Rights Law §§ 40–c, 40–d; *Hart v. Sullivan,* 84 A.D.2d 865, 866 (3rd Dep't 1981)). "Facts sufficient to sustain a cause of action under New York Executive Law section 296 will support a cause of action under section 40–c of the Civil Rights Law." *Id.* (citing *People v. Hamilton,* 125 A.D.2d 1000, 1001 (4th Dep't 1986); *Sampler v. Univ. of Rochester,* 144 A.D.2d 940, 941 (4th Dep't 1988)). Accordingly, as Plaintiff has stated valid claims under section 296 of the NYHRL, Plaintiff's claims are sufficient to support a cause of action under section 40–c of the NYCRL.

**\*9** However, the statute of limitations for claims brought under NYCRL § 40–c is three years from the date of injury caused by discrimination. *Pratt v. Indian River Cent. Sch. Dist.,* 803 F.Supp.2d 135, 148 (N.D.N.Y.2011) (citation omitted). CCNH's alleged discriminatory conduct as to Plaintiff occurred no later than May 15, 2009, when Plaintiff

resigned her position with CCNH. *See* Complaint at ¶ 21. Thus, in the absence of any tolling, the statute of limitations on Plaintiff's NYCRL claim expired on May 15, 2012. New York Civil Practice Law and Rules § 208 provides for tolling of the statute of limitations during a period of infancy. *See* N.Y.C.P.L.R. § 208. Plaintiff's exact date of birth is unclear from her filings, but it is clear that she was born in 1991. *See, e.g.,* Dkt. No. 1 at 13, 15. Thus, even assuming Plaintiff's date of birth is the latest possible date of December 31, 1991, the statute of limitations on her NYCRL claim ran no later than December 31, 2012, three years after her eighteenth birthday. *See* N.Y.C.P.L.R. § 208; *Niles v. Nelson,* 72 F.Supp.2d 13, 20 (N.D.N.Y.1999) ("[I]f the toll [for infancy under § 208] applies, the statute of limitations did not begin to run until [the plaintiff] reached age eighteen."). Plaintiff's filing of her claim on August 8, 2013 is clearly outside the statute of limitations, even giving Plaintiff the benefit of all potentially applicable tolling. [3] The Court therefore denies Plaintiff's motion for default judgment as to this claim. *See Waldron v. Milana,* No. 5:10–CV–0065, 2013 WL 2445047 (N.D.N.Y. June 5, 2013) (denying a motion for default judgment on claims barred by the applicable statute of limitations and explaining that "district courts may dismiss an action sua sponte on statute of limitations grounds in certain circumstances where 'the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted.' " (quoting *Walters v. Indus. & Commercial Bank of China, Ltd.,* 651 F.3d 280, 293 (2d Cir.2011)).

[3]   The Court has identified no precedent establishing that a claim under NYCRL § 40–c is tolled while a plaintiff has an EEOC complaint pending. In the absence of any authority for tolling the statute of limitations, the Court is constrained from extending Plaintiff's time to file her claim. *See Pasqualini v. MortgageIT, Inc.,* 498 F.Supp.2d 659, 669 (S.D.N.Y.2007) ("New York law provides for the tolling of statutes of limitation only in certain narrowly-defined circumstances ...."); *id.* at 669 n.10 ("New York has codified its statutes of limitations and the circumstances under which they may be tolled." (quotation omitted)).

### 3. Intentional Infliction of Emotional Distress Claim

In order to state a claim for intentional infliction of emotional distress under New York law, the Plaintiff must plead: "(1) extreme and outrageous conduct, measured by the reasonable bounds of decency tolerated by society; (2) intent to cause or disregard of a substantial probability of causing severe

emotional distress; '(3) a causal connection between the conduct and the injury; and (4) severe emotional distress.' " *Margrabe v. Sexter & Warmflash, P.C.,* 353 Fed. Appx. 547, 550 (2d Cir.2009) (quoting *Conboy v. AT & T Corp.,* 241 F.3d 242, 258 (2d Cir.2001)); *see also Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 121 (1993) (stating the same). New York law sets a very high threshold for extreme and outrageous conduct. "The conduct at issue 'must transcend the bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community." *Margrabe,* 353 Fed. Appx. at 550 (quoting *Klinge v.. Ithaca Coll.,* 235 A.D.2d 724, 727 (3d Dept.1997)). To survive a motion to dismiss, "[t]he conduct alleged must be such that it can be fairly characterized as egregious, utterly despicable, heartless or flagrant." *Lydeatte v. Bronx Overall Econ. Dev. Corp.,* No. 00CIV5433, 2001 WL 180055, *2 (S.D.N.Y. Feb. 22, 2001). A claim for the intentional infliction of emotion distress is "rigorous, and difficult to satisfy." *Howell,* 81 N.Y.2d at 122 (citations omitted).

**\*10** Pursuant to New York Civil Practice Law and Rules § 215, the statute of limitations for a cause of action for the intentional infliction of emotional distress is one year. N.Y.C.P.L.R. § 215(3); *Goldner v. Sullivan, Gough, Skipworth, Summers & Smith,* 105 A.D.2d 1149, 1151 (4th Dep't 1984). Plaintiff's intentional infliction of emotional distress claim against CCNH centers on her supervisor's response to her complaints against Mr. Greene. *See* Complaint at ¶¶ 45–52. Accordingly, her claim accrued at the latest by May 15, 2009, the date she resigned her position, and the statute of limitations expired on May 15, 2010. As the Court discussed above, the statute of limitations was tolled during Plaintiff's infancy, and the latest possible date for Plaintiff's date of birth is December 31, 1991. As such, the statute of limitations on her intentional tort claim ran no later than December 31, 2010, one year after her eighteenth birthday. Furthermore, the Second Circuit has held that as a matter of federal law, "filing an EEOC charge does not toll the limitations period for state-law tort claims, even if those claims arise out of the same factual circumstances as the discrimination alleged in the EEOC charge." *Castagna v. Luceno,* 744 F.3d 254, 255 (2d Cir.2014). Thus, Plaintiff's intentional infliction of emotional distress claim filed on August 8, 2013 is clearly untimely, and the Court denies Plaintiff's motion for default judgment on this claim.

### D. Prejudice

The final factor the Court must consider is whether the non-defaulting parties would be prejudiced if the motion

for default were to be denied. Denying this motion would be prejudicial to Plaintiff, "as there are no additional steps available to secure relief in this Court." *Bridge Oil Ltd. v. Emerald Reefer Lines, LLC,* No. 06 Civ. 14226, 2008 WL 5560868, *2 (S.D.N.Y. Oct. 27, 2008) (citing *Mason Tenders,* 2003 WL 1960584, at *3). Without the entry of a default judgment, Plaintiff would be unable to recover for the claims adequately set forth in the Complaint. Since Plaintiff sufficiently made out claims under Title VII and NYHRL for hostile work environment and retaliation, a default judgment is warranted on these claims. However, Plaintiff cannot prevail on her NYCRL and intentional infliction of emotional distress claims.

For the foregoing reasons, Plaintiff is entitled to default judgment on liability on her Title VII and NYHRL claims.

### E. Damages

"While a party's default is deemed to constitute a concession of all well-pleaded allegations of liability, it is not considered an admission of damages." *Greyhound,* 973 F.2d at 158. Therefore, once a party's default as to liability is established, a plaintiff still must prove damages. *See Flaks v. Koegel,* 504 F.2d 702, 707 (2d Cir.1974) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation."). "[E]ven upon default, a court may not rubber-stamp the non-defaulting party's damages calculation, but rather must ensure that there is a basis for the damages that are sought." *Overcash v. United Abstract Group, Inc.,* 549 F.Supp.2d 193, 196 (N.D.N.Y.2008). "To award damages, it is not necessary for a court to hold a hearing; instead, a court may rely upon affidavits and documentary evidence." *Id.* (citing *Fustok v. ContiCommodity Servs., Inc.,* 873 F.2d 38, 40 (2d Cir.1989); *Action S.A. v. Marc Rich & Co., Inc.,* 951 F.2d 504, 508 (2d Cir.1991)).

**\*11** For instance, in *Fustok,* the Second Circuit upheld an award of damages on a default judgment against a third-party defendant where "the District Court relied upon detailed affidavits and documentary evidence, supplemented by the District Judge's personal knowledge of the record, gained during four years of involvement with the litigation, including his role as presiding judge at trial." 873 F.2d at 40. The Second Circuit noted that "the nature and value of [the plaintiff's] claim were 'fully aired' at the trial" between the plaintiff and defendant. *Id.* Similarly, in *Action S.A.,* the Second Circuit affirmed an award of compensatory damages on a

default judgment after the district court "conducted a year-long inquest on damages involving volumes of affidavits and lengthy oral argument from the parties, and denied a subsequent defense request for a full evidentiary hearing." 951 F.2d at 508.

In the present matter, the Court alerted Plaintiff of the need to supplement the record to support her claims for damages in its September 8, 2014 Order. *See* Dkt. No. 28 at 2 n.2. Nonetheless, as to damages, Plaintiff's amended motion for default judgment includes a one-page statement of amount due in default judgment, three-page attorney affirmation, and combined statement and invoice totaling $1,842.46 in costs and disbursements by Plaintiff's counsel that were included in her prior motion for default judgment. *See* Dkt. Nos. 18–1, 18–2, 18–3, 29–1, 292, 29–3. Plaintiff's submissions are plainly insufficient for the Court to ensure that there is a basis for the $1,250,000 in damages that Plaintiff seeks. *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir.1997) ("[T]he District Court ... could not just accept [the plaintiff's] statement of the damages. This did not satisfy the court's obligation to ensure that the damages were appropriate."). As a result, the Court finds that it is inappropriate to award damages without first conducting an evidentiary hearing, at which Plaintiff must prove the quantum of damages she seeks.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's amended motion for default judgment (Dkt. No. 29) is **GRANTED** as to liability on Plaintiff's Title VII and NYHRL claims and **DENIED** as to liability on Plaintiff's NYCRL and intentional infliction of emotional distress claims; and the Court further

**ORDERS** that Plaintiff's amended motion for default judgment is **RESERVED** as to damages pending the damages hearing discussed herein;[4] and the Court further

[4]     Plaintiff's counsel will be contacted to schedule a date for the damages hearing.

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3463433

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2445047
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Debbie M. WALDRON, Plaintiff,

v.

James MILANA; Scott Henderson; Sean Lynch;
Thomas Skardinski; Detective Lamberton;
City of Syracuse, New York; Carmel J.
Riggs; and DAnielle Riggs, Defendants.

No. 5:10–CV–0065 (GTS/DEP).
|
June 5, 2013.

### Attorneys and Law Firms

Office of Peter M. Hobaica, LLC, B. Brooks Benson, Esq., of
Counsel, Utica, NY, for Plaintiff.

The Golden Law Firm, Lawrence Golden, Esq., of Counsel,
Utica, NY, for Plaintiff.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this civil rights and
common law tort action is a motion by plaintiff, Debbie M.
Waldron ("Plaintiff") against defendants, Carmel J. Riggs and
Danielle Riggs ("Defendants") for default judgment pursuant
to Fed.R.Civ.P. 55(b)(2).

### I. Relevant Background

#### A. Plaintiff's Amended Complaint

Generally, in her Amended Complaint, Plaintiff asserts the
following four claims against Defendants: (1) malicious
prosecution, (2) slander, libel and defamation, (3) fraud,
and (4) intentional infliction of emotional distress. (*See
generally* Dkt. No. 33 [Pl .'s Am. Compl.].) Generally, in
support of these claims, Plaintiff alleges that Defendants
made knowingly false oral and written statements to police
implicating Plaintiff in an arson, for which Plaintiff was
falsely arrested and imprisoned, with the intent to injure
Plaintiff and that resulted in injury to Plaintiff. (*See id.* at ¶¶
40–58.)

#### B. Plaintiff's Service of Her Complaint and

#### Defendants' Failure to Answer or Otherwise Appear

This action was originally commenced on January 19, 2010
against Defendants as well as the City of Syracuse, the County
of Onondaga, and multiple agents or officers of those entities.
On December 7, 2010, Honorable Neal P. McCurn, Senior
United States District Judge, dismissed the action against the
County of Onondaga and its officers. (*See* Dkt. No. 30.) On
September 10, 2012, Judge McCurn granted the Syracuse
Defendants' motion for summary judgment. (*See* Dkt. No.
60.) Thereafter, Plaintiff appealed Judge McCurn's decision,
which is currently pending before the Court of Appeals for
the Second Circuit.

Despite being served with a summons and complaint on
January 28, 2010, (*see* Dkt. No. 15 [Aff. of Service] ),
Defendants have never answered the complaint or otherwise
appeared in this action. On August 29, 2011, upon request
from Plaintiff, the Clerk of the Court entered default against
Defendants.

On October 2, 2012, this Court issued an Order directing
Plaintiff that a motion for default must be filed, if at all, within
thirty days of the Order. On November 1, 2012, Plaintiff
sought an extension of time to file her motion, which was
granted. On December 3, 2012 Plaintiff filed the current
motion for default judgment against Defendants.

Generally, in support of her motion for default judgment
against Defendants, Plaintiff argues that neither of the
Defendants have appeared in this action and that default
has been entered. Plaintiff further argues that her Amended
Complaint sets forth valid New York common law claims for
malicious prosecution, "slander, libel and defamation," fraud
and intentional infliction of emotional distress against both
Defendants.

Accordingly, Plaintiff requests that the Court, not a jury,
determine the damages she is entitled to by reason of the
personal injuries she sustained as a result of the tortious acts
committed against her by Defendants. Plaintiff contends that
the items of damage to be determined by the Court at a
damages inquest hearing include punitive damages, attorney's
fees and costs.

### II. Relevant Legal Standards

2013 WL 2445047

**A. Legal Standard Governing Motions for Default Judgment**

**\*2** Pursuant to Rule 55 of the Federal Rules of Civil Procedure, courts must follow a two-step procedure in order to enter a default judgment. *See Paramount Pictures Corp. v. Hopkins,* No. 07–CV–593, 2008 WL 314541, at \*2 (N.D.N.Y. Feb. 4, 2008). First, Rule 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend ... the clerk must enter the party's default." Fed.R.Civ.P. 55(a). Second, pursuant to Rule 55(b)(2), the party seeking default judgment must present its application for an entry of judgment to the court. *See* Fed.R.Civ.P. 55(b)(2).

When a court considers a motion for the entry of a default judgment, it must first "accept[ ] as true all of the factual allegations of the complaint...." *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir.1981) (citations omitted). Next, the court must determine whether those facts are sufficient to state a claim for relief as to each cause of action for which the plaintiff seeks default judgment. *See Priestly v. Headminder, Inc .,* 647 F.3d 497, 505(2d Cir.2011) (citing *Rolex Watch, U.S.A., Inc. v. Pharel,* 09–CV–4810, 2011 WL 1131401, at \*2 (E.D.N.Y. Mar. 11, 2011)).

> The fact that a complaint stands unanswered does not ... suffice to establish liability on its claims: a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading. With respect to liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action.

*Peri Formwork Sys., Inc. v. Vesta 50, LLC,* No. 10–CV–4773, 2013 WL 1334475, at \*2 (E.D.N.Y. Mar. 11, 2013) (citing *Finkel v. Romanowicz,* 577 F.3d 79, 84 (2d Cir.2009)).

Further, "the court cannot construe the damages alleged in the complaint as true." *Eng'rs Joint Welfare, Pension, Supplemental Unemployment Benefit & Training Funds v. Catone Constr. Co., Inc.,* 08–CV–1048, 2009 WL 4730700, at \*2 (N.D.N.Y. Dec. 4, 2009) (citing *Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F .3d 151, 155 (2d Cir.1999) (citations omitted)). "Rather, the court must 'conduct an inquiry in order to ascertain the amount of damages with reasonable certainty.' " *Eng'rs Joint Welfare, Pension, Supplemental Unemployment Benefit & Training Funds,* 2009 WL 4730700, at \*2 (quoting *Alcantara,* 183 F.3d at 155 (citation omitted)). This inquiry "involves two tasks: (1) determining the proper rule for calculating damages on such a claim, and (2) assessing plaintiff's evidence supporting the damages to be determined under this rule." *Alcantara,* 183 F.3d at 155.

**C. Legal Standards Governing Plaintiff's Claims**

**1. Malicious Prosecution**

The elements of a claim for malicious prosecution under New York common law are "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor." *Jean v. Montina,* 412 F. App'x 352, 354 (2d Cir.2011) (quoting *Rohman v. N.Y.C. Transit Auth.,* 215 F.3d 208, 215 (2d Cir.2000)).

**\*3** Under New York law, in order to "initiate[ ] a prosecution" such that liability for malicious prosecution will attach, "[t]he mere reporting of a crime to police and giving testimony are insufficient; it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman,* 215 F.3d at 217 (quoting *DeFilippo v. Cnty. of Nassau,* 583 N.Y.S.2d 283, 284,183 A.D.2d 695, 696 (N.Y.App.Div.1992) (quoting *Viza v. Town of Greece,* 463 N.Y.S.2d 970, 971, 94 A.D.2d 965, 966 (N.Y.App.Div.1983) (alteration in original)); *see also Present v. Avon Prods., Inc.,* 687 N.Y.S.2d 330, 335, 253 A.D.2d 183, 189 (N.Y.App.Div.1999) ("One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding.")).

The statute of limitations under New York law for a claim of malicious prosecution is one year and accrues when there is a favorable termination of criminal proceedings against the plaintiff. *See Norwood v. Salvatore,* No. 12–CV–1025, 2013

WL 1499599, at *15 (N.D.N.Y. Apr. 10, 2013) (citing N.Y. C.P.L.R. § 215(3); *Roman v. Comp USA, Inc.,* 832 N.Y.S.2d 270, 38 A.D.3d 751 (N.Y.App.Div.2007)).

## 2. Slander, Libel and Defamation

"Defamation is injury to a person's reputation, either by written expression (libel) or oral expression (slander)." *Lesesne v. Brimecome,* ——F.Supp.2d ——, ——, 2013 WL 154299, at *2 (S.D.N.Y.2013) (citing *Krepps v. Reiner,* 588 F.Supp.2d 471, 483 (S.D.N.Y.2008)). Under New York law, claims for defamation that are brought after one year from the date that the alleged defamatory statements were made are barred by the statute of limitations. *See* N.Y. C.P.L.R. § 215(3).

## 3. Fraud

Under New York law, the elements of a civil fraud claim are that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *JBCHoldings NY, LLC v. Pakter,* —— F.Supp.2d ——, ——, 2013 WL 1149061, at *13 (S.D.N.Y.2013) (quoting *Wall v. CSX Transp., Inc.,* 471 F.3d 410, 415–16 (2d Cir.2006)) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19 (2d Cir.1996))).

A claim for common law fraud under New York law must satisfy the requirements of the heightened pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure. *JBCHoldings NY, LLC,* 2013 WL at * 13 (quoting *Landesbank Baden–Wurttemberg v. Goldman, Sachs & Co.,* 478 F. App'x 679, 681 (2d Cir.2012) (summary order) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 187 (2d Cir.2004))). Pursuant to Rule 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). "The Second Circuit has clarified that although intent may be alleged generally, 'we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations.' " *JBCHoldings NY, LLC,* 2013 WL at * 13 (quoting *Lerner v. Fleet Bank,* 459 F.3d 273, 290 (2d Cir.2006) (citation omitted)). Rather, plaintiffs must allege facts that give rise to "a strong inference of fraudulent intent." *Id.* (quoting *Space Hunters v. United States,* 500 F. App'x 76 (2d Cir.2012)

((quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994))).

## 4. Intentional Infliction of Emotional Distress

**\*4** The elements of a claim for intentional infliction of emotional distress under New York common law are (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *See Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir.1999) (citing *Howell v. New York Post Co.,* 612 N.E.2d 699, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350 (N.Y.1993)). In New York, a cause of action for intentional infliction of emotional distress accrues on the date of injury and carries a one year statute of limitations. *See Wilson v. Erra,* 942 N.Y.S.2d 127, 128–129, 94 A.D.3d 756 (N.Y.App.Div.2012) (citing N.Y. C.P.L.R. 215(3); *Passucci v. Home Depot, Inc.,* 889 N.Y.S.2d 353, 67 A.D.3d 1470, 1471 (N.Y.App.Div.2009)).

"Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." *Stuto,* 164 F.3d at 827 (citing *Howell,* at 121, 596 N.Y.S.2d 350, 612 N.E.2d 699.) Only where the alleged conduct "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society" will a court allow a claim for intentional infliction of emotion distress to go forward. *Id.,* at 827 (quoting *Howell,* at 122, 596 N.Y.S.2d 350, 612 N.E.2d 699.)

Courts have generally concluded that in order to successfully plead such a claim, it is not "enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.*

However, New York courts have sustained claims for intentional infliction of emotional distress where there is "some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy." *Baez v. Jetblue Airways Corp.,* No.09–CV–596, 2009 WL 2447990, at *9 (E.D.N.Y. Aug. 3, 2009) (quoting *Stuto,* 164 F.3d at 828 (collecting cases)).

## III. Analysis

### A. Whether Plaintiff is Entitled to a Default Judgment Against Defendants on Her Claim for Malicious Prosecution

The Court answers this question in the negative for the following reasons.

First, the Court notes that the claims against Defendants may be dismissed for failure to prosecute pursuant to the Federal Rules of Civil Procedure and this Court's Local Rules. *See* Fed.R.Civ.P. 41(b); [1] N.D.N.Y. R. 41.2(a). The Clerk of the Court entered default against Defendants on August 29, 2011. (*See* Dkt. No. 44 .) It was not until December 3, 2012 that Plaintiff filed the current motion for default judgment, and that was only after the Court's prompting. (*See* Dkt. No. 65.) At best, fourteen months passed before Plaintiff took any action in furtherance of her claims against Defendants. Accordingly, for this reason alone, Plaintiff's motion for default judgment on her malicious prosecution claim against Defendants is denied.

[1]   Even though Fed.R.Civ.P. 41(b) speaks only of a dismissal on a motion by a defendant, courts have recognized that the rule does nothing to abrogate a district court's inherent power to dismiss a plaintiff's complaint, sua sponte, for failure to prosecute. *See* *Saylor v. Bastedo,* 623 F.2d 230, 238–39 (2d Cir.1980).

**\*5** Second, Plaintiff's Amended Complaint fails to sufficiently state a claim for malicious prosecution against Defendants. Generally, in support of Plaintiff's malicious prosecution claim against Defendants, the Amended Complaint alleges that on January 17, 2009, Defendants gave false information to one or more members of the Syracuse Police Department by signing an affidavit claiming that they saw Plaintiff at the scene of a suspicious house fire prior to and/or at about the time the fire broke out, thereby falsely implicating Plaintiff in having started the fire. (*See* Dkt. No. 33, at ¶¶ 41–42 [Pl.'s Am. Compl.].) The Amended Complaint also alleges that Defendants did so maliciously and without probable cause, resulting in Plaintiff's arrest and prosecution for arson and reckless endangerment as well as further injury to Plaintiff. (*Id* . at ¶¶ 42–44, 47.) Finally, the Amended Complaint alleges that the charges against Plaintiff were dismissed on July 13, 2009. (*Id.* at ¶ 45.)

As indicated above in Part II.C.1. of this Decision and Order, in order to establish initiation of a prosecution, which is the first element of a claim for malicious prosecution, "it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman,* 215 F.3d at 217. Here, Plaintiff alleges only that Defendants reported to the police that Plaintiff was present at the scene of the fire and gave testimony by affidavit in support of that report. However, "[t]he mere reporting of a crime to police and giving testimony are insufficient." *Id.* Therefore, the facts alleged in the Amended Complaint are not sufficient to state a claim against Defendants for malicious prosecution. Consequently, for this additional reason, Plaintiff's motion for default judgment on her malicious prosecution claim against Defendants is denied.

### B. Whether Plaintiff is Entitled to a Default Judgment Against Defendants on Her Claim of Slander, Libel and Defamation

The Court answers this question in the negative for the following reasons.

First, as previously indicated in this Decision and Order, Plaintiff's claims against Defendants may be dismissed for failure to prosecute under the Federal Rules of Civil Procedure and this Court's Local Rules. Accordingly, for this reason alone, Plaintiff's motion for default judgment on her claim of "slander, libel and defamation" against Defendants is denied.

Second, Plaintiff's claim against Defendants for "slander, libel and defamation," is barred by the statute of limitations. Generally, in support of Plaintiff's claim against Defendants for "slander, libel and defamation," the Amended Complaint alleges that Defendants' "aforementioned" false statements and affidavits were made maliciously and with the intent to injure Plaintiff. (*See* Dkt. No. 33, at ¶¶ 50–51 [Pl.'s Am. Compl.].)

As indicated above in Part II.C.2. of this Decision and Order, claims for defamation are subject to a one-year statute of limitations. *See* N.Y. C.P.L.R. § 215(3). Plaintiff has alleged that these false statements and affidavits were made on January 17, 2009. This action was not initiated until January 19, 2010. By statute in New York, "[n]o court shall extend the time limited by law for the commencement of an action." N.Y. C.P.L.R. § 215(3). [2] Therefore, courts are

"expressly prohibited" from extending the periods of statutes of limitations. *See Randolph v. CIBC World Mkts.,* 219 F.Supp.2d 399, 402 (S.D.N.Y.2002). Moreover, district courts may dismiss an action sua sponte on statute of limitations grounds in certain circumstances where "the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted." *Walters v. Indus. & Commercial Bank of China, Ltd.,* 651 F.3d 280, 293 (2d Cir.2011) (quoting *Leonhard v. United States,* 633 F.2d 599, 609, n. 11 (2d Cir.1980)). Here, by her Amended Complaint, Plaintiff alleges injury on January 17, 2009. Therefore, the facts alleged in the Amended Complaint are not sufficient to state a claim against Defendants for "slander, libel and defamation." Consequently, for this additional reason, Plaintiff's motion for default judgment on her "slander, libel and defamation" claim against Defendants is denied.

2    This court must apply the New York's statute of limitations to New York common law tort claims such as the claims alleged against Defendants here. *See Castagna v. Luceno,* No. 09–CV–9332, 2011 WL 1584593, at *14 (S.D.N.Y. Apr. 26, 2011).

### C. Whether Plaintiff is Entitled to a Default Judgment Against Defendants on Her Claim for Fraud

**\*6** The Court answers this question in the negative for the following reasons.

First, as previously indicated in this Decision and Order, Plaintiff's claims against Defendants may be dismissed for failure to prosecute under the Federal Rules of Civil Procedure and this Court's Local Rules. Accordingly, for this reason alone, Plaintiff's motion for default judgment on her fraud claim against Defendants is denied.

Second, Plaintiff's Amended Complaint fails to state a claim for fraud against Defendants. Generally, in support of Plaintiff's fraud claim against Defendants, the Amended Complaint alleges that "by the intentionally false and fraudulent statements made by Defendants[ ] to the City of Syracuse police officers," Plaintiff suffered injury. (*See* Dkt. No. 33, at ¶¶ 54–55 [Pl.'s Am. Compl.].) As indicated above in Part II.C.3. of this Decision and Order, the elements of a claim for fraud under New York law are that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *JBCHoldings NY, LLC,* 2013 WL 1149061, at * 13. According to the

allegations in the Amended Complaint, Defendants made a materially false representation and Plaintiff suffered damage as a result. However, the allegations are that Defendants intended to defraud the City of Syracuse police officers, not Plaintiff, and that it was the City of Syracuse police officers, not Plaintiff, who reasonably relied upon Defendants' representation. Therefore, by the allegations in her Amended Complaint, Plaintiff has failed to state a claim of fraud against Defendants. Consequently, for this additional reason, Plaintiff's motion for default judgment on her fraud claim against Defendants is denied.

### D. Whether Plaintiff is Entitled to a Default Judgment Against Defendants on Her Claim for Intentional Infliction of Emotional Distress

The Court answers this question in the negative for the following reasons.

First, as previously indicated in this Decision and Order, Plaintiff's claims against Defendants may be dismissed for failure to prosecute under the Federal Rules of Civil Procedure and this Court's Local Rules. Accordingly, for this reason alone, Plaintiff's motion for default judgment on her claim of intentional infliction of emotional distress against Defendants is denied.

Second, Plaintiff's claim against Defendants for intentional infliction of emotional distress is barred by the statute of limitations. Generally, in support of Plaintiff's claim against Defendants for intentional infliction of emotional distress, the Amended Complaint alleges that Defendants' "aforementioned false statements and affidavits" were made intentionally and maliciously and with the intent to injure Plaintiff. (*See* Dkt. No. 33, at ¶ 57 [Pl.'s Am. Compl.].)

As indicated above in Part II.C.4. of this Decision and Order, claims for intentional infliction of emotional distress are subject to a one-year statute of limitations. *See* N.Y. C.P.L.R. § 215(3). Plaintiff has alleged that these false statements and affidavits were made on January 17, 2009. This action was not initiated until January 19, 2010. By statute in New York, "[n]o court shall extend the time limited by law for the commencement of an action," N.Y. C.P.L.R. § 215(3), and courts are "expressly prohibited" from extending the periods of statutes of limitations, *Randolph v. CIBC World Mkts.,* 219 F.Supp.2d 399, 402 (S.D.N.Y.2002). Moreover, district courts may dismiss an action sua sponte on statute of limitations grounds in certain circumstances where "the facts supporting the statute of limitations defense are set forth

in the papers plaintiff himself submitted." *Walters v. Indus. & Commercial Bank of China, Ltd.,* 651 F.3d 280, 293 (2d Cir.2011) (quoting *Leonhard v. United States,* 633 F.2d 599, 609, n. 11 (2d Cir.1980)). Here, by her Amended Complaint, Plaintiff alleges injury on January 17, 2009. Therefore, the facts alleged in the Amended Complaint are not sufficient to state a claim against Defendants for intentional infliction of emotional distress. Consequently, for this additional reason, Plaintiff's motion for default judgment on her intentional infliction of emotional distress claim against Defendants is denied.

## IV. Conclusion

**\*7** Because Plaintiff's Amended Complaint fails to sufficiently state any claims against Defendants, Plaintiff's motion for default judgment against Defendants is denied.

**ACCORDINGLY,** it is

**ORDERED** that the motion for default judgment by plaintiff, Debbie M. Waldron against defendants, Carmel J. Riggs and Danielle Riggs, (Dkt. No. 65), is DENIED; and it is further

**ORDERED** that the Clerk of the Court is directed to enter judgment in favor of defendants, Carmel J. Riggs and Danielle Riggs, and close this case as to those defendants.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 2445047

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   6

2011 WL 846830
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Anthony ANDRESAKIS, Plaintiff,

v.

CAPITAL ONE BANK (USA) N.A., Defendant.

No. 09 Civ. 08411(DAB)(FM).
|
Feb. 3, 2011.

## REPORT AND RECOMMENDATION TO THE HONORABLE DEBORAH A. BATTS [*]

[*] This Report and Recommendation was prepared with the assistance of Jeremi Roux, a student at Brooklyn Law School who served as a summer intern in my Chambers.

FRANK MAAS, United States Magistrate Judge.

### I. *Introduction*

 **\*1** Plaintiff Anthony Andresakis ("Andresakis") brings this pro se action in an effort to recover damages from defendant Capital One Bank (USA), N.A. ("Capital One"), which issued a credit card that he later canceled. On October 5, 2009, Chief Judge Loretta A. Preska issued a *sua sponte* order detailing numerous infirmities in the original complaint and directing that Andresakis file an amended complaint within sixty days. (*See* ECF No. 2). After Andresakis timely complied, (*see* ECF No. 3 ("Am.Compl.")), Capital One moved to dismiss his Amended Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim, (ECF No. 8). For the reasons set forth below, that motion should be granted in its entirety.

### II. *Factual Background* [1]

[1] The factual recitation that follows is based on Andresakis' Amended Complaint, the allegations of which are assumed to be true for present purposes.

In 1996, Capital One opened a credit card account in the name of Andresakis, who is an eighty-three-year-old World War II veteran. (Am. Compl. Attach. at 5–6). Andresakis "never signed any papers, and when [he] got the first statement in 1998 ... mailed back the card" and closed the account. (*Id.* at 8). Nevertheless, in 2002, Capital One began making repeated abusive collection calls to him. (*Id.* at 7).

In March 2003, after Andresakis "notified TransUnion Credit Reporting Co. ["TransUnion"] that [he] did not owe Capital One the money," the "phone calls stopped for a while," but later resumed. (*Id.* at 6). Then, in March 2007, Capital One sold the Andresakis account to Portfolio Recovery Associates ("Portfolio"), a debt collection agency, which also made collection calls to Andresakis. (*Id.* at 5).

Although Andresakis notified Capital One at least five times between 2002 and 2006 that its claim was invalid, Capital One "knowingly and with malice, gave false information to TransUnion." (*Id.* at 1–2). As a result, Andresakis' credit history was not corrected until March 31, 2009. (*Id.* at 2).

In November 2004, before Andresakis' credit history was corrected, he was rejected for a mortgage, causing him to lose an opportunity to purchase his apartment at an insider price of $328,000 as part of his building's conversion to condominiums. (*Id.* at 1). Worse yet, the actions of Capital One and Portfolio caused Andresakis to suffer a stroke in 2007. (*Id.* at 8).

Andresakis' original complaint is dated March 9, 2009. (ECF No. 1). His Amended Complaint is dated November 15, 2009, and was received by the Pro Se Office of this Court on December 1, 2009. (ECF No. 3). Liberally construed, the Amended Complaint alleges that Capital One (a) supplied false information about him to a credit reporting agency, in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681n, 1681*o*, and 1681s–2(b), resulting in Andresakis' inability to obtain a mortgage, (b) barraged Andresakis with phone calls in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, (c) defamed him by falsely reporting to TransUnion that he owed Capital One money, (d) committed fraud by falsely reporting to TransUnion that he owed Capital One money and by selling his account to Portfolio, and (e) either intentionally or negligently inflicted such emotional distress that he suffered a stroke. For these alleged wrongs, Andresakis seeks over $1 million in compensatory damages, as well as punitive damages. (Am. Compl. Attach. at 9).

### III. *Standard of Review*

**\*2** Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must dismiss a complaint that fails to state a claim upon which relief can be granted. In deciding a motion under Rule 12(b) (6), the Court must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. *Leatherman v. Tarrant Cnty Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164 (1993); *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. ——, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). While a complaint need not contain detailed factual allegations, it must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" or "naked assertion[s] devoid of further factual enhancement." *Id.* (internal quotation marks omitted). Determining whether the allegations of a complaint "nudge[ ]" a plaintiff's claims across the line from "conceivable to plausible" requires a court to "draw on its judicial experience and common sense." *Id.* at 1950–51. Moreover, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly,* 550 U.S. at 555 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)).

In deciding a Rule 12(b)(6) motion, "the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken." *Associated Fin. Corp. v. Kleckner,* No. 09 Civ. 3895(JGK), 2010 WL 3024746, at *1 (S.D.N.Y. Aug. 3, 2010) (citing *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002)). In this case, because the plaintiff is proceeding *pro se,* the Court may also rely on the plaintiff's opposition papers in assessing the legal sufficiency of his claims. *See Crum v. Dodrill,* 562 F.Supp.2d 366, 374 n. 13 (N.D.N.Y.2008) (citing *Gadson v. Goord,* No. 96 Civ. 7544(SS), 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997)). His *pro se* status further compels the Court to "read his supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

IV. *Discussion*

   A. *FCRA*

In his Amended Complaint, Andresakis alleges that Capital One "did not comply with the ... FCRA" and that, due to its "negligence and false credit reporting, [he] was prevented from obtaining a mortgage in November of 2004." (Am. Compl. Attach. at 1, 6). Read liberally, this can be construed as a claim that Capital One violated Sections 616, 617, and 623 of the FCRA, 15 U.S.C. §§ 1681n, 1681*o*, 1681s–2, by furnishing false credit information to TransUnion. Capital One contends that any such claim is time barred under the applicable statute of limitations. (*See* ECF No. 9 ("Def.'s Mem.") at 6–7).

   **\*3** The FCRA requires that any "action to enforce any liability created under this subchapter ... be brought ... not later than the earlier of ... 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or ... 5 years after the date on which the violation that is the basis for such liability occurs." 15 U.S.C. § 1681p. The shorter two-year limitation period runs from the date that Andresakis was on "inquiry notice" of an FCRA violation. *Willey v. J.P. Morgan Chase, N.A.,* No. 09 Civ. 1397(CM), 2009 WL 1938987, at *4–5 (S.D.N .Y. July 7, 2009); 149 Cong. Rec. E2512–02, at E2514 (daily ed. Nov. 21, 2003) (statement of Rep. Oxley) (claims must be "brought within 2 years of the discovery of the violation ... but with an outside restriction that all claims must be brought within 5 years of when the violation occurred").

Andresakis alleges that, in "March of 2003, [he] notified TransUnion ... that [he] did not owe Capital One the money they claimed." (Am. Compl. Attach. at 6). At that point, he obviously was aware of the reporting violation. The statute of limitations on his claim of false reporting under the FCRA therefore expired no later than March 2005—two years after he reported the alleged violation. Since Andresakis' original complaint is dated March 9, 2009, (*see* ECF No. 1 at 4), it is clear that the Pro Se Office could not have received it before then. This lawsuit consequently was filed four years too late for him to bring an FRCA claim.

In his Amended Complaint, Andresakis also alleges that he subsequently was denied mortgage financing. (Am. Compl. Attach. at 1). Although the Second Circuit has yet to consider whether the denial of a loan to a consumer based on false information supplied by a "furnisher" of credit information starts a new limitations period for claims against that furnisher, at least two decisions suggest that this should be the result. In *Caltabiano v. BSB Bank & Trust Co.,* 387 F.Supp.2d 135, 140 (E.D.N.Y.2005), Judge Seybert focused

2011 WL 846830

her statute of limitations analysis on the date that the plaintiff's loan application was denied, rather than when the plaintiff became aware of the error in his credit report. Judge Seybert held that, because the plaintiff's loan application was denied two years and four days prior to filing his suit, his claim was time barred under 15 U.S.C. § 1681p. *Id.* Similarly, in *Hyde v. Hibernia National Bank,* 861 F.2d 446, 450 (5th Cir.1988), the Fifth Circuit held that the two-year statute of limitations on claims arising out of a bank's actions in furnishing incorrect information begins to run anew each time a loan or credit line is denied as a result of the information furnished. As the court explained, "each transmission of the same credit report is a separate and distinct tort to which a separate statute of limitations applies." *Id.*

In his Amended Complaint, Andresakis alleges that he was denied a mortgage in November 2004 as a result of Capital One's "false credit reporting" to TransUnion. (Am. Compl. Attach. at 1). Andresakis, however, has not suggested that he suffered any subsequent denial of credit based upon information about him that Capital One furnished to TransUnion. Accordingly, even if the denial of credit in November 2004 started the limitations clock anew, any claim under the FCRA would have had to be filed by November 2006 to be timely. Since Andresakis missed this deadline by several years, his FRCA claim must be dismissed.

### B. *FDCPA*

**\*4** Andresakis also claims that Capital One "ignored" the FDCPA by barraging him with "phone calls at all hours of the day and night and on weekends" in an attempt to "collect a debt that [he] did not even owe." (*Id.* at 4). He further maintains that Capital One "became a contributor to [Portfolio]'s action" by selling or transferring his account to Portfolio. (*Id.* at 5).

"Congress enacted the FDCPA to eliminate abusive practices in the debt collection industry and to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged." *Ellis v. Solomon & Solomon, P.C.,* 591 F.3d 130, 134 (2d Cir.2010) (internal quotation marks and ellipsis omitted). The FDCPA states that "any debt collector who fails to comply with [the statute] with respect to any person is liable to such person" for damages. 15 U.S.C. § 1692k(a). A "debt collector," in turn, is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly,

debts owed or due or asserted to be owed or due another." *Id.* § 1692a(6).

The FDCPA is a strict liability statute; therefore a defendant's degree of culpability is relevant only with respect to damages. *Ellis,* 591 F.3d at 135. Nevertheless, "[a]s a general matter, creditors are not subject to the FDCPA." *Maguire v. Citicorp Retail Servs., Inc.,* 147 F.3d 232, 235 (2d Cir.1998); *see* 15 U.S.C. § 1692a(6)(F) (excluding "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity ... concerns a debt which was originated by such person"); *Schmitt v. FMA Alliance,* 398 F.3d 995, 998 (8th Cir.2005) (FDCPA "does not regulate creditors' activities at all") (quoting *Randolph v. IMBS, Inc.,* 368 F.3d 726, 729 (7th Cir.2004)). Furthermore, creditors "cannot be held responsible for the actions of any other entity merely based on vicarious liability." *Schuh v. Druckman & Sinel, LLP,* 602 F.Supp.2d 454, 463 (S.D.N.Y.2009); *see also Kolari v. New York–Presbyterian Hosp. (Kolari I),* 382 F.Supp.2d 562, 573 (E.D.N.Y.2005) ("[A] creditor that is not itself a debt collector is not vicariously liable for the actions of a debt collector it has engaged to collect its debts."), *vacated in part,* 455 F.3d 118. The rationale for treating debt collectors differently than creditors is that "debt collectors, unlike creditors, are not constrained in their actions by the risk that a negative reputation regarding debt collection practices might threaten their continued access to new borrowers." *Williams v. Citibank, N.A.,* 565 F.Supp.2d 523, 528 n. 6 (S.D.N.Y.2008) (citation omitted).

In his Amended Complaint, Andresakis does not allege, nor is there any reason to believe, that Capital One was not the originator of the debt that Capital One, and later Portfolio, sought to collect. Accordingly, because the FDCPA does not permit vicarious liability, and because there is no plausible basis to believe that Capital One's principal business activity is the collection of debts owed to others, Andresakis has failed to state a claim under the FDCPA against Capital One.

### C. *State Law Claims*

**\*5** Andresakis' Amended Complaint also asserts defamation and fraud claims against Capital One. He further contends that Capital One either negligently or intentionally inflicted emotional distress.

A federal court may exercise supplemental jurisdiction over state law claims when a federal claim vests the court with subject matter jurisdiction and the state and federal claims

Andresakis v. Capital One Bank (USA) N.A., Not Reported in F.Supp.2d (2011)

2011 WL 846830

"derive from a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725 (1966). A federal court also has the discretion to retain pendent state claims after dismissing a plaintiff's federal claims on the merits prior to trial, but it must consider "the values of judicial economy, convenience, fairness, and comity ... to decide whether to exercise jurisdiction." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n. 7;*see also Klein & Co. Futures v. Bd. of Trade of City of N.Y.,* 464 F.3d 255, 262 (2d Cir.2006) ("It is well settled that where ... the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

In this case, the Court has not held a pretrial conference, nor has there been any pretrial discovery. Indeed, the only event that has taken place is the filing of Capital One's motion to dismiss. The "usual" rule therefore suggests that Andresakis' state law claims against Capital One should, in the exercise of this Court's discretion, be dismissed without prejudice. *See Kolari v. New York–Presbyterian Hosp. (Kolari II),* 455 F.3d 118, 123 (2d Cir.2006) (district court's exercise of supplemental jurisdiction was an abuse of discretion when it dismissed all federal claims and failed to balance *Cohill* factors or articulate a federal interest).

The only reason why the Court might retain jurisdiction is the possibility that the FCRA preempts Andresakis' state law defamation and fraud claims. (See Def.'s Mem. at 10). The FCRA contains two provisions that expressly preempt state law, Sections 610 and 625, 15 U.S.C. §§ 1681(e), 1681t(b)(1)(F). [2] Courts have not reached a consensus, however, regarding the extent to which these two provisions preempt state law claims against furnishers of credit information. *Compare Kane v. Guar. Residential Lending, Inc.,* No. 04 Civ. 4847(ERK), 2005 WL 1153623, at *7 (E.D.N.Y. May 16, 2005) (Section 625 supersedes Section 610 by "total[ly] preempt[ing]" both statutory and common law state claims), *and McCloud v. Homeside Lending,* 309 F.Supp.2d 1335, 1341–42 (N.D.Ala.2004) (Section 625 preempts only state statutory claims while Section 610 preempts certain state common law claims), *with Prakash v. Homecomings Fin.,* No. 05 Civ. 2895(JFP) (VVP), 2006 WL 2570900, at *5–6 (E.D.N.Y. Sept. 5, 2006) (preemption under Sections 610 and 625 depends on whether state claim arose before or after furnisher of credit

information received notice of inaccuracies in consumer's credit history). Because Andresakis' defamation and fraud claims are based on conduct that the FCRA regulates, and which may be preempted by that statute, the Court's exercise of supplemental jurisdiction over these claims is appropriate. *See Gibbs,* 383 U.S. at 727 (approving supplemental jurisdiction over state law claim that "implicates" the federal doctrine of preemption).

[2]     Section 610 prohibits "any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency ... except as to false information furnished with *malice or willful intent* to injure such consumer." *Id.* § 1681h(e) (emphasis added). Section 625 provides, insofar as relevant, that "[n]o requirement or prohibition may be imposed under the laws of any [s]tate ... with respect to any subject matter regulated under ... section 1681s–2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies." *Id.* § 1681t(b).

**\*6** There is no need to consider which approach to the preemption issue is correct since Adresakis' defamation and fraud claims are subject to dismissal under all three theories. Turning first to the total preemption approach, if *Kane* correctly states the law, the Court would apply only Section 625, which precludes states from imposing any "requirement or prohibition" with respect to any subject matter regulated under 15 U.S.C. § 1681s–2. *See Kane,* 2005 WL 1153623, at *7. The latter provision prohibits a person from furnishing a consumer reporting agency with credit information concerning a consumer that the furnisher "knows or has reasonable cause to believe ... is inaccurate." 15 U.S.C. § 1681s–2(a) (1)(A). A person also is prohibited from furnishing a consumer reporting agency with information that is inaccurate after it has been notified that such information is inaccurate. *Id.* § 1681s–2(a)(1)(B). Since Andresakis' state defamation and fraud claims are based on Capital One's alleged furnishing of inaccurate information—conduct that is governed by the FCRA—he could not pursue those claims in federal court under the total preemption approach.

Even if the two remaining approaches adopted in *McCloud* and *Prakash* did not mandate the dismissal of Andresakis' state law defamation and fraud claims on preemption grounds,

his claims still would be time barred. Under New York law, a defamation cause of action must be brought within one year from the date the actionable statements are made, regardless of when the plaintiff learned of them. *See* N.Y. C.P.L.R. § 215(3); *Mitchell v. Home,* 377 F.Supp.2d 361, 374 (S.D.N.Y.2005) (citing *Vasile v. Dean Witter Reynolds Inc.,* 20 F.Supp.2d 465, 495 (E.D.N.Y.1998), *aff'd,* 205 F.3d 1327 (2d Cir.2000)). Additionally, a fraud cause of action must be filed within the later of six years after the cause of action accrued or two years after the plaintiff discovered the fraud or could have discovered it through the exercise of "reasonable diligence." N.Y. C.P.L.R. § 213(8). Here, Andresakis notified TransUnion in March 2003 that he owed Capital One no money and that its allegations were untrue. (Am. Compl. Attach. at 6). Andresakis therefore knew of Capital One's allegedly false statements and fraud by that date. It follows that his defamation claim, which was filed in 2009, is time barred since it first was brought considerably more than one year after the allegedly defamatory statements were made. Similarly, Andresakis' fraud claim, which first was raised in November 2009 in his Amended Complaint, is time barred since it was filed more than two years after he learned of the allegedly false reporting and more than six years after the allegedly false report was made.

Andresakis' remaining state law claims allege intentional and negligent infliction of emotional distress. Andresakis bases these claims on the repeated collection calls made by Capital One and Portfolio, which allegedly led to his hospitalization for a stroke. (*See* Am. Compl. Attach. at 5, 7–8). Because these causes of action do not involve Capital One's furnishing of credit information to a credit reporting agency, the FCRA is inapplicable and cannot be a basis for preemption. On the other hand, because the Court has dismissed all of Andresakis' claims that arise under (or implicate) federal statutes, Your Honor should decline to exercise supplemental jurisdiction

over his claims of intentional and negligent infliction of emotional distress. *See Kolari II,* 455 F.3d at 123.

## V. *Conclusion*

**\*7** For the foregoing reasons, I recommend that Capital One's motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6), (ECF No. 8), be granted with prejudice with respect to his federal, defamation, and fraud claims, and without prejudice with respect to his claims asserting intentional and negligent infliction of emotional distress. Further, the Clerk of the Court should be instructed to close this case.

## VI. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed.R.Civ.P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Batts. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 846830

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Thomasian v. Wells Fargo Bank, N.A., D.Or., March 25, 2014

2011 WL 1097413
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Anthony ANDRESAKIS, Plaintiff,

v.

CAPITAL ONE BANK (USA) N.A., Defendant.

No. 09 CV 8411(DAB).
|
March 23, 2011.

*ADOPTION OF REPORT AND RECOMMENDATION*

DEBORAH A. BATTS, District Judge.

**\*1** *Pro se* Plaintiff Anthony Andresakis ("Andresakis") brought this action against Defendant Capital One Bank (USA) N.A. ("Capital One") alleging that Capital One supplied false information to a credit reporting agency ("CRA") resulting in, *inter alia,* a barrage of phone calls and Andresakis' inability to obtain a mortgage. Defendant has moved to dismiss Plaintiff's claims under Fed.R.Civ.P. ("Rule") 12(b)(6). On February 3, 2011, United States Magistrate Judge Frank Maas issued a Report and Recommendation ("Report") to this Court, recommending that the Court grant Defendant's Motion to Dismiss for failure to state a claim under Rule 12(b)(6). (Report at 1.) For the reasons set forth below, the Court adopts Judge Maas' Report in full and GRANTS Defendant's Motion to Dismiss under Rule 12(b)(6).

I. Objections to the Report and Recommendation

"Within fourteen days after being served with a copy [of a Magistrate Judge's Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations." Fed.R.Civ.P. 72(b)(2); *accord* 28 U.S.C. § 636(b)(1)(C). The court may adopt those portions of the report to which no timely objection has been made, as long as there is no clear error on the face of the record. *Wilds v. United Parcel Serv., Inc.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003). A district court must review *de novo* "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C).

"To the extent, however, that the party makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the Report strictly for clear error." *Indymac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.,* 2008 WL 4810043, at \*1 (S.D.N.Y. Nov.3, 2008); *see also Ortiz v. Barkley,* 558 F.Supp.2d 444, 451 (S.D.N.Y.2008) ("[r]eviewing courts should review a report and recommendation for clear error where objections are merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition.") (citation and internal quotation marks omitted). After conducting the appropriate levels of review, the Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate. 28 U.S.C. § 636(b)(1)(C).

The objections of *pro se* parties are "generally accorded leniency and should be construed to raise the strongest arguments that they suggest." *Howell v. Port Chester Police Station,* 2010 WL 930981, at \*1 (S.D.N.Y. Mar.15, 2010) (citation omitted). "Nonetheless, even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." *Id.* (quoting *Pinkney v. Progressive Home Health Servs.,* 2008 U.S. Dist. LEXIS 55034, at \*2–3,2008 WL 2811816 (S.D.N.Y. July 21, 2008) (internal quotations marks omitted)).

**\*2** Andresakis' original complaint is dated March 9, 2009. Andresakis' Amended Complaint was received by the *Pro Se* Office of this Court on December 1, 2009. (Dkt. No. 3). Liberally construed, the Amended Complaint alleges that Capital One: (1) supplied false information about him to a credit reporting agency, in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681n, 1681*o*, and 1681s–2(b), resulting in Andresakis' inability to obtain a mortgage, (2) barraged Andresakis with phone calls in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, (3) defamed him by falsely reporting to TransUnion that he owed Capital One money, (4) committed fraud by falsely reporting to TransUnion that he owed Capital One money and by selling his account to Portfolio, and (5) either intentionally or negligently inflicted such emotional distress that he suffered a stroke.

On February 3, 2011, Judge Maas issued his Report recommending that the Court grant Defendant's Motion to Dismiss for failure to state a claim under Rule 12(b)(6). On February 17, 2011, Andresakis filed a timely objection to Judge Maas' Report. [1] As best as the Court can discern, Plaintiff makes the following objections to the Report: (1) Judge Maas citation to the time periods alleged in Andresakis' Amended Complaint was improper because those dates are not supported by evidence; (2) Andresakis discovered Capital One's fraud on January 13, 2009, not in 2003; and (3) the statute of limitations should have been tolled due to Andresakis' age, memory problems, mental health and physical health.

[1]    On March 17, 2011, Andresakis also filed a reply to Capital One's response to Andresakis' objections.

II. Fair Credit Reporting Act Claim

Andresakis objects to the Report's recommendation that his FCRA claim should be dismissed under Rule 12(b)(6). (*See generally* Pl.'s Objs.) Plaintiff argues that his FCRA is not time barred because he discovered the facts that support his claim in 2009 or, in the alternative, the Statute of Limitations should be tolled. Construing Andresakis' objection as liberally as possible, Andresakis' objection on his FCRA claim is specific enough to warrant *de novo* review. 28 U.S.C. § 636(b)(1)(C).

As Judge Maas found, the FCRA requires that any "action to enforce any liability created under this subchapter ... be brought ... not later than the earlier of ... 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or ... 5 years after the date on which the violation that is the basis for such liability occurs." 15 U.S.C. § 1681p. The shorter two-year limitation period applies here as Andresakis had "inquiry notice" of an FCRA violation. *Willey v. J.P. Morgan Chase, N.A.,* No. 09 Civ. 1397(CM), 2009 WL 1938987, at *4–5 (S.D.N.Y. July 7, 2009).

First, there is simply no basis for Andresakis to argue that he discovered the FCRA violation within the two year statute of limitations. In the Report, Judge Maas presumed all of Andresakis' facts as true, as is required by Rule 12(b)(6). (See Report at 2, FN No. 1.) The latest that Andresakis can allege a violation is when he was allegedly denied a mortgage in November 2006. Andresakis did not file suit until 2009, more the two years later. Since Andresakis failed to allege a

possible FCRA violation within the statute of limitations, his FCRA claim must be dismissed as a matter of law. [2]

[2]    In his objections, Andresakis has provided a letter from "Portfolio Recovery Associates" dated January 19, 2009 that confirms ownership of the debt that was acquired from Capital One on March 22, 2007. This letter does not provide a basis for a renewed claim under the FCRA; it only confirms what Andresakis already knew from 2003–2006: that Capital One claimed Andresakis was indebted to Capital One for an unsecured credit account. Even if this letter did provide a claim under the FCRA, the Court will not permit Andresakis to submit evidence or amend his complaint at this late stage.

*3  Second, Andresakis seeks to toll the running of the statute on the grounds of his claimed age, disability or infirmity. The Court knows of no basis that would allow Andresakis to evade the statute of limitations requirement. Even if the Court were able to invoke New York CPLR § 208, which provides a tolling on the grounds of "a disability because of infancy or insanity," Andresakis has not alleged sufficient facts here to toll his claims under § 208. *See Eisenbach v. Metro. Transp. Auth.,* 62 N.Y.2d 973, 479 N.Y.S.2d 338, 468 N.E.2d 293 (N.Y.1984) (hospitalization during which strong pain-killing drugs were administered resulting in the plaintiff being "generally confused, disoriented, and unable to effectively attend to [his] affairs" did not rise to the level of insanity under Section 208). Accordingly, the Court adopts Judge Maas' Report's and dismisses Andresakis' FCRA claim.

III. Federal Debt Collection Practices Act Claim

Andresakis makes no discernable objection regarding Judge Maas' recommendation that the Court should dismiss Andresakis' claim under the FDCPA. (*See generally* Pl.'s Objs.) The Court will review this portion of Judge Maas' Report "strictly for clear error." *Indymac Bank, F.S.B.,* 2008 WL 4810043, at *1.

Judge Maas correctly concluded that Capital One, as a creditor, is "not subject to the FDCPA." *Maguire v. Citicorp Retail Servs. ., Inc.,* 147 F.3d 232, 235 (2d Cir.1998); *see* 15 U.S.C. § 1692a(6)(F) (excluding "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity ... concerns a debt which was originated by such person"). Furthermore, creditors "cannot be held responsible for the actions of

Andresakis v. Capital One Bank (USA) N.A., Not Reported in F.Supp.2d (2011)

2011 WL 1097413

any other entity merely based on vicarious liability." *Schuh v. Druckman & Sinel, LLP*, 602 F.Supp.2d 454, 463 (S.D.N.Y.2009). In his Amended Complaint, Andresakis does not allege that Capital One was anything other than the originator of the debt or that later Portfolio sought to collect the debt. Accordingly, the Court adopts Judge Maas' Report's and dismisses Andresakis' FDCPA claim.

## IV. State Law Claims
Like his FDCPA claim, Andresakis makes no objection regarding Judge Maas' recommendation that the Court should dismiss Andresakis' claims state law claims. (*See generally* Pl.'s Objs.) The Court will review this portion of Judge Maas' Report "strictly for clear error." *Indymac Bank, F.S.B.*, 2008 WL 4810043, at *1.

Judge Maas correctly found that the FCRA preempts Andresakis' state law defamation and fraud claims as the FCRA contains two provisions that expressly preempt state law, Sections 610 and 625, 15 U.S.C. §§ 1681h(e), 1681t(b)(1)(F). Under either a total preemption or a partial preemption approach, Andresakis' state law claims are fully barred as his claims are inextricably tied-up with his federal claims and, in addition, no state law claim is valid for statute of limitations reasons. *Compare Kane v. Guar. Residential Lending, Inc.*, No. 04 Civ. 4847(ERK), 2005 WL 1153623, at *7 (E.D.N.Y. May 16, 2005) (Section 625 supersedes Section 610 by "total[ly] preempt[ing]" both statutory and common law state claims), and *McCloud v. Homeside Lending*, 309 F.Supp.2d 1335, 1341–42 (N.D.Ala.2004) (Section 625 preempts only state statutory claims while Section 610 preempts certain state common law claims), *with Prakash v. Homecomings Fin.*, No. 05 Civ. 2895(JFP)(VVP), 2006 WL 2570900, at *5–6 (E.D.N.Y. Sept. 5, 2006) (preemption under Sections 610 and 625 depends on whether state claim arose before or after furnisher of credit information received notice of inaccuracies in consumer's credit history).

**\*4** Finally, Judge Maas correctly concluded that Andresakis' state law claims alleging intentional and negligent infliction of emotional distress for repeated collection calls made by Capital One and Portfolio do not involve Capital One's furnishing of credit information to a CRA and cannot be preempted. While it appears unlikely to the Court that Andresakis could succeed on his claims for intentional and negligent infliction of emotional distress, the Court will dismiss these claims without prejudice.

Accordingly, the Court adopts Judge Maas' Report and dismisses Andresakis' state law claims.

## V. Conclusion
Having conducted the appropriate levels of review of the Report and Recommendation of United States Magistrate Judge Frank Maas dated February 3, 2011, this Court APPROVES, ADOPTS, and RATIFIES the Report and Recommendation in full. Accordingly, Defendant's Motion to Dismiss under Rule 12(b)(6) is GRANTED with prejudice with respect to *Pro se* Plaintiff Anthony Andresakis' federal, defamation and fraud claims, and without prejudice with respect to his claims asserting intentional and negligent infliction of emotional distress. The Court declines to exercise supplemental jurisdiction over the intentional and negligent infliction of emotional distress claims, so that *Pro se* Plaintiff Anthony Andresakis will not be permitted to proceed in Federal Court any further. 28 U.S.C. § 1367(c)(3). The Clerk of Court is DIRECTED to close the docket in this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1097413

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Manno v. American General Finance Co., E.D.Pa., July 12, 2006

2005 WL 1153623

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Florence L. KANE, Robert Kane,

and Penelope Kane, Plaintiffs,

v.

GUARANTY RESIDENTIAL

LENDING, INC., Defendant.

No. 04-CV-4847 (ERK).

|

May 16, 2005.

**Attorneys and Law Firms**

Stephen R. Jellenik, Scheyer & Jellenik, Esq., Nesconset, NY, for Plaintiffs.

John Gerard McCarthy, Bainton McCarthy L.L.C., New York, NY, for Defendant.

MEMORANDUM AND ORDER

KORMAN, Chief J.

**\*1** Florence, Robert and Penelope Kane (collectively "the Kanes" or "plaintiffs") are homeowners who refinanced the mortgage on their home with Guaranty Residential Lending, Inc. ("GRL"). Plaintiffs originally brought this action in state court, claiming that GRL furnished false and malicious information to unidentified credit reporting agencies. Plaintiffs allege that, although they made all payments due under the mortgage, defendant erroneously notified unspecified credit reporting agencies that plaintiffs were in default on the payments due. As a result, plaintiffs were denied credit for which they applied, and for which they allege they were rightfully entitled. Plaintiffs seek compensatory and punitive damages, as well as legal fees, claiming that GRL was "negligent, careless, wrongful, libelous, slanderous and malicious in falsely and erroneously making reports of alleged late mortgage payments ... [and] for failing and refusing to correct the wrongful and libelous information which was negligently disseminated,

even though Defendant knew or, in the exercise of reasonable care and diligence, should have known that such information was false." Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Plaintiffs' Memorandum") at 3 (internal quotation marks omitted). GRL removed the case to federal court, and now moves to dismiss. Because plaintiffs have failed to allege facts that state a claim upon which relief can be granted, I grant defendant's motion to dismiss.

*Background*

On October 11, 2002, plaintiffs refinanced the mortgage on their home, taking out a mortgage from defendant in the amount of $360,000.00, together with interest, for a period of 30 years. Plaintiffs' first payment (for principal and interest) amounted to approximately $2,300, and was due on December 1, 2002. Plaintiffs allege that they made this first payment, along with all others due, in a timely manner.

In or about January 2003, defendant assigned plaintiffs' mortgage to a company called "Homecomings," to whom plaintiffs began making their monthly payments. Subsequently, in December 2003, "Homecomings" reassigned plaintiffs' mortgage back to defendant. Since then, plaintiffs have timely made all monthly payments to defendant.

In spite of the fact that they made all payments in a timely fashion, defendant notified them or about January 2004 that they were in arrears and default on the mortgage. Plaintiffs allege that they notified defendant that they were not in default, and provided defendant with photocopies of the cancelled checks with which they had paid defendant. Nevertheless, defendant "continued to harass and annoy the Plaintiffs and continued to maintain that Plaintiffs were in default in their monthly payments." Complaint, ¶ Fifteenth. Plaintiffs allegedly continued contacting defendant on a monthly basis through July 2004 to provide proof of their timely payments, and yet throughout the same period defendant continued to insist they were in default. In July 2004, plaintiffs retained counsel, who again contacted defendant.

**\*2** Notwithstanding the fact that plaintiffs had timely made all mortgage payments, defendant reported plaintiff's alleged late payments to unnamed credit reporting agencies at some unspecified date. These unspecified credit reporting agencies

2005 WL 1153623

began listing defendant's claims of missed payments on plaintiffs' credit reports. When plaintiffs applied for credit in or about July 2004, they were denied credit on the ground that they were late in making their mortgage payments. Plaintiffs allege that in "falsely and erroneously making reports of alleged late mortgage payments by the Plaintiffs to credit reporting agencies [defendant's acts] were negligent, careless, wrongful, libelous, slanderous, and malicious, and were done without due regard to the true facts and the information available to the Defendant at the time it made such false and erroneous reports." Complaint, ¶ Twenty-First. Plaintiffs allege that, as a result of defendant's actions, plaintiffs' credit standings have been permanently and irreparably damaged.

Plaintiffs seek $1,000,000.00 in compensatory damages, $5,000,000.00 in punitive damages, and fees and costs in the amount of $25,000.00. Defendant has moved to dismiss all plaintiffs' claims in their entirety.

## Discussion

Plaintiffs' complaint is not a model of clarity, and the claims within it are not presented artfully. Nevertheless, it is clear that the gravamen of the complaint is that defendants defamed plaintiffs by informing unnamed credit reporting agencies that plaintiffs were late in making required payments under the mortgage agreement. Plaintiffs do not cite any statute under which they might have a claim on which relief could be granted, but instead aver, generally, that defendant's actions were "negligent, careless, wrongful, libelous, slanderous and malicious." Complaint, ¶ Twenty-First. Because of the context in which the alleged defamation took place, it is clear that plaintiffs' claims implicate the Fair Credit Reporting Act ("the FCRA" or "the Act"), even though plaintiffs make no mention of the Act in their Complaint. Indeed, the proper analysis of plaintiffs' claims requires an examination of whether they have alleged any viable causes of action under the FCRA, and whether any potential state tort claims are viable, or pre-empted by the FCRA.

### Plaintiffs have alleged no viable claims under FCRA

Congress enacted the FCRA in 1968 to promote "efficiency in the Nation's banking system and to protect consumer privacy." 15 U.S.C. § 1681(a); seealsoStafford v. Cross Country Bank, 262 F.Supp.2d 776, 781 (W.D.Ky.2003). "[T]he FCRA is aimed at protecting consumers from

inaccurate information in consumer reports and at the establishment of credit reporting procedures that utilize correct, relevant and up-to-date information in a confidential and responsible manner." Jones v. Federated Fin. Reserve Corp., 144 F.3d 961, 965 (6th Cir.1998); seealsoStafford, 262 F.Supp.2d at 781-82. In order to protect consumers from the harm that can result when inaccurate information is disseminated into their credit reports, the FCRA prescribes specific duties on three types of entities: (1) consumer reporting agencies; (2) users of consumer reports; and (3) furnishers of information to consumer reporting agencies. Stafford, 262 F.Supp.2d at 782 (citing Carney v. Experian Info. Solutions, Inc., 57 F.Supp.2d 496, 500 (W.D.Tenn.1999)).

**\*3** Furnishers of information are entities that transmit, to credit reporting agencies, information relating to debts owed by consumers. In this case defendant acted as a furnisher of information to credit reporting agencies.

> The FCRA imposes two duties on furnishers of information, codified at 15 U.S.C. §§ 1681s-2(a) and (b). The category of duties in subsection (a) relates to the furnishers' duty to report accurate information and their ongoing duty to correct inaccurate information.... The category of duties in subsection (b) governs the furnishers' duty once notice is received from a credit reporting agency that there is a dispute as to the completeness or accuracy of the information provided to that reporting agency.

Redhead v. Winston & Winston, P.C., No. 01-Civ-11475(DLC), 2002 WL 31106934 at *4 (S.D.N.Y. Sept. 20, 2002). The first issue that must be resolved in ruling on defendant's motion to dismiss is whether plaintiffs have alleged any viable causes of action based on defendant's violation of the duties laid out in 15 U.S.C. §§ 1681s-2(a) and (b).

### 1. Plaintiffs can bring no private cause of action based on violations of § 1681s-2(a)

Section 1681s-2(a) of Title 15 the U.S.Code prohibits furnishing, to a credit reporting agency, any information that the person knows is inaccurate or consciously avoids knowing is inaccurate. Subsection (a) forbids providing any information to a credit reporting agency if the furnisher of information is informed by the consumer that the information is inaccurate. Moreover, if a person learns that any reported information is inaccurate, Subsection (a) obligates that person to notify the credit reporting agency of the inaccuracies, and to provide corrections for any incomplete or inaccurate information. 15 U.S.C. §§ 1681s-2(a).

Plaintiffs' complaint contains allegations that defendant engaged in conduct which violated some of the various prohibitions contained in Subsection (a) of 15 U.S.C. § 1681s-2. In an affidavit submitted by Florence Kane, one of the plaintiffs, in opposition to defendant's motion to dismiss, Kane summarizes the essence of plaintiffs' complaint, which "alleges that Defendant, over a period in excess of seven months, alleged that the Plaintiffs were in default ...; that during that entire time Plaintiffs notified the Defendant that they were not in such default ...; [and] that Defendant's insistence of Plaintiffs' defaults continued through July, 2004, although Plaintiffs had contacted the Defendant on a monthly basis and continued to provide Defendant with proof of timely payments on the mortgage...." Affidavit of Florence L. Kane at 4-5. Plaintiffs allege that defendants continued to furnish erroneous information to credit reporting agencies after being notified by plaintiffs that the information was inaccurate, and that they failed to provide corrected information to credit reporting agencies in a timely fashion. Plainly, plaintiffs have alleged conduct on the part of the defendant which violates the provisions of Subsection (a) of 15 U.S.C. § 1681s-2.

**\*4** Plaintiffs' problem here is that "[t]here is no private cause of action under Section 1681s-2(a), for the FCRA limits the enforcement of this subsection to government agencies and officials. 15 U.S.C. § 1681s-2(d)." *Redhead,* 2002 WL 31106934 at *4 (collecting cases); *seealsoNelson v. Chase Manhattan Mortgage Corp.,* 282 F.3d 1057, 1059 (9th Cir.2002). It is by now well established that an individual consumer may not bring a cause of action for the violation of Section 1681s-2(a), since the Act provides that "[s]ubsection (a) ... shall be enforced exclusively by § 1681 of this title by the Federal agencies and officials and the State officials identified in that section." 15 U.S.C. § 1681s-2(d); *seealsoRiley v. Gen. Motors Acceptance Corp.,* 226 F.Supp.2d 1316, 1319 (S.D.Ala.2002).

In short, while plaintiffs have alleged that defendant violated Subsection (a) of Section 1681s-2 of the FCRA, they may not proceed with a cause of action for based on that violation, because the FCRA expressly limits the enforcement of Subsection (a) to federal and state officials. "Admittedly, this statutory framework may seem troubling because it seems to disregard the significance of the fact that [defendant] continued to report information ... at a time when it knew ... [it] was disputed. However, consumers such as the [plaintiffs] are, in fact, entitled to some protection from such conduct." *Aklagi v. Nationscredit Fin. Servs. Corp.,* 196 F.Supp.2d 1186, 1194 (D.Kan.2002). While plaintiffs may not enforce the terms of § 1681s-2(a) through a private cause of action, they can report violations to the Federal Trade Commission, which is authorized to enforce the terms of Subsection(a) under the FCRA. *Seeid.;Hasvold v. First U.S.A. Bank, N.A.,* 194 F.Supp.2d 1228, 1235 (D.Wy.2002).

2. *Plaintiffs have not alleged a violation of § 1681s-2(b)*

Subsection (b) of Section 1681s-2 regulates the duties of a furnisher of information once that furnisher has received notice from a credit reporting agency that there is a dispute concerning the completeness or accuracy of any information the credit reporting agency has received. Under Subsection (b), once a credit reporting agency gives notice to an information furnisher, the furnisher must conduct an investigation into the information in question, and must disseminate the results of that investigation. However, the duty to investigate in Subsection (b) is triggered only after a furnisher of information receives notice *from a credit reporting agency* of a consumer's dispute. *See*15 U.S.C. § 1681s-2(b)(1) (explaining duties that are triggered after an information furnisher is notified of a dispute "pursuant to section 1681i(a)(2)," the section of the FCRA under which a credit reporting agency must notify an information furnisher of a dispute). Notice from an individual consumer, in the absence of notice from a credit reporting agency, is insufficient to trigger the duties contained in Subsection (b).

**\*5** Unlike with Subsection (a), under which there is no private cause of action, courts have generally allowed consumers to pursue private claims for "willful or negligent noncompliance with Section 1681s-2(b)." *Redhead,* 2002 WL 1941179 at *13 (collecting cases). But those courts that have "concluded that a private right of action exists under Section 1681s-2(b) have required a plaintiff to show that the furnisher received notice from a consumer reporting agency, as opposed to the plaintiff alone, that the credit information is disputed."

2005 WL 1153623

*Id.* (citing *Young v. Equifax Credit Info. Servs., Inc.,* 294 F.3d 631, 639-40 (5th Cir.2002)).

Thus, unless and until a furnisher of information receives notice from a credit reporting agency, no private right of action exists under section 1681s-2(b). "This means that a furnisher of credit information, such as [GRL], has no responsibility to investigate a credit dispute until *after* it receives notice from a consumer reporting agency. Under the statutory language, notification from a consumer is not enough." *Stafford,* 262 F.Supp.2d at 784.

Here, plaintiffs have alleged that GRL reported inaccurate information to credit reporting agencies after being notified by plaintiffs and their counsel that such information was false. However, plaintiffs have not alleged that GRL received notice of the dispute from any credit reporting agency. As a result, plaintiffs have failed to allege any violation of section 1681s-2(b).

In sum, I find that plaintiffs have failed to allege any viable causes of action based on the violation of Section 1681s-2 of the FCRA. The allegations in their complaint describe conduct that violates the terms of section 1681s-2(a), but the Act limits enforcement of that provision to federal and state officials. Thus, plaintiffs have no private cause of action based on violations of Subsection (a). And while Subsection (b) does allow for a private cause of action, plaintiffs have failed to allege sufficient facts to state a claim for the violation of Subsection (b). Specifically, plaintiffs have failed to allege that defendant ever received notice of their dispute from a credit reporting agency. Without alleging such facts, plaintiffs cannot satisfy the requirements for a viable cause of action based on violations of 15 U.S.C. § 1681s-2(b). As a result, plaintiffs have failed to plead any viable federal cause of action under FCRA.

Any potential state law claims are preempted by FCRA

Because they have not alleged facts which would support any federal claims against GRL, plaintiffs' claims must be dismissed unless they have alleged any viable state law claims. Plaintiffs argue that their first claim is "one sounding basically in negligence which, in effect, alleges that [GRL] libeled the Plaintiffs through the negligent and careless dissemination of credit information." Plaintiffs' Memorandum at 4. Plaintiff argues further that "no interpretation of 15 U.S.C. Section 1681s-2(a) or (b) can be used to deprive Plaintiffs of their common law cause of action against the Defendant." *Id.* at 5.

**\*6** Plaintiffs' assertion is correct to the extent that no common law claims would be pre-empted by Subsections 1681s-2(a) or (b), because neither provision itself concerns the preemption of any state law claims. What plaintiffs fail to acknowledge, however, is that *other* sections of the FCRA, specifically 15 U.S.C. § 1681t(b)(1)(F) and § 1681h(e), may well preempt their claims. That plaintiffs have failed to meaningfully address the implications of §§ 1681t(b)(1)(F) and § 1681h(e) is no surprise, though, since their Memorandum opposing GRL's motion to dismiss does not cite a single precedent relating to the FCRA even generally, and cites no cases pertaining specifically to preemption under the statute.

Determining whether plaintiffs can proceed with any common law claims requires examining the two "overlapping and potentially contradictory preemption provisions, § 1681t(b)(1)(F) and § 1681h(e), which limit the circumstances under which [plaintiffs] may bring [their] state common law claims." *Stafford,* 262 F.Supp.2d at 784. The Courts of Appeals have not yet weighed in on how these two provisions should be reconciled, and the District Courts have come up with at least three different approaches to applying Sections 1681t(b)(1)(F) and 1681h(e). It may be true that none of these approaches is perfect, but under the best reasoned of the three, plaintiffs' common law claims are preempted. Indeed, it appears that plaintiffs' common law claims are preempted under *any* of the three approaches to reconciling §§ 1681t(b)(1)(F) and 1681h(e).

Section 1681h(e) provides:

> (e) Limitation of liability. Except as provided in sections 1681n and 1681*o*, no consumer may bring any action for proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency ... except as to false information furnished with malice or willful intent to injure such customer.

2005 WL 1153623

15 U.S.C. § 1681h(e). Section 1681h(e) does not preempt every possible action, as it allows plaintiffs to maintain tort actions, including defamation and negligence claims, but requires plaintiffs to prove malice or willful intent for such claims. In contrast, Section 1681t(b)(1)(F) of the Act appears to preempt all common law claims. It provides:

> No requirement or prohibition may be imposed under the laws of any State ... with respect to any subject matter regulated under ... section 1681s-2, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply [to specific sections of the Massachusetts Annotated Laws and the California Civil Code].

15 U.S.C. § 1681t(b)(1)(F).

Courts have struggled to reconcile § 1681h(e) and § 1681t(b)(1)(F) because, while the latter appears to grant absolute immunity to furnishers of information, the former appears to bestow only qualified immunity, while permitting claims that include allegations of willful intent or malice. "The tension between these two provisions ... results from the fact that § 1681h(e) permits state tort claims, but requires a higher standard of proof for those in the nature of defamation, slander, or invasions of privacy, while § 1681t(b)(1)(F) prohibits all state claims covered by § 1681s-2." *Stafford,* 262 F.Supp.2d at 785. Notably, the broad language of § 1681t(b)(1)(F) was added to the FCRA in a series of amendments made in 1996, none of which made reference to § 1681h(e) or how the two preemption provisions were interrelated. *See id.* The interplay and precise relationship between the two provisions is not entirely clear, leading courts to come up with at least three different approaches to reconciling §§ 1681t(b)(1)(F) 1681h(e).

*7 Under the first approach courts have used to resolve the tension between Sections 1681h(e) and 1681t(b)(1)(F), the "total preemption" approach, *all* state causes of action against furnishers of information are deemed preempted by the sweeping language of § 1681t(b)(1)(F). *See Stafford,* 262 F.Supp.2d at 785; *see also Hasvold,* 194 F.Supp.2d at

1239 ("[F]ederal law under the FCRA preempts plaintiff's claims against the defendant relating to it as a furnisher of information."). Courts concluding that the FCRA preempts all state claims have reasoned that when Congress amended FCRA in 1996 by adopting the sweeping language of § 1681t(b)(1)(F), it intended to eliminate all state actions against furnishers of information. As the Court explained in *Jaramillo v. Experian Info. Solutions, Inc.,* 155 F.Supp.2d 356 (E.D.Pa.2001):

While Congress did not specifically provide in the [1996] amendments that section 1681t supercedes 1681h, it is clear from the face of section 1681t(b)(1)(F) that Congress wanted to eliminate all state causes of action 'relating to the responsibilities of persons who furnish information to consumer reporting agencies.' Any other interpretation would fly in the face of the plain meaning of the statute.

....

The plain language of section 1681(b)(1)(F) clearly eliminated all state causes of action against furnishers of information.

*Id.* at 361-62. Adopting the total preemption approach outlined in *Hasvold* and *Jaramillo* "means that *no* state tort claims are ever permissible against *any* furnisher of credit information." *Stafford,* 262 F.Supp.2d at 785 (emphasis added).

The total preemption approach clearly gives effect to the plain meaning of § 1681t(b)(1)(F). Because that provision was added to the FCRA in 1996, it is a more recent addition to the Act than § 1681h(e), and may indeed represent Congress' conclusion that all common law claims against information furnishers should be preempted by the FCRA. Nevertheless, it is also clear that, as part of the 1996 amendments, Congress did *not* expressly repeal § 1681h(e). As a result, the problem with giving literal effect to § 1681t(b)(1)(F) is that doing so essentially renders § 1681h(e) a meaningless nullity. Thus, adopting the total preemption approach would make it impossible to comply with "the canon of construction that cautions against 'adopt[ing] a construction making another statutory provision superfluous.' " *Krause v. Titleserv, Inc.,* 402 F.3d 119, 127-28 (2d Cir.2005) (quoting *Hohn v. United States,* 524 U.S. 236, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998)).

In order to avoid reading § 1681t(b)(1)(F) so broadly that it renders § 1681h(e) superfluous, other courts have adopted

2005 WL 1153623

a second, more limited approach to preemption of state claims under the FCRA. Under this second approach, known as the "temporal approach," "the only state law claims preempted are those relating to the obligations of furnishers of information once they know, or have reason to know, about possible inaccuracies." *Id.* These courts have emphasized that § 1681t(b)(1)(F) must be read in conjunction with § 1681h(e), and that the latter must retain some meaning, reasoning that if § 1681t(b)(1)(F) is read broadly to preempt all claims, § 1681h(e) becomes mere surplusage. *See Malm v. Household Bank (SB), N.A.,* No. Civ. 03-4340ADMAJB, 2004 WL 1559370 at *6 (D.Minn. July 7, 2004) ("[T]he temporal approach is the most convincing ... because it follows the 'whole statute' analysis and does not render either section superfluous.").

**\*8** Under the temporal approach, state law claims based on actions of a furnisher of information after the furnisher has received notice of inaccuracies are held preempted by § 1681t(b)(1)(F), while actions taken before notice has been received may not be preempted. *See, e.g., Aklagi,* 196 F.Supp.2d at 1194-95. It is important to note that the notice referred to here need not be from a credit reporting agency, as is required to sustain a private cause of action under § 1681s-2(b) of FCRA; notice may be received from the a credit reporting agency or from the consumer himself.

The reasoning behind the temporal approach is as follows. Section 1681t(b)(1)(F) provides that no state law claims may be asserted "with respect to any subject matter regulated under ... section 1681s-2." 15 U.S.C. § 1681t(b)(1)(F). To the extent that a furnisher of information provides inaccurate information after receiving notice of inaccuracy *from a credit reporting agency,* that conduct is regulated under 15 U.S.C. § 1681s-2(b). To the extent that a furnisher provides inaccurate information after receiving notice *from the consumer himself,* the "conduct falls squarely within § 1681s-2(a)(1)(B)." *Aklagi,* 196 F.Supp.2d at 1194-95. Either way, once a furnisher of information has notice *from any source* and provides inaccurate information, the conduct is "subject matter regulated under ... section 1681s-2" of the FCRA. 15 U.S.C. § 1681t(b)(1)(F). Accordingly, any state law claim predicated on a furnisher providing inaccurate information after receiving notice of a dispute "is completely preempted by § 1681t(b)(1)(F)." *Aklagi,* 196 F.Supp.2d at 1195; *see also Vazquez-Garcia v. Trans Union De Puerto Rico,* 222 F.Supp.2d 150, 162 (D.P.R.2002).

Under the temporal approach, causes of action predicated on acts that occurred *before* a furnisher of information had notice of any inaccuracies are not preempted by § 1681h(b)(1)(F), but are instead governed by § 1681h(e). As a result, according to the temporal approach, plaintiffs may bring claims for actions that take place before a furnisher has notice of inaccuracies, but-pursuant to the plain language of § 1681h(e)-these claims can only go forward if a plaintiff alleges that the furnisher of information provided inaccurate information with malice or willful intent to injure the consumer.

Finally, some courts have taken yet a third approach to reconciling Sections 1681h(e) and 1681t(b)(1)(F). Under this "statutory preemption" approach, courts have concluded that § 1681t(b)(1)(F) only applies to, and preempts, claims based on state statutes, while § 1681h(e)-and its malice requirement-applies to state common law torts. *See Jeffrey v. Trans Union, LLC,* 273 F.Supp.2d 725, 726-28; *McCloud v. Homeside Lending,* 309 F.Supp.2d 1335, 1341-42 (N.D.Ala.2004). This third approach is "somewhat strained, however, because § 1681t(b)(1)(F) does not specify that it relates to statutes only. Further, as [this approach] greatly minimize[s] § 1681t(b)(1)(F)'s applicability, [it] run[s] afoul of the 'whole statute' approach" and is therefore unpersuasive. *Malm,* 2004 WL 1559370 at \*6.

**\*9** On balance, the middle course taken in the temporal approach appears to be the best reasoned approach to reconciling the apparently contradictory preemption provisions of the FCRA. The temporal approach strikes a balance which gives effect to both Sections 1681h(e) and 1681t(b)(1)(F). In contrast, the total preemption approach would essentially render § 1681h(e) a superfluous nullity. Moreover, the statutory preemption approach reads an element into § 1681t(b)(1)(F) that its text does not contain-i.e., applicability to statutory claims only-and does not give effect to the two contradictory preemption provisions in a manner as faithful to the statutory language as the temporal approach. In determining whether any of plaintiffs' potential state law claims survive defendant's motion to dismiss, therefore, I believe it is appropriate to utilize the temporal approach, application of which compels the conclusion that all of plaintiffs' state law claims are preempted.

As explained above, under the temporal approach, § 1681t(b)(1)(F) completely preempts any action taken by a furnisher of information after the furnisher has notice of inaccuracies. Here, plaintiffs have stated that, after GRL initially furnished inaccurate information, plaintiffs

2005 WL 1153623

"immediately notified Defendant that they were not in default," Plaintiffs' Memorandum at 2, and repeatedly notified GRL of the alleged inaccuracies directly and through counsel. It would appear, then, that the vast majority of the defendant's actions about which plaintiffs complain occurred after GRL had received notice of the inaccuracies. Any state law claims which plaintiffs might bring based on these actions are preempted by § 1681t(b)(1)(F). Notably, in her affidavit, Florence Kane argues that "Plaintiffs were NEVER late with ANY mortgage payment; accordingly, *any action taken by the Defendant in connection with Plaintiffs' credit standing was done with 'notice' of the fact that the information was erroneous."* Affidavit of Florence L. Kane at 4 (emphasis added). Under these circumstances, *all* potential state law claims would be preempted, since the plaintiffs themselves contend that all defendant's actions were taken with notice of the inaccuracies. However, it may not be appropriate to hold plaintiffs to a literal interpretation of Kane's statements: in spite of Kane's allegation that GRL had notice of the inaccuracies from the very beginning, it is safe to assume that, at minimum, the first information GRL furnished regarding the alleged default by plaintiffs was made prior to the point at which GRL received notice of the inaccuracy.

According to the temporal approach, § 1681t(b)(1)(F) only preempts claims based on actions after GRL had notice of inaccuracy, and plaintiffs may still assert claims based on GRL's furnishing inaccurate information before it had notice. In order to successfully assert claims based on these actions, plaintiffs must comply with § 1681h(e). Section 1681h(e), however, requires that plaintiffs allege that GRL's initial furnishing of inaccurate information was done with malice or willful intent to harm plaintiffs. *See* 15 U.S.C. § 1681h(e). Plaintiffs have not done so. Rather, plaintiffs have alleged that GRL was negligent.

 **\*10** It is true that, in their complaint, plaintiffs allege that GRL's conduct was "negligent, careless, wrongful, libelous, slanderous and *malicious* in falsely and erroneously making reports of alleged late mortgage payments." Complaint ¶ Twenty-First (emphasis added). Aside from invoking the term "malicious," however, plaintiffs have alleged nothing to support the contention that, before receiving notice that the information was disputed, GRL acted with malice or willful intent to injure the plaintiffs. Indeed, the gravamen of plaintiffs' complaint is that "Defendant *negligently* disseminated false and damaging credit information." Plaintiffs' Memorandum at 5 (emphasis added). Plaintiffs have made clear that their claim for compensatory damages

is one "sounding *basically in negligence,* which, in effect, alleges that Defendant libeled the Plaintiffs through the *negligent and careless* dissemination of credit information." *Id.* at 4 (emphasis added). Plaintiffs argue that punitive damages are appropriate not because GRL originally acted with malice, but because it took GRL "close to one year to remediate the problems caused by its *negligence."Id.* at 5 (emphasis added). Finally, in support of their request for counsel fees, plaintiffs reiterate that their injuries were "exacerbated by Defendant's *negligence* and failure to appropriately respond." *Id.* (emphasis added). Simply put, that plaintiffs include the word "malicious" in their complaint does not assume talismanic significance when all plaintiffs' subsequent arguments make clear they aver here that defendant's actions were negligent.

While plaintiffs go on to state that "[i]t is respectfully submitted that intent is not an issue," *id.,* plaintiffs cite no authority for this assertion, one that plainly runs afoul of § 1681h(e), which clearly makes intent a dispositive issue. Because plaintiffs argue that GRL acted only carelessly or negligently, any of their claims that are not preempted by § 1681t(b)(1)(F) are preempted by § 1681h(e).

In short, following the temporal approach to preemption under the FCRA, I find that all plaintiffs' potential state law claims are preempted by the Act. Notably, however, while application of the temporal approach yields the conclusion that the plaintiffs' state law claims are preempted by the FCRA, following either of the other approaches to preemption under the Act yields the same conclusion in this case. Of course, under the total preemption approach, all potential state law claims the plaintiffs might assert are preempted. And the use of the statutory preemption approach, under which all non-statutory causes of action are governed by § 1681h(e), does not yield a different result, since plaintiffs have failed to allege the malice or willful intent required to sustain a cause of action under § 1681h(e). Thus, while I find the temporal approach to be the best reasoned of the approaches to reconciling §§ 1681t(b)(1)(F) and 1681h(e), and accordingly follow it, the finding that all plaintiffs' state law claims are preempted is reached whether I apply the temporal or any other approach.

 **\*11** In support of its motion to dismiss, defendant argues, alternatively, that, even if plaintiffs' state law claims were not preempted under the FCRA, they should be dismissed nonetheless, because plaintiffs have failed to plead a valid claim for libel or slander. It is likely true that plaintiffs have

2005 WL 1153623

failed to plead any state law defamation claims with the particularity necessary under New York law, since they have failed to specify the words claimed to be defamatory, and have failed to specify when or to whom these words were conveyed. I need not and do not reach this issue, however, in light of the foregoing conclusion on preemption.

*Conclusion*

Defendant's motion to dismiss is granted in its entirety. While plaintiffs' complaint leaves much to be desired, I cannot say that it is so clearly deficient that amendment would necessarily be futile. Plaintiffs are granted leave to file an amended complaint within thirty days of the date of this order.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1153623

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 951459
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael SHAW, Petitioner,

v.

SUPERINTENDENT, ATTICA
CORRECTIONAL FACILITY, Respondent.

No. 9:03-CV-0610 (NPM).
|
March 28, 2007.

**Attorneys and Law Firms**

Michael Shaw, Comstock, NY, Petitioner, pro se.

Hon. Andrew Cuomo, New York State Attorney General, Patrick F. MacRae, Esq., Assistant Att'y General, of counsel, Syracuse, NY, for Respondent.

***MEMORANDUM-DECISION and ORDER***

NEAL P. McCURN, Senior United States District Judge.

**I.** *Background*

**A.** *State Court Proceedings*

 **\*1** According to the testimony adduced at trial, on May 15, 1998, Donovan "Romeo" Allen, lived on East Fayette Street in the City of Syracuse, New York. See Transcript of Trial of Michael Shaw (2/23/99) ("Trial Tr.") at 575. Allen had been involved in an ongoing dispute with Michael "Lucky" Johnson and his friends, including petitioner, *pro se,* Michael "Gem Star" Shaw. Trial Tr. at 578-579, 697-700. Specifically, the records reflect that several months before May, 1998, Allen had hit Johnson's car, Trial Tr. at 759, and the two had been involved in both verbal arguments and fist fights. Trial Tr. at 784-785.

Between 2:30 and 3:30 in the afternoon of May 15, 1998, Johnson, his girlfriend Sayeeda and Shaw drove to Allen's home. Trial Tr. at 693-695. At the time, people were sitting outside of that house, however Allen himself was not at home. Trial Tr. at 577. Johnson, Sayeeda and Shaw exited their vehicle and Johnson began talking with an individual who was standing in front of Allen's house. Trial Tr. at 579, 698. Their conversation ended when Orville "Sardine" Miller

came out of Allen's house brandishing a knife and approached the group. Trial Tr. at 579, 698-700, 901. Miller and Shaw soon "exchanged words" and then "went to go fight." Trial Tr. at 701. At some point during that altercation, Miller discarded his knife and pulled a gun out from his back pocket. Trial Tr. at 582, 702. Miller's actions prompted Shaw to exclaim "this is the second or third time you pull a gun on me. I'll be back." Trial Tr. at 582, 705. Miller then put the gun back in his pocket and walked away. Trial Tr. at 704.

Shaw, Johnson and Sayeeda then left the area and met Omar Lutehman, a friend of both Shaw and Johnson. Trial Tr. at 582, 705-08. After a brief meeting, Lutehman entered his car and drove to the Western Lights area of Syracuse with Shaw, Johnson and Sayeeda following in their automobile. Trial Tr. at 708-10. Lutehman and Shaw then briefly entered a house together, after which they both entered Johnson's car and drove towards East Fayette Street. Trial Tr. at 711-713. After dropping Shaw off, Johnson parked his car and he, Lutehman and Sayeeda began walking towards Allen's home. Trial Tr. at 713.

Allen, who had returned to his home approximately fifteen minutes after the fight between Shaw and Miller had ended (Trial Tr. at 585), soon noticed Sayeeda, Johnson and Lutehman walking toward his house. Trial Tr. at 588-589, 714-715, 902-905. When Johnson and Allen met, the two began fighting. Trial Tr. at 537, 590, 716.

Around that time, Shaw was observed walking up East Fayette Street with a long, black gun at his side. Trial Tr. at 598-99, 717-718, 905-907. Around that time, Sayeeda apparently said something to Allen which prompted him to call her a "bitch." Trial Tr. at 592-93, 905. Johnson responded by moving toward Allen, who then brandished a knife. Trial Tr. at 592-93. Johnson turned and ran away, however Allen chased after him. Trial Tr. at 594, 716-717. Shaw then started shooting the gun he was carrying at Allen. Trial Tr. at 599-601, 718-19, 842-843, 849, 905-907. [1] After the shooting, Lutehman, Johnson and Sayeeda entered their car and drove away, however the trio soon returned to pick up Shaw. Trial Tr. at 719-20. At that time, Shaw informed Johnson that he had shot Allen. Trial Tr. at 722.

[1]     Witnesses heard multiple, rapid shots being fired at the time. Trial Tr. at 540, 594, 718, 843, 905-09.

 **\*2** The trial transcript also reflects that at approximately 4:19 p.m. on May 15, 1998, Syracuse Police Officer Ronald

Brico was dispatched to the 1400 block of East Fayette Street in the City of Syracuse on a call that "started out with a man with a gun and it was updated to a shots fired and ultimately a man down." Trial Tr. at 510. Upon arriving at the scene, Officer Brico observed an individual later identified as Allen lying in the driveway of a residence bleeding profusely from his left side. Trial Tr. at 511-12. Allen was transported to Upstate Medical Center where he was pronounced dead at 4:46 p.m. on May 15, 1998, never having regained consciousness after the shooting. Trial Tr. at 512-513. [2]

[2]    An autopsy performed on Allen's body revealed that he had sustained "a number of gunshot wound injuries," one of which hit his right lung, traversed through his heart, went through his left lung and exited the left side of his body. *See* Trial Tr. at 877. Allen's death was caused by multiple gunshot wounds. Trial Tr. at 890.

As a result of the foregoing, on July 15, 1998, an Onondaga County grand jury returned an indictment against Shaw. *See* Indictment No. 98-0573-1 ("Indictment"). In that accusatory instrument, Shaw was charged with murder in the second degree, in violation of N.Y. Penal L. § 125.25(1), criminal possession of a weapon in the second and third degrees, contrary to N.Y. Penal L. §§ 265.02(1) and 265.03, and first degree reckless endangerment, in violation of N.Y. Penal L. § 120.25. *See* Indictment. Beginning on February 23, 1999, Shaw was tried before a jury on the foregoing charges in Onondaga County Court with County Court Judge J. Kevin Mulroy presiding. At the close of the prosecution's case-in-chief, Shaw's counsel moved to dismiss all counts in the Indictment based upon his claim that the prosecution had failed to meet its burden of proof as to each of the above-described charges. Trial Tr. at 1037. Judge Mulroy dismissed the charge of criminal possession of a weapon in the third degree after he determined that it was duplicitous of the other weapons possession charge brought against Shaw, however the County Court denied counsel's motion to dismiss the Indictment in all other respects. *See* Trial Tr. at 1038.

Following the arguments of counsel and the trial court's instructions, the jury began its deliberations. Trial Tr. at 1198. During the course of those deliberations, Judge Mulroy responded to several requests of the jury, which included a request that the testimony of a prosecution witness, Everod Reid, be read back to the jury. Trial Tr. at 1201-06. The jury thereafter returned a unanimous verdict in which it found

Shaw guilty of the second degree murder, criminal possession of a weapon and reckless endangerment charges. Trial Tr. at 1207-09.

On April 16, 1999, Shaw appeared before Judge Mulroy for sentencing on the above convictions. At that proceeding, the County Court sentenced Shaw to a term of twenty-five years to life imprisonment on the murder conviction, and lesser, concurrent terms on the remaining convictions. *See* Transcript of Sentencing of Michael Shaw (4/16/99) at 12-13.

Shaw appealed his convictions to the New York State Supreme Court, Appellate Division, Fourth Department, which appeal was opposed by the Onondaga County district attorney. On November 13, 2000, the Appellate Division denied Shaw's appeal in all respects. *See People v. Shaw,* 277 A.D.2d 1052 (4th Dept.2000). On April 6, 2001, the Court of Appeals denied Shaw's application for leave to appeal to that court. *See People v. Shaw,* 96 N.Y.2d 806 (2001).

**\*3**  On November 27, 2001, Shaw filed a collateral challenge to his state court conviction in the form of an application for a writ of error *coram nobis* filed with the Appellate Division. See State Court Record ("Record") at 1732-95 ("*Coram Nobis* Application"). In that application, Shaw alleged several theories in support of his claim that his appellate counsel rendered ineffective assistance. *See Coram Nobis* Application. That application was opposed by the district attorney, and on March 11, 2002, the Appellate Division denied Shaw's *coram nobis* request in all respects. *See People v. Shaw,* 292 A.D.2d 881 (4th Dept.2002).

On April 2, 2002, Shaw filed a motion to vacate his judgment of conviction pursuant to Section 440.10 of New York's Criminal Procedure Law ("CPL") with the County Court. *See* Record at 1800-46. Later that same month, Shaw filed a second CPL Motion with that court. *See* Record at 1856-79. The district attorney opposed those applications, see Record at 1880, 1883-84, and on July 22, 2002, Onondaga County Court Judge William D. Walsh denied Shaw's motions to vacate. *See People v. Shaw,* No. 98-573-1 (Onon.Cty.Ct. July 22, 2002) (Record at 1881-82) ("July, 2002 Order"). In its order dated February 27, 2003, the Appellate Division denied Shaw's application for leave to appeal that decision of the County Court to the Appellate Division. *See People v. Shaw,* No. KA 02-02099 (4th Dept. Feb. 27, 2003) (Record at 1885).

**B. *Proceedings in This Court***

2007 WL 951459

Petitioner commenced this proceeding, *pro se,* on May 3, 2003. *See* Petition (Dkt. No. 1) at 7. [3] Now-Chief United States District Judge Norman A. Mordue thereafter directed Shaw to file an amended petition in this action (Dkt. No. 3), and on August 14, 2003, Shaw filed an amended petition herein. Dkt. No. 5. Shaw thereafter requested permission to file another amended pleading in this action (Dkt. No. 19), and on April 20, 2004, Magistrate Judge David E. Peebles granted that application. *See* Dkt. No. 21. Shaw thereafter filed such pleading in which he alleges that: i) he received the ineffective assistance of appellate counsel; ii) the prosecutor engaged in misconduct when he called a "false witness" to testify at Shaw's trial; iii) he was deprived of his right to a fair trial by the County Court; and iv) he received the ineffective assistance of trial counsel. *See* Dkt. No. 23 ("Am.Pet."). The respondent was afforded until July 30, 2004 to file his response to the amended pleading, *see* Dkt. No. 25, and on that day, the Office of the Attorney General for the State of New York, acting on respondent's behalf, filed an answer together with a memorandum of law in opposition to Shaw's amended petition. Dkt. No. 26. [4] Petitioner thereafter submitted a traverse in further support of his habeas application. *See* Dkt. No. 27.

[3]    Although Shaw's petition was file-stamped by the clerk on May 19, 2003, the Second Circuit has held that due to the unique difficulties faced by incarcerated *pro se* litigants, a prisoner's pleading is deemed to be properly filed at the time he hands the papers to the prison authorities for transmittal to the court. *Dory v. Ryan,* 999 F.2d 679, 681-82 (2d Cir), *modified on reh'g,* 25 F.3d 81 (2d Cir.1994); *Noble v. Kelly,* 246 F.3d 93, 97-98 (2d Cir.2001) (extending "prison mailbox rule" to petitions seeking writ of habeas corpus pursuant to 28 U.S.C. § 2254). Shaw dated his petition on May 3, 2003. See Petition (Dkt. No. 1) at 7. Therefore, applying the prison mailbox rule, the undersigned finds that Shaw should be deemed to have commenced this proceeding on May 3, 2003.

[4]    Respondent's memorandum of law in opposition to the amended petition ("Resp.Mem.") has been docketed as an attachment to his answer to that pleading. See Dkt. No. 26.

On January 5, 2006, then-Chief United States District Judge Frederick J. Scullin, Jr. reassigned this action to the undersigned for disposition. *See* Dkt. No. 29.

## II. *Discussion*

### A. *Timeliness of Petition*

**\*4** Respondent initially claims that this action was not timely commenced by Shaw in light of the one year statute of limitations applicable to habeas corpus petitions as a result of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* Resp. Mem. at 11-12; *see also* 28 U.S.C. § 2244(d).

On October 17, 2003, United States District Judge Norman A. Mordue, who at the time was the assigned District Judge relating to this action, entered an order that specifically addressed the issue of the timeliness of Shaw's action. *See* Dkt. No. 8 ("October, 2003 Order"). In that order, Judge Mordue provided a detailed analysis relating to the state court actions filed by Shaw and the effect that those proceedings had on tolling the AEDPA's statute of limitations. *See* October, 2003 Order at 1-3. [5] Judge Mordue ultimately concluded that "it appears as though Petitioner has timely filed his original Petition for purposes of the AEDPA." *See* October, 2003 Order at 3.

[5]    The AEDPA provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review ... is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

Under the doctrine of the law of the case, " 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.' " *Small v. Arch Capital Group, Ltd.,* No. 03 CIV. 5604, 2005 WL 2584158, at *2 (S.D.N.Y. Oct. 12, 2005) (quoting *Arizona v. California,* 460 U.S. 605, 618 (1982)).

Nothing in the record suggests that Judge Mordue's determination that this action was timely commenced by Shaw is erroneous in any way. [6] Therefore, under the doctrine of law of the case, this Court denies respondent's request to dismiss this action as untimely filed, and accordingly next considers the standard of review that is to be employed in considering petitioner's claims.

[6]    Respondent's argument that this action is time-barred appears to be based upon the erroneous assumption that Shaw's conviction became final

on July 5, 2000. *See* Resp. Mem. at 11. However, New York's Court of Appeals did not deny Shaw's application for leave to appeal the Appellate Division's decision until approximately nine months *after* that date, i.e., on April 6, 2001. *See People v. Shaw,* 96 N.Y.2d at 806.

**B. *Standard of Review Applicable to Shaw's Claims***
Under the AEDPA:

> a federal court may award habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the adjudication resulted in an outcome that: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Rodriguez v. Miller,* 439 F.3d 68, 73 (2d Cir.2006) (quoting 28 U.S.C. § 2254(d)); *see also DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005); *Miranda v. Bennett,* 322 F.3d 171, 177-78 (2d Cir.2003). "A state court adjudication is 'contrary to' clearly established federal law only if 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.' " *Rodriguez,* 439 F.3d 73 (quoting *Williams v. Taylor,* 529 U.S. 362, 413 (2000)). Under the "unreasonable application" clause of the AEDPA, a federal habeas court may only grant the writ where the state court's decision "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Rodriguez,* 439 F.3d at 73 (quoting *Williams,* 529 U.S. at 413).

**B. *Substance of Shaw's Claims***

**1. *Ground One***
**\*5** In his first ground for relief, Shaw argues that he was denied the effective assistance of appellate counsel. *See* Am. Pet., Ground One.

**i. *Clearly Established Supreme Court Precedent***
The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const., amend. VI. This Amendment has been

interpreted to require that indigents be provided with assigned counsel for their first appeal as of right. *Douglas v. California,* 372 U.S. 353, 358 (1963). Thus, an individual is entitled to the effective assistance of appellate counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14 (1970). The proper standard for evaluating a claim which alleges that appellate counsel was ineffective is the test enunciated in *Strickland v. Washington,* 466 U.S. 668 (1984). *See Smith v. Robbins,* 528 U.S. 259, 287-89 (2000). In *Strickland,* the Supreme Court held that to establish a violation of one's right to the effective assistance of counsel, a habeas petitioner must show both: i) that counsel's representation fell below an objective standard of reasonableness, measured in the light of the prevailing professional norms; and ii) resulting prejudice that is, a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. *Strickland,* 466 U.S. at 688-90.

**ii. *Contrary to, or Unreasonable Application of, Clearly Established Supreme Court Precedent***
In support of his first ground for relief, petitioner argues that he was not present at a hearing conducted by the trial court relating to a "juror that was forced to give a guilty verdict against the Petitioner," *see* Am. Pet., Ground One, and that his appellate counsel's failure to raise that issue on appeal constituted ineffective assistance. *Id.* In his traverse, Shaw argues that his counsel wrongfully failed to argue on appeal that: 1) his absence from that hearing deprived him of his right to be present during a material stage of his trial; and 2) trial counsel wrongfully withdrew a request that the County Court conduct "a hearing to inquire into the truth" regarding the letters purportedly written by the former juror. *See* Traverse at 1-4 (citing CPL § 330.40). [7] Both of these theories relate to correspondence sent to, *inter alia,* the County Court by an individual who claimed to have been member of the jury that convicted Shaw. *See* Am. Pet., Ground One; *see also* Traverse. Therefore, a review of the state court record relating to such correspondence is warranted.

[7]     Article 330 of New York's CPL sets for the procedure that must be followed by attorneys who seek to set aside verdict based upon, *inter alia,* juror misconduct. *See* CPL §§ 330.30(2); 330.40(2).

On March 22, 1999, Judge Mulroy presided over a hearing at which Shaw, his trial attorney and the prosecutor were present. The following exchange occurred at that hearing:

THE COURT: I've received a letter for what it's worth, from somebody that has signed their name, "Unknown," alleging certain improprieties that took place in the jury room during the deliberations of this gentleman's case.

I understand through conversations with Mr. Carey [8] that he's also received a letter and I also understand the Syracuse Newspapers have received a letter. I assume Mr. Carey is going to ask for some type of an adjournment . [9] I'll hear you, Mr. Carey.

[8]     Shaw's trial attorney was Paul G. Carey, Esq.

[9]     Shaw was scheduled to be sentenced on March 22, 1999. 11

*6   MR. CAREY: I am, Judge. Judge, in light of the fact that the Court ... and myself, have received a letter from a person who identifies themselves as a juror in this case, who in my letter states that they were untruthful and they broke their oath, that they did, in fact, have reasonable doubt but they were somehow pressured by the other jurors into rendering a guilty verdict. This person does say in my letter, and I think in the Court's as well, that, as of now he or she wants to remain unknown, but it says, "I will stay unknown until I find the proper authorities and then I will deal with the consequences at that time." I would first ask the Court in light of this very serious matter, Judge, to recall the jurors singly, not en masse. Obviously this person is saying that he or she was coerced by someone or other people in the jury room and I think it's so important that the Judge should-the Court should bring back the entire jury and in-camera interview each one.

THE COURT: Well, first of all, I think any request for the Court to do anything is premature. I think your request should be in writing so that Mr. Cuffy, [10] can have a chance to respond.... Mr. Cuffy, I'll make my letter available to you for your response. If you'd like, stop by this afternoon and my secretary will make a copy of it.

[10]     Gordon G. Cuffy, Esq. prosecuted the criminal action brought against Shaw on behalf of the State of New York.

MR. CUFFY: Your Honor, Mr. Carey has provided me with a copy of the letter.

THE COURT: Of my letter?

MR. CUFFY: Oh, excuse me.

MR. CAREY: The letter I received I gave it to him.

MR. CUFFY: I don't know if the Court has a copy of it.

THE COURT: I don't have Mr. Carey's copy. He doesn't have my copy and you don't have my copy .....

MR. CUFFY: Okay.

THE COURT: I don't, quite frankly, want anybody's copy.

MR. CAREY: Judge, I'm passing up a copy.

THE COURT: I'll read about it in some motion papers, I'm sure. All right? Now I'm not going to do anything, Mr. Carey, other than grant you an adjournment for you to formalize your request in writing to me and give Mr. Cuffy a chance to respond. How long will it take you to put that request down, sir?

MR. CAREY: Judge, I would ask for at least two weeks, because hopefully, whoever this person is will come forward by that time. I think that would be important if the Court had an opportunity but I'll need at least a couple of weeks to do this, Judge.

MR. CUFFY: Your Honor, could I be heard briefly on this?

THE COURT: Yes, sir. Yeah.

MR. CUFFY: Basically, the Court's presented with a typed-and it's important that it's typed-a typed letter from someone who signs, "Unknown," and claims to be a juror in this case. As far as I know, your Honor, I ... may have a different letter as I'm understanding. I wasn't sent a copy of any letter at all on this case. From what I read in this letter you have a juror say that. Even if this letter is accepted as being truthful, it doesn't make grounds-it doesn't establish grounds for any change in the outcome of this because the letter basically says that, "I was persuaded by other jurors during jury deliberation," which the Court I know is well aware that's what happens in jury deliberations in every

case. So based prima facie on what I have in front of me, I ask that sentencing go forward because there isn't a ground here to change the verdict.

**\*7**  THE COURT: I don't disagree with you but I think for fairness sake and for proper appellate review we ought to just formalize it in writing. I don't know how you're going to make this person who's unknown, come forward. I do not intend with this information to start calling jurors, bringing them in and beginning an inquiry. I don't think that's-this information rises to that level yet. So that's just a gut reaction I have to this information, but I'll give you a chance to put it in writing and afford this person, if this person is a member of the jury, to come forward and see what else is new....

*See* Transcript of Hearing before Judge Mulroy (3/22/99) (Dkt. No. 26, Exh. J.) ("March, 1999 Tr.") at 3-7. [11]

[11]    This Court was not provided with a copy of any of the letters to which the County Court refers in the March, 1999 hearing.

Approximately three weeks later, on April 14, 1999, Shaw, his attorney and the prosecutor appeared before Acting Supreme Court Judge John J. Brunetti. The transcript of that proceeding reflects the following discussion relating to the above-described letters:

THE COURT: This was on today for arguments of motions relative to some information that came to your attention-my attention, and I understand the District Attorney's attention about some letters or whatnot. Today was the day to make motions addressed to that. No motion has been received. I intend to sentence this man....

MR. CAREY: Judge, with regards to my motion, my motion was for the court to conduct an in camera review of each and every juror particularly with regards to the letter that was received by numerous people. In light of the fact that the District Attorney's office has conducted an investigation, and it's my understanding that all the jurors were questioned, no one stated that they sent that letter, and they continued their investigation, I would withdraw my motion for the court to do that investigation.

THE COURT: I wasn't going to do it anyway. Fine, now that I have your permission not to I'll not do it.

MR. CAREY: You do, judge.

*See* Transcript of Hearing before Justice Brunetti (4/14/99) (Dkt. No. 26, Exh. K) ("April, 1999 Tr.") at 2-3.

In addressing the merits of Shaw's *Coram Nobis* Application, the Appellate Division had the benefit of the above transcripts as well as an affidavit provided by the district attorney in opposition to Shaw's *coram nobis* application. In that affidavit, the district attorney noted that the investigation into the source of the letters conducted by the district attorney's office revealed that "the typeface of the letter had been traced back to a typewriter located in the Justice Center Jail, on the same floor where [Shaw] was being held." *See* Affidavit in Opposition to Shaw's *Coram Nobis* Application (2/1/02) (Dkt. No. 26, Exh. V) ("February, 2002 Aff.") at 2-3. That evidence-which was not refuted by Shaw in either the state courts or this action-is entirely consistent with the district attorney's finding that the above-mentioned letters were not written by any member of the jury at Shaw's criminal trial. [12]

[12]    Petitioner seems to argue that his trial attorney wrongfully failed to conduct an independent investigation into the source of the letters. *See* Traverse at 2. However, Shaw has offered nothing short of sheer surmise which suggests that an independent investigation by the defense counsel would have somehow revealed that the letters were, in fact, written by a juror from Shaw's trial. Unfortunately for petitioner, federal habeas courts cannot grant habeas relief based upon unsubstantiated conclusions, opinions or speculation. *See Wood v. Bartholomew,* 516 U.S. 1, 8 (1995) (federal courts should not grant "habeas relief on the basis of little more than speculation with slight support"); *Huntley v. Superintendent, Supt. of Southport Corr. Facility,* No. 00-CV-191, 2007 WL 319846, at *20 (N.D.N.Y. Jan. 30, 2007) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (citations omitted). Thus, Shaw is plainly not entitled to habeas intervention merely because his trial attorney failed to independently question the jurors at Shaw's trial as to whether they had written the above-described letters.

**\*8**  To establish that his appellate counsel's conduct was objectively unreasonable, " 'it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made.' " *Clark v. Stinson,* 214 F.3d 315, 322 (2d Cir.2001) (citing *Jones*

*v. Barnes,* 463 U.S. 745, 754 (1983)); *see also Atkins v. Miller,* 18 F.Supp.2d 314, 320 (S.D.N.Y.1998) (citation omitted). Rather, to prevail upon such this claim, Shaw must demonstrate that his counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Clark,* 214 F.3d at 322. Thus, appellate counsel cannot be considered ineffective for making a strategic decision to abandon weaker arguments and, instead, develop only those arguments more likely to succeed. *See Gonzalez v. Duncan,* No. 00-CV-1857, 2001 WL 726985, at *6 (E.D.N.Y. June 22, 2001) (citing *Jones,* 463 U.S. at 753) ("[a] brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound of strong and weak contentions").

Turning to the specific allegations asserted by Shaw in his first ground for relief, the undersigned notes that Shaw initially argues that his counsel wrongfully failed to argue on appeal that the hearing held by the County Court in Shaw's absence regarding the identity of the author of the letters referenced above violated the principles announced by New York's Court of Appeals in *People v. Antommarchi,* 80 N.Y.2d 247 (1992). [13] *See* Am. Pet. at (unnumbered) 7. However, the transcripts of the hearings referenced above establishes that the County Court **never conducted** a hearing where factual issues relating to the letters was explored. *See* March, 1999 Tr. at 7 (Judge Mulroy noting that he did not intend to contact jurors and question them about letters); April, 1999 Tr. at 2-3 (Justice Brunetti noting that he had no intention of questioning jurors about the above-referenced correspondence). Therefore, Shaw's claims that his attorney wrongfully failed to argue on appeal that: 1) the holding of such a hearing by the trial court in his absence violated his *Antommarchi* rights (*see* Am. Pet., Ground One; Traverse at 2); and 2) Shaw was wrongfully denied his right to be present at that hearing (*see* Traverse at 2-3), are clearly without substance.

[13]   In *Antommarchi,* New York's Court of Appeals held that a criminal defendant has a right to be present at side-bar conferences held by the trial court with prospective jurors. *See Figueroa v. Donnelly,* No. 02 CIV. 6259, 2003 WL 21146651, at *9 n. 5 (S.D.N.Y. May 16, 2003) (citing *Antommarchi* ).

Shaw also argues that his appellate counsel rendered ineffective assistance by failing to argue that petitioner's trial attorney "was not looking out for the petitioner's best interest, nor was he ... seeking out the truth" when trial counsel withdrew his motion which had requested that the County Court conduct an investigation into the source of the letters. *See* Traverse at 2. However, this claim appears to overlook the facts that: 1) the district attorney's investigation into the source of letters revealed that none of the jurors at Shaw's criminal trial had sent such correspondence (*see* April, 1999 Tr. at 2-3); 2) the investigation into the source of the letters established that they had been created by a typewriter located in the Justice Center Jail at which petitioner was incarcerated (*see Coram Nobis* Aff. at 2-3); and 3) the County Court specifically declared on the record that it would have denied defense counsel's motion to conduct a hearing into the matter (*see* April, 1999 Tr. at 3). The foregoing conclusively demonstrates that appellate counsel did not act unreasonably when he failed to argue on appeal that trial counsel's strategic decision to withdraw the above-described application amounted to ineffective assistance.

 **\*9**   Finally, Shaw's argument that appellate counsel improperly failed to argue on appeal that the trial court erred when it did not conduct any hearing relating to the above-mentioned letters fails to recognize the fact that the County Court had determined that no hearing was necessary in light of the facts that were disclosed by the district attorney's investigation relative to the source of the letters.

In sum, the record fails to support Shaw's habeas claim that his appellate counsel rendered ineffective assistance. Accordingly, he has not demonstrated that the Appellate Division's decision denying his *Coram Nobis* Application, *see Shaw,* 292 A.D.2d at 881, is either contrary to, or represents an unreasonable application of, the above-cited Supreme Court precedent. Therefore, the undersigned denies Shaw's first ground for relief.

### 2. *Ground Two*

In his second ground, Shaw argues that his conviction was obtained as a result of prosecutorial misconduct. *See* Am. Pet., Ground Two.

It is well settled that a federal district court " 'may not grant the habeas petition of a state prisoner unless it appears that the applicant has exhausted the remedies available in the courts of the State....' " *Shabazz v. Artuz,* 336 F.3d 154,160 (2d Cir .2003)) (quoting *Aparicio v. Artuz,* 269 F.3d 78, 89 (2d Cir.2001) (other citation omitted); *see also Ellman v. Davis,* 42 F.3d 144, 147 (2d Cir.1994). This is because "[s]tate courts, like federal courts, are obliged to enforce federal law." *Galdamez v. Keane,* 394 F.3d 68, 72 (2d Cir.) (quoting

*O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999)), *cert denied sub nom., Galdamez v. Fischer,* 544 U.S. 1025 (2005). As the Supreme Court noted in *O'Sullivan,* "[c]omity ... dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." *O'Sullivan,* 526 U.S. at 844; *see also Galdamez,* 394 F.3d at 72 (quoting *O'Sullivan* ). [14]

[14]     This exhaustion requirement "reduces friction between the state and federal court systems by avoiding the unseemliness of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." *O'Sullivan* 526 U.S. at 845; *see also Galdamez,* 394 F.3d at 72 (citing *O'Sullivan* ).

Shaw never raised in the state courts-as an independent claim for relief-that his conviction must be reversed because of prosecutorial misconduct. [15] Rather, Shaw only argued that the prosecutor engaged in misconduct at petitioner's trial as one of the theories Shaw asserted in support of his claim that his appellate counsel rendered ineffective assistance. *See* Record at 1747-48; 1757-58.

[15]     Although Shaw's brief on appeal refers to the conduct that forms the basis of Shaw's second ground for relief, *see* App. Br. at 37, that brief never alleges that Shaw's conviction should be reversed because of prosecutorial misconduct at Shaw's criminal trial. *See* App. Br.

"*Coram nobis* applications brought in state court do not exhaust the 'predicate' issues raised therein...." *Richards v.. Berbary,* No. 01CIV.5524, 2003 WL 22076247, at *5 (S.D.N.Y. Aug. 22, 2003) (citing *Turner v. Artuz,* 262 F.3d 118, 123 (2d Cir.2001)); *see also Perez v. Hollins,* No. 02CIV.6120, 2004 WL 307271, at *5-7 (S.D.N.Y. Feb. 5, 2004) (claims advanced in state court only as the predicate for ineffective assistance of appellate counsel claim are not exhausted for purposes of asserting such claims independent of appellate counsel claim); *Williams v. Bennett,* No. 99 CV 1119, 2003 WL 21143070, at *5 n. 4 (E.D.N.Y. Jan. 3, 2003) (same). Thus, the claim asserted in ground two of Shaw's amended petition, which has never been asserted by petitioner as independent claim for relief in any state court, is necessarily unexhausted.

*10 However, for reasons best known to the respondent, he has not argued that Shaw has failed to exhaust this (or any) of his claims in the state courts. [16] Rather, respondent argues this claim must be denied on the merits. *See* Resp. Mem. at 16-17.

[16]     As will be seen, petitioner has also failed to exhaust the claim he asserts in his fourth ground for relief.

It is improper for a federal district court to *sua sponte* dismiss a federal habeas claim on the theory that such claim is unexhausted. *E.g., Acosta v. Artuz,* 221 F.3d 117, 121-24 (2d Cir.2000) (courts may not *sua sponte* raise nonjurisdictional defenses without affording inmate "notice and an opportunity to be heard" relative to the proposed dismissal); *Klem v. Brunelle,* 96-CV-0807, 1999 WL 603824, at *2 n. 3 (W.D.N.Y. Aug. 9, 1999) (exhaustion requirement applicable to habeas petitions is not jurisdictional but rather a principle of comity) (citation omitted).

28 U.S.C. § 2254(b)(2) permits federal courts to consider the merits of an unexhausted habeas claim. [17] The Second Circuit, however, has not yet discussed the standard of review that district courts should employ when reviewing such a claim. *See Brown v. State of New York,* 374 F.Supp.2d 314, 318 (W.D.N.Y.2005). The majority of courts in this circuit that have addressed this issue have utilized a "patently frivolous" standard. *See Brown,* 374 F.Supp.2d at 318 (citing *Naranjo v. Filion,* No. 02-CIV-5449, 2003 WL 1900867, at *8 (S.D.N.Y. Apr. 16, 2003)) (collecting cases) (footnote omitted). A minority of district courts have opined that the dismissal of unexhausted claims is appropriate when " 'it is perfectly clear that the [petitioner] does not raise even a colorable federal claim.' " *See Hernandez v. Lord,* No. 00-CIV-2306, 2000 WL 1010975, at *4 n. 8 (S.D.N.Y. July 21, 2000) (collecting cases); *see also Edmonson v. Artus,* No. 04-CV-5477, 2006 WL 3486769, at *11 (E.D.N.Y. Nov. 30, 2006); *Russell v. Ricks,* No. 02-CV-0940, 2006 WL 1555468, at *16 (N.D.N.Y. May 31, 2006) (Kahn, J.). Since the undersigned concludes that Shaw's prosecutorial misconduct claim must be dismissed under either standard, this Court need not determine which of the above-referenced tests should be applied in considering petitioner's unexhausted claims.

[17]     A federal court may deny-but not grant-a habeas petition based upon an unexhausted claim.

*Aparicio,* 269 F.3d at 91 n. 5; *Cuadrado v. Stinson,* 992 F.Supp. 685, 687 (S.D.N.Y.1998).

A criminal defendant's right to a fair trial is mandated by the Due Process Clause of the United States Constitution. *Albright v. Oliver,* 510 U.S. 266, 273 n. 6 (1994) (citing *United States v. Agurs,* 427 U.S. 97, 107 (1976)). [18] For habeas relief to be granted based on a claim of prosecutorial misconduct, however, the alleged misconduct must have " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)); *see, e.g., United States v. Shareef,* 190 F.3d 71, 78 (2d Cir.1999) (internal quotations and citations omitted). In considering such a claim, courts are to focus on "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982).

[18]     "A right to a fair trial is a right ... protected by the due process clause of the Fourteenth Amendment." *Adamson v. People of State of California,* 332 U.S. 46, 53 (1947) (footnote omitted).

**\*11** In support of his claim that his conviction must be set aside due to prosecutorial misconduct, Shaw argues that the prosecutor "knowingly and willingly used fraud and misrepresentation to obtain a conviction against petitioner by putting a false witness on the stand to testify." Am. Pet. at (unnumbered) 8. Specifically, Shaw argues that the prosecution "used trickery" when it called Everod Reid as a prosecution witness, and that Reid thereafter provided "false testimony" at Shaw's trial. *Id.* Petitioner contends that "**no** justification ... can make up for the numerous blatant constitutional violations the D.A. bestowed upon the Petitioner," *id.* (emphasis in original), and that the "fraud and misrepresentation" of the prosecutor deprived Shaw of his right to a fair trial. *Id.*

A detailed record relating to Shaw's claim that a "false" witness was purportedly called by the prosecution was generated in the state court proceeding. Therefore, a review of that record is warranted.

Toward the conclusion of its case-in-chief against Shaw, the prosecution called Everod Reid as a prosecution witness. *See* Trial Tr. at 895. The following exchange occurred between Shaw's counsel, the County Court and the prosecution at the conclusion of that witness's testimony:

MR. CAREY: Since discovery ... we have been by way of all the police reports informed an Everod Reid was another person. We have never been told that Everod Reid, as we had believed by the police reports, was in fact the witness that they just called. And I think it's improper, given the fact that the prosecutor knew that we had no knowledge that the Everod Reid that we thought was Sardine and the police report said was Sardine was, in fact, not this witness.

THE COURT: Are you telling-

MR. CAREY: Which should have been disclosed when that witness list came out, but they never agreed on.

THE COURT: Are you telling me you've been misl[ed] by the fact that Everod Reid was somebody in the police report or described or some indication of what you thought this man was going to say, who he was, when in fact he takes the witness stand he's been misidentified in those police reports? As a matter of fact, there is no report-

MR. CAREY: During the course of the investigation the name Everod Reid came up as a witness to the homicide. He was identified as Anthony Miller, Sardine, all the police reports we had. Not until five minutes before this witness took the stand was I informed that the Everod Reid that we had all the police reports was in fact not Sardine, it was someone else. I believe they have an obligation to tell us if the witness list has someone else on it that we don't know about.

THE COURT: Let me ask you this. Mr. Cuffy, at what point in time did you realize that the Everod Reid discussed and identified in these police reports was, in fact, this individual who fled the area and you had no statement, no reports on.

**\*12** MR. CUFFY: Well, Your Honor, the Everod Reid who is identified in the police reports is identified as Sardine, so I never thought that was Everod Reid. He was identified as-identified as Oliver Miller, Sardine, and in fact gave a statement at which Sardine identifies himself as Elijah Bey, so there was never any dispute in the police reports that Sardine was not Everod Reid.

THE COURT: The point is, we had a discussion about Everod Reid that apparently the police have had some continual or contact with about this case.

MR. CUFFY: Yes.

THE COURT: ... [M]ay I ask when did you learn about this person?

MR. CUFFY: When I learned there was another Everod Reid, I learned the Everod Reid, I ... learned of [another] Everod Reid in late January.

THE COURT: ... Did you ever tell [defense counsel] that the Everod Reid you talked about in your letter was misidentified in these police reports?

MR. CUFFY: No, Your Honor, I did not.

THE COURT: Did you know that at some point during this preparing, did you know that person was misidentified in those police reports you have?

MR. CUFFY: No, Your Honor, the Everod Reid in the police reports is not misidentified. The police reports-

THE COURT: There's another Everod Reid.

MR. CUFFY: Yes, it is.

THE COURT: Oh. Oh. I'm sorry.

MR. CUFFY: The Everod Reid, Sardine uses the name Everod Reid. He also uses the name Elijah Bey. And that's clearly in the police reports.

THE COURT: Oh, so the misrepresentation has come from some witness.

MR. CUFFY: From the witness.

THE COURT: Who says I am Everod Reid.

MR. CUFFY: Yes. That's my position.

THE COURT: I see. Well, you know, Mr.-I don't know.

MR. CAREY: Judge, I have a problem with that. There's no indication in here that Everod Reid, and we have consistently seen with all the witnesses the prosecutor has called, they all have several names.

THE COURT: Yeah.

MR. CAREY: All right? They should have been under [an] obligation, ethical obligation, it's a homicide trial where this man is facing life, should have been under some

ethical obligation to at least come back and tell us the Everod Reid that we gave you all these police reports on is not the Everod Reid that we told you about February 3rd, 1999.

* * *

THE COURT: Well, I know. Let me give it some thought. I don't know what sanction, if there was a violation of something, some exculpatory rule.

MR. CAREY: That's what my motion is here today, Judge. My motion is for a mistrial.

THE COURT: Okay. Okay.

MR. CAREY: All right? Because I believe now, first of all, we're not given the opportunity to prepare for that type of witness, when obviously he's-he's disclosing some time in December of 1998 to his attorney about his involvement and what he saw. Now ...

THE COURT: Were you informed he was going to come in and make some identification here?

*13  MR. CAREY: No.

THE COURT: That came as a complete surprise.

MR. CAREY: Complete surprise.

THE COURT: When did you know that, Mr. Cuffy?

MR. CUFFY: I knew that. Your Honor. I thought I informed him.

THE COURT: When[?]

MR. CUFFY: I knew that when I spoke to him, when I sent that letter to Mr. Carey.

THE COURT: So in early February, I guess, you knew....

MR. CUFFY: Well, I did not know he would be able to identify him. I can't say that.

THE COURT: So when you asked him the question do you see the gunman in the courtroom.

MR. CUFFY: Yeah, I didn't know he was going to identify him. In fact-in fact, as you notice, I didn't ask him that question. He just pointed to the guy.

Trial Tr. at 958-64.

The following week, Judge Mulroy ruled on defense counsel's request for a mistrial based upon the foregoing. The County Court opined that the better course for the prosecution to have followed would have been to clearly advise defense counsel, prior to trial, that the Everod Reid to whom the police reports referred was an individual other than the Everod Reid whom the prosecution intended to call as a witness. Trial Tr. at 971-72. However, although the County Court noted that Reid's testimony was "important" for the prosecution, Judge Mulroy nevertheless concluded that such testimony was also "cumulative [of] other witnesses who came in and identified [Shaw] as being the shooter...." Trial Tr. at 971. The trial court therefore denied the mistrial motion and declined to *sua sponte* strike Reid's testimony. Trial Tr. at 971.

Initially, this Court finds that the prosecutor did not engage in misconduct with respect to calling Everod Reid as a witness. It is undisputed that before the trial started, the prosecution provided defense counsel with the federal criminal identification record [19] that related to the Everod Reid who took the witness stand. Trial Tr. at 968. The evidence at trial suggested that the rap sheet provided to defense counsel contained all of the aliases of the Reid who testified for the prosecution. [20] *See* Trial Tr. at 970 (prosecutor noting that federal rap sheets contain the aliases of the individuals about whom the rap sheet is created). Although the Everod Reid whom defense counsel believed would be testifying was also known by the aliases "Sardine" and "Elijah Bey," *see* Trial Tr. at 960, neither of those aliases appeared on the federal rap sheet that was provided by the prosecutor to defense counsel relating to Reid. Trial Tr. at 968-69. Therefore, as the trial court properly noted, the omission on Reid's rap sheet of those known aliases should have caused defense counsel to inquire further about the identity of the Reid who was listed on the prosecution's witness list. [21] Trial Tr. at 970. The fact that Reid's rap sheet was provided to defense counsel in advance of the trial severely undermines petitioner's claim that the prosecutor engaged in misconduct through deceit or trickery.

[19]     The federal criminal identification record of an individual is commonly referred to as a "rap sheet."

[20]     For reasons that are not clear to the undersigned, the rap sheet that was provided to counsel regarding Reid is not included in the state court record provided to this Court.

[21]     Defense counsel informed Judge Mulroy that counsel could not recall whether federal rap sheets "provide[ ] an area for aliases." Trial Tr. at 969-70. However, federal rap sheets routinely list the aliases of criminal defendants. *E.g., United States v. Rodriguez-Arreola,* 313 F.3d 1064, 1067-68 (8th Cir.2002). In this Court's experience, federal criminal identification records contain the known aliases of the individual discussed therein.

**\*14** Regardless, it is undisputed that before Reid testified, the prosecution informed Shaw's counsel that the Everod Reid who was about to testify was not the same Everod Reid mentioned in the police reports. Trial Tr. at 970-71. Defense counsel never requested a delay in the proceedings upon learning that information, and went on to conduct what the County Court characterized as a "very vigorous cross-examination" of that witness. Trial Tr. at 971. During that cross-examination, defense counsel: i) fully explored Reid's prior criminal history (Trial Tr. at 914-20); ii) established that Reid had violated the terms of his federal probation and was testifying as part of a plea agreement with the United States Attorney relating to that probation violation (Trial Tr. at 921-23); and iii) elicited testimony from Reid in which he admitted that he had a history of illegally selling guns and had previously been arrested while in possession of at least six pounds of marijuana (Trial Tr. at 923-24). Significantly, Shaw has failed to articulate how defense counsel's cross-examination of Reid was impacted, in any way, by the claimed misconduct of the prosecution relating to Reid.

"To succeed in a habeas claim based on prosecutorial misconduct, the petitioner must demonstrate 'that he suffered actual prejudice because the prosecutor's [conduct] had a substantial and injurious effect or influence in determining the jury's verdict.' " *Johnson v. State of New York,* No. 01 CIV. 4219, 2002 WL 1974048, at \*3 (S.D.N.Y. Aug. 26, 2002) (quoting *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994)). Therefore, even assuming, *arguendo,* that the prosecutor improperly failed to inform the defense of the fact that the Everod Reid who was to testify at trial was an individual other than the Everod Reid mentioned in the police reports, Shaw's failure to establish that he was prejudiced by the timing of such disclosure is fatal to his prosecutorial misconduct claim.

Finally, in denying defense counsel's motion for a mistrial on the theory of prosecutorial misconduct, Judge Mulroy noted that Reid's testimony was cumulative of the testimony provided by other prosecution witnesses. Trial Tr. at 971. After reviewing the trial transcript, this Court endorses that

2007 WL 951459

finding of Judge Mulroy. For example, Ricky Campbell testified that he had observed the fist fight between Johnson and Allen, and that he thereafter observed Shaw shoot Allen.[22] *See* Trial Tr. at 597-602. Campbell's testimony was buttressed by the testimony of Ameko Brooks, who specifically identified Shaw as the shooter when asked by the prosecutor to identify the person whom he observed holding the gun after Allen was shot. *See* Trial Tr. at 848-49. Additionally, Johnson testified that minutes after the shooting, Shaw admitted that he had shot Allen. *See* Trial Tr. at 721-22. Since Reid's testimony was cumulative of other evidence offered by the prosecution against Shaw, that evidence did not have a substantial and injurious effect or influence in determining the jury's verdict. *E.g., Smith v. Girdich,* No. 03-CV-5193, 2004 WL 1743946, at *3 (E.D.N.Y. Aug. 4, 2004) (admission of cumulative testimony did not have substantial and injurious effect or influence in determining the jury's verdict); *Richardson v. Artuz,* No. 97 CV 2128, 2004 WL 556688, at *21 (E.D.N.Y. Mar. 22, 2004) (admission of perjurious testimony "was merely cumulative, and could not have affected the jury's decision").

[22]     Campbell testified that he was "right there next to" Shaw when he began shooting his gun. Trial Tr. at 600.

**\*15** In sum, Shaw has failed to demonstrate that the prosecutor engaged in misconduct with respect to the manner in which Everod Reid testified for the prosecution at Shaw's trial. Furthermore, Shaw has wholly failed to establish that he was prejudiced by that conduct in light of the facts that: 1) defense counsel thoroughly cross-examined Reid at trial; and 2) that witness's testimony was merely cumulative of other testimony offered by prosecution witnesses. Therefore, this unexhausted claim is patently frivolous. The undersigned alternatively concludes that it is perfectly clear that Shaw has not raised even a colorable claim alleging prosecutorial misconduct at his trial. Therefore, the second ground in his amended petition must be denied.

**C. Ground Three**

Shaw next alleges that his conviction is constitutionally infirm because of the misconduct in which the County Court engaged at Shaw's criminal trial. *See* Am. Pet. at (unnumbered) 9. In support of this claim, Shaw alleges that Judge Mulroy: i) improperly allowed Everod Reid to testify at Shaw's trial; and ii) was neither fair nor impartial at that proceeding. *See id.* at (unnumbered) 9-10.

Shaw raised these claims in his April 2, 2002 CPL motion, *see* Record at 1806-08, as well as in his April 29, 2002 CPL motion. *See* Record at 1856-57, 1873-78. Those applications were denied by Judge Walsh. *See* July, 2002 Order. This Court must therefore determine whether Judge Walsh's determination is either contrary to, or represents an unreasonable application of, clearly established Supreme Court precedent.

**i. *Clearly Established Supreme Court Precedent***

Petitioner's claim that the trial court was biased against him necessarily implicates his right to a fair trial. *See Albright,* 510 U.S. at 273 n. 6; *Agurs,* 427 U.S. at 107. Additionally, the Supreme Court has noted that "the floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal ... before a judge with no actual bias against the defendant or interest in the outcome of his particular case.'" *Bracy v. Gramley,* 520 U.S. 899, 904-05 (1997).

**ii. *Contrary To, or Unreasonable Application Of, Clearly Established Supreme Court Precedent***

Addressing first Shaw's claim that the County Court improperly allowed Reid to testify, this Court finds such claim to be without substance. Shaw never alleges that he was unaware that the prosecution intended to call Reid as a witness, only that the defense was under the mistaken impression that the Everod Reid who was mentioned in the police reports would testify at trial, rather than a different individual with the same name.[23] Thus, there was no basis upon which the County Court could have properly precluded Reid's testimony at the subject criminal trial. Additionally, as noted above, since that witness's testimony was cumulative of that offered by other witnesses at Shaw's trial, this factor weighs against a finding that Reid's testimony deprived Shaw of his right to a fair trial. *E.g., Wray v. Johnson,* 202 F.3d 515, 526 (2d Cir.2000).

[23]     Defense counsel did not object to Reid's testimony until after that witness had completed his testimony. *E.g.,* Trial Tr. at 958.

**\*16** Next, although petitioner claims that Reid provided "false and injurious testimony" at Shaw's trial, *see* Am. Pet. at (unnumbered) 10, the undersigned notes that Shaw provides no support for his claim that Reid's testimony was false. Rather, this claim appears to invite this Court to find the testimony of that witness to be not credible. However, the undersigned notes that where evidence was presented from

2007 WL 951459

which the jury could have drawn an inference favorable to the accused but it chose not to, courts must " 'defer to ... the jury's choice of the competing inferences.' " *Daily v. New York,* 388 F.Supp.2d 238, 248 (S.D.N.Y.2005) (quoting *United States v. Kinney,* 211 F.3d 13, 18 (2d Cir.2000) (other citation omitted)); *see also Keller v. Bennett,* No. 98CV1437, 2002 WL 975306, at *4 (N.D.N.Y. Mar. 21, 2002) (Sharpe, M.J.) ("a habeas court, viewing a cold record, may not properly reassess the jury's finding of credibility concerning the testimony of witnesses offered at trial") (citations omitted), *adopted, Keller v. Bennett,* No. 98CV1437 (Dkt. No. 18) (N.D.N.Y. Apr. 15, 2002) (Kahn, J.), *appeal dismissed,* No. 02-2328 (2d Cir. Dec. 12, 2003); *Bellezza v. Fischer,* 01CV 1445, 2003 WL 21854744, at *15 (E.D.N.Y. Aug. 6, 2003) (on collateral review, a federal habeas court "must presume that the jury resolved any questions of credibility in favor of the prosecution") (citing *Vera v. Hanslmaier,* 928 F.Supp. 278, 284 (S.D.N.Y.1996)) (other citations and internal quotation omitted); *Cottrel v. New York,* 259 F.Supp .2d 300, 308 (S.D.N.Y.2003) (citing *Marshall v. Lonberger,* 459 U.S. 422, 434 (1983)). Since there is no evidence before this Court which establishes that Reid's testimony was false or misleading, this unsubstantiated claim does not support a finding that petitioner is entitled to federal habeas intervention.

Finally, as to Shaw's claim that Judge Mulroy was biased against him, *see* Am. Pet. at (unnumbered) 9-10, the Court notes that mere allegations of judicial bias or prejudice do not state a due process violation. *Brown v. Doe,* 2 F.3d 1236, 1248 (2d Cir.1993) (citing *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 820 (1986)). Rather, when a judge is claimed by a party to have been biased against him, the entire record must be examined to determine "whether the jurors have been so impressed by the judge's partiality that it affected their deliberations." *United States v. Tocco,* 135 F.3d 116, 129 (2d Cir.1998) (citing *United States v. Filani,* 74 F.3d 378, 385-86 (2d Cir.1996)). "To state a due process claim that a judge is biased, the claimant must show either that actual bias existed, or that an appearance of bias created a conclusive presumption of actual bias." *Frase v. McCray,* No. 01-CV-1704, 2003 WL 25459378, at *1 (N.D.N.Y. July 22, 2003) (citing *Phelps v. Hamilton,* 122 F.3d 1390, 1323 (10th Cir.1997)).

In the case *sub judice,* petitioner cites the fact that Judge Mulroy denied defense counsel's motion for a mistrial and did not strike Reid's testimony as evidence that Judge Mulroy harbored a bias against Shaw. *See* Am. Pet. at 9-10. However, Reid's testimony at Shaw's trial was proper and in no way

suggestive of bias on the part of the County Court. Moreover, this Court's review of the trial transcript fails to disclose conduct which indicated improper conduct on the part of the trial court towards Shaw. To the contrary, the state court record below reveals no conduct on the part of Judge Mulroy that suggests any bias against Shaw.

**\*17** Since petitioner has failed to demonstrate that the trial court erred in permitting Reid to testify for the prosecution, or that the County Court harbored any bias against Shaw, he has failed to demonstrate that the County Court's July, 2002 Order denying petitioner's CPL motions is either contrary to, or represents an unreasonable application of, the clearly established Supreme Court precedent noted above. Therefore, the undersigned denies Shaw's third ground for federal habeas relief.

### 4. *Ground Four*

In his fourth and final claim, Shaw argues that he received the ineffective assistance of trial counsel. *See* Am. Pet. at (unnumbered) 10-11. In support of this claim, Shaw contends that his trial attorney wrongfully allowed the district attorney "to question juror members out of his presence," and that counsel thereafter wrongfully withdrew his application to question the jurors about the letters that had been sent to, *inter alia,* the County Court and trial counsel which suggested that a juror was improperly coerced into finding Shaw guilty of the charges alleged in the Indictment. *See* Am. Pet., Ground Four.

The exhaustion requirement applicable to federal habeas petitions is satisfied where the habeas claim has been "fairly presented" to the state courts. *See Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997) (quoting *Picard v. Connor,* 404 U.S. 270, 275 (1971)). A claim has been "fairly presented" when the state courts are apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye v. Attorney Gen'l of N.Y.,* 696 F.2d 186, 191 (2d Cir.1986); *Morales v. Miller,* 41 F.Supp.2d 364, 374 (E.D.N.Y.1999). Where certain theories in support of an ineffective assistance of counsel claim have been raised in the state courts and others have not, those theories that have never been asserted in the state courts are considered unexhausted when raised for the first time in a federal habeas petition. *E.g. Edmonson,* 2006 WL 3486769, at *11-12.

In his appellate brief, counsel argued that Shaw received the ineffective assistance of trial counsel because counsel's motion to dismiss the Indictment at the close of the prosecution's proof failed to specify the legal basis for that

motion. *See* App. Br. at 36-40. Appellate counsel also argued that trial counsel improperly failed to move for a mistrial upon learning that "one or more of the People's witnesses had lied to the grand jury." App. Br. at 37. However, appellate counsel did not assert either of the theories now raised by petitioner in his fourth ground for relief in support of counsel's appellate claim which argued that Shaw's trial counsel rendered ineffective assistance. *See* App. Br. Additionally, as with the claims raised by Shaw in his second ground for relief, respondent has failed to argue that petitioner is procedurally barred from asserting his unexhausted claims alleging ineffective assistance of trial counsel in this action. *See* Resp. Mem. at 12-14. Thus, the undersigned considers whether Shaw's claim alleging ineffective assistance of trial counsel is patently frivolous or, alternatively, whether it is perfectly clear that Shaw has not raised even a colorable claim alleging ineffective assistance of trial counsel.

**\*18** As noted above, the Sixth Amendment mandates that criminal defendants be afforded the assistance of counsel for their defense to the charges against them. *See U.S. Const., amend. VI.* Thus, to prevail on his claim alleging ineffective assistance of trial counsel, Shaw must establish that his trial attorney's representation fell below an objective standard of reasonableness and that petitioner was prejudiced by such deficient representation. *Strickland, 466 U.S. at 688-90; see also Cuevas v. Henderson,* 801 F.2d 586, 589-90 (2d Cir.1986); *Simms v. Moscicki,* No. 06CIV2056, 2007 WL 162295, at \*4 (S.D.N.Y. Jan 19, 2007) (citations omitted); *Youngblood v. Brown,* 465 F.Supp.2d 270, 282 (S.D.N.Y.2006) (citations omitted); *Anwar v. United States,* 648 F.Supp. 820, 826 (N.D.N.Y.1986) (Munson, C.J.) (citation omitted).

With respect to Shaw's claim that the prosecutor improperly questioned the jurors outside of Shaw's presence, this argument appears to overlook the significant fact that the jury in his criminal trial was discharged from its duties on March 2, 1999, *see* Trial Tr. at 1209, and that the letters defense counsel and the trial court received alleging improper conduct during the course of deliberations were written some time *after* the jury was disbanded. *E.g.* March, 1999 Tr. at 2.[24] Since those individuals had been formally excused from their service as jurors at the time they were questioned by the district attorney, there is no basis upon which this Court may properly conclude that the district attorney wrongfully asked the former members of the jury whether they had written the letters that form the basis of this aspect of Shaw's claim. In this regard, the Court notes that petitioner has not cited

any authority, and this Court's research has disclosed none, which stands for the proposition that defense counsel and/or the defendant himself must be present where the prosecutor questions members of a jury that has been formally excused by a court after the completion of their service on the jury. Moreover, since the questioning of the jurors occurred *after* the jury had delivered its verdict, it is unclear to the Court how Shaw can properly claim he was prejudiced by the manner in which the jurors were questioned. Additionally, any claim of prejudice on the part of Shaw is further undermined by the fact that the investigation into the source of the letters ultimately demonstrated that those letters were not written by any of the jurors at Shaw's trial. *See* February, 2002 Aff. at 2-3.

[24] The state court record does not reflect the date on which those letters were purportedly written, or when those letters were received by the addressees.

As to his final theory in support of this ground, since the County Court specifically declared that it would not grant defense counsel's motion which requested that the trial court individually question the former jurors, *see* April, 1999 Tr. at 2-3, Shaw cannot demonstrate that he was prejudiced by trial counsel's decision to withdraw his application which requested that relief.[25] Thus, this final theory in support of his ineffective assistance of trial counsel claim is plainly without merit.

[25] The post-verdict questioning of jurors by courts is generally disfavored. *See Tanner v. United States,* 483 U.S. 107, 120-21 (1987); *King v. United States,* 576 F.2d 432, 438 (2d Cir.1978).

**\*19** Based upon the above, this Court concludes Shaw's unexhausted claim of ineffective assistance of trial counsel is patently frivolous. The undersigned alternatively finds that it is perfectly clear that Shaw has not raised even a colorable claim with respect to his fourth ground for relief. Therefore, the final ground in his amended petition must be denied.

### III. *Certificate of Appealability*

Finally, the Court notes that 28 U.S.C. § 2253(c) provides in relevant part that:

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from-

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court.... [26]

> [26] Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may not proceed "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." *See* Fed.R.App.P. 22(b).

28 U.S.C. § 2253(c)(1)(A). A Certificate of Appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Since petitioner has failed to make such a showing herein, the Court declines to issue any Certificate of Appealability in this matter.

**WHEREFORE,** after having reviewed the state court record, the documents submitted by the parties in conjunction with this action, the applicable law, and for the reasons discussed herein, it is hereby

**ORDERED,** that Shaw's amended petition (Dkt. No. 23) is **DENIED** and **DISMISSED,** and it is further

**ORDERED,** that the Clerk of Court serve a copy of this Memorandum-Decision and Order upon the parties to this action by regular or electronic mail, and it is further

**ORDERED,** that any state court records that were not filed in this action be returned directly to the Attorney General at the conclusion of these proceedings (including any appeal of this Memorandum-Decision and Order filed by any party).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 951459

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 931729
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Anthony M. GARRAWAY, Plaintiff,
v.
BROOME COUNTY, NEW YORK; Ronald J.
Bill, Chief Civil Deputy; Broome County Sheriff's
Department; Dennis Rowlands, Deputy # 260;
and Chris Smith, Deputy # 223, Defendants.

No. 5:03-CV-0681.
|
April 7, 2006.

**Attorneys and Law Firms**

Anthony M. Garraway, Moravia, NY, pro se.

Aaron J. Marcus, Binghamton, NY, for Defendants.

*DECISION and ORDER*

THOMAS J. McAVOY, Senior United States District Judge.

**I. INTRODUCTION**

*1  Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 alleging that Defendants violated his Fourth Amendment right against unreasonable search and seizures and his Fourteenth Amendment right to equal protection and due process. Defendants move for summary judgement pursuant to Fed.R.Civ.P. 56 based on the untimeliness of Plaintiff's claim and his failure to state a cause of action. Plaintiff opposes arguing his claim is timely under the "prison mailbox rule" and that there are genuine issues of fact warranting a trial.

**II. BACKGROUND**

Plaintiff claims that on or about May 15, 2000 he entered into an oral agreement with Esther Gardner for a "month-to-month lease" of a mobile home. Plaintiff contends that he made a rent payment for the remainder of the month and was given "the only key to the property so he could move in." (Pl.'s Statement of Undisputed Facts at ¶ 1). Gardner, however, states she never met or talked with Plaintiff prior to May 31, 2000 and that she did not lease any property to him. (Gardner Aff. ¶

9.) Gardner's daughter, Margaret Dunn, claims that Denise Houck, Plaintiff's then girlfriend, contacted her a few weeks prior to May 31, 2000 about renting the property. (Dunn Aff. ¶ 2.) Dunn claims she and Houck had an oral agreement that Houck would not move in until she had paid Dunn the first month's rent and a security deposit. Dunn gave Houck permission to fix the property up prior to moving in and gave Houck a key. Dunn states she never intended to rent the property to Plaintiff, but rather to Houck and her children. (Dunn Aff. ¶ 8.) No formal lease documents were drawn up. There remains a factual dispute as to what rental agreements, if any, were made between Plaintiff, Houck, Gardner, and Dunn.

Dunn became aware that Houck had moved in without making any rent or security deposit payments. (Dunn Aff. ¶ 5.) Dunn claims Houck told her she would have the rent money within the next few days and, upon that belief, Dunn allowed Houck to stay in the mobile home. *Id.*

On May 31, 2000, Gardner went to the mobile home and saw that Houck and Plaintiff had moved in and had pit bulls living on the property. Gardner claims she no longer wanted Houck to lease the property and called the Broome County Humane Society and the Broome County Sheriff's Office to see what actions could be taken. (Gardner Aff. ¶ 5.)

When the Humane Society arrived, Plaintiff came outside from within the mobile home and an argument ensued between he and Gardner as to her request for the Humane Society to remove Plaintiff's dogs. Shortly thereafter, Defendant Sheriff's Deputy Rowlands arrived on the scene and claims he was advised by Gardner that Plaintiff did not belong on the property. (Rowlands Aff. ¶ 3.)

Defendant Sheriff's Chief Civil Deputy Bill claims he responded to the scene after hearing a discussion of it on his radio. Upon arrival, Bill claims he spoke with Gardner who advised him that, while Plaintiff and Houck were going to lease the property and had been given permission to do some work inside the home, they had not been given permission to move into the residence. Bill claims Houck told him what Gardner said was true and that no money had exchanged hands and there was no formal lease agreement. (Bill Aff. ¶ 4.) Bill claims that he then advised Houck that in his opinion she and Plaintiff were "not in the residence legally" and that they would ultimately have to leave. Bill states that he advised Houck of the legal processes by which she could contest the landlord's representations. (Bill Aff. ¶ 4.)

**\*2** Defendant Sheriff's Deputy Smith claims that upon his arrival, Rowlands was interviewing Plaintiff who stated his name was Hubert A. Garraway and was refusing to offer any form of identification. Hubert Garraway is Plaintiff's brother. (Smith Aff. ¶ 3.) Smith claims he was advised by the Humane Society employees that Plaintiff's name was Anthony Garraway and that they had a number of prior dealings with him. (Smith Aff. ¶ 4). Smith claims Plaintiff continued to give conflicting information as to his name, social security number and other identification information. Smith states that just prior to placing Plaintiff into custody on suspicion of committing criminal impersonation, he was advised of an active arrest warrant outstanding for Plaintiff from the Binghamton Police Department regarding a Criminal Mischief in the Fourth Degree charge. (Smith Aff. ¶ 6.) Smith claims he never entered or searched the mobile home.

Because Defendants suspected Plaintiff was lying about his identity, Rowlands entered the mobile home to find a form of personal identification for Plaintiff. Rowlands claims he entered the mobile home upon the belief that Plaintiff did not belong there and that Gardner had the authority to consent to the search. (Rowlands Aff. ¶ 8.) Rowlands claims the search entailed "nothing more than glancing over any papers or documents that might have been lying around the residence." (Rowlands Aff. ¶ 7.) Rowlands claims he did not remove any items from the property. *Id* .

Plaintiff offers a conflicting version of the events. Plaintiff claims that Houck was not present and that she was at work during the entire incident. Plaintiff admits he would not offer any form of identification to Defendants and that he stated he was Hubert. Plaintiff claims Defendant Smith unlawfully entered the mobile home and returned with letters written and sent to Anthony Garraway. Plaintiff claims Rowlands also unlawfully entered the mobile home, found Plaintiff's wallet within a pair of Plaintiff's pants and removed Plaintiff's license and social security card. Plaintiff claims these identification cards were obtained from an illegal search and were illegally seized. Plaintiff claims the identification cards were taken from the property to the station where Plaintiff was processed.

It is undisputed that Plaintiff was arrested and charged with Criminal Impersonation in the Second Degree (New York Penal Law § 190.25) and Criminal Mischief in the Fourth Degree (New York Penal Law § 145.00). Following the incident, Gardner began a formal eviction proceeding and posted a 3-day notice on the door of the mobile home. Following the posting, Gardner believed no one remained in the mobile home. (Gardner Aff. ¶ 7.)

Plaintiff filed the instant claim pursuant to 42 U.S.C.1983 claiming a violation of his Constitutional Fourth Amendment right against unreasonable search and seizures and a violation of his due process right for being evicted from the property.

## III. STANDARD OF REVIEW

**\*3** It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v.. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). With this standard in mind, the Court will address Defendants' motion

## IV. DISCUSSION

Plaintiff's Complaint alleges violations of his Constitutional right against illegal search and seizures by Defendants, and a violation of his Constitutional right to equal protection and due process by denying Plaintiff a legal eviction. (See Pl. Compl.). Plaintiff claims there was an oral rental agreement between he and Gardner and, therefore, Gardner did not have the authority to consent to a search of the mobile home.

Plaintiff further claims Defendants threatened his family that if they were to return to the property they would be arrested for trespassing, thus resulting in an illegal eviction by Defendants. Defendants argue the Complaint should be dismissed because it is untimely under 42 U.S.C.S. § 1983. In addition, Defendants argue that the motion for summary judgment should be granted because no Fourth Amendment or due process rights have been violated and, assuming there was a violation, that they are entitled to qualified immunity.

*A. Timeliness of Plaintiff's Claim*

There is a three year statute of limitations for actions arising under 42 U.S.C.1983. Plaintiff's claim arose from the incidents occurring on May 31, 2000. Defendants claim the filing date of June 4, 2003 renders the Complaint untimely. However, Plaintiff, in his position of being both *pro se* and incarcerated, is afforded protection by the "prison mailbox rule". This rule is justified under the rationale that in being *pro se* and incarcerated the plaintiff has no choice but to hand his notices to prison authorities to forward to the Court Clerk. Because the plaintiff loses control over the documents and must therefore rely on prison authorities to forward them on to the clerk, Courts have recognized the date plaintiffs hand over their documents to prison authorities as the effective "filing date", and not the date when the Court Clerk actually is in receipt of them. *See Houston v. Lack,* 487 U.S. 266 (1988).

**\*4** In the instant case, while the filing date as entered by the clerk is June 4, 2003, Plaintiff appears to have handed the Complaint over to prison officials prior to May 31, 2003, and by virtue of the "prison mailbox rule", filed the Complaint within the three year statute of limitations. [1]

[1]      Respondents may, however, inquire as to the date Plaintiff actually handed over the papers and later raise this issue if it should appear that Plaintiff handed over the papers *after* May 31, 2003.

*B. Fourth Amendment right against unreasonable search and seizures*

Plaintiff claims his Fourth Amendment right against unreasonable search and seizures was violated when Defendants Rowlands and Smith, without permission from Plaintiff, unlawfully entered into the mobile home and unlawfully seized Plaintiff's property.

To claim a violation of a Fourth Amendment right against unreasonable search and seizures, Plaintiff has to show a

legitimate expectation of privacy in the property. *California v. Ciraolo,* 476 U.S. 207 (1986). A legitimate expectation may be shown by establishing an actual subjective expectation of privacy and that the expectation is one that society is prepared to recognize as legitimate. *Id.* Thus, "a tenant's expectation of privacy in his apartment ceases to be 'objectively justifiable' when his occupancy ceases to be lawful, as determined by the terms of his lease...." *U.S. v. Ross,* 43 Fed. Appx. 751, 757 (6th Cir.2002). In *U.S. v. Allen,* 106 F.3d 695 (6th Cir.1997), for example, the court held a defendant lacked a legitimate expectation of privacy when he failed to remain current on his rental payments.

A search conducted without a warrant is considered per se unreasonable and, therefore, a violation of the Fourth Amendment unless the search falls within a specifically established exception. *See Katz v. United States,* 389 U.S. 347 (1967). One such exception is a warrantless search conducted with consent. *See Schneckloth v. Bustamonte,* 412 U.S. 218 (1973). "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph,* ---S.Ct. ----, ----, 2006 WL 707380, at *3 (Mar. 22, 2006). Valid consent is established when one with actual authority over the property voluntarily gives consent to a search. *Schneckloth,* 412 U.S. 218. "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Randolph,* --- S.Ct. at ----, 2006 WL 707380 at *5. Generally, a lessor of real property has no authority to consent to a warrantless search of rental property which is subject to an existing lease. *See Chapman v. U.S.,* 365 U.S. 610 (1961); *U.S. v. Elliott,* 50 F.3d 180, 186 (2d Cir.1995). "A landlord does, however, have authority to consent to a search by police of dwelling units in his building that are not leased. Further, if the landlord has joint access or control over certain areas of his apartment building for most purposes, he may validly consent to a search of those areas." *Id.*

*1. Actual Authority to Consent*

**\*5** The first issue is whether Plaintiff had actual authority over the mobile home as a result of a rental agreement. Plaintiff claims there was an oral lease agreement with Gardner and that he paid rent for the month of May. Gardner claims she never made such an agreement and never received

any payments from Plaintiff. Dunn claims she and Houck had an oral lease agreement but that she was not authorized to live there yet and had made no rental payments. Based on the foregoing, there is a material dispute as to whether there was a lease agreement in effect at the time of the search and whether rental payments had been made. As a result, it remains unclear as to whether Plaintiff or Gardner had actual authority over the mobile home and was, therefore, authorized to give or refuse consent to the warrantless search.

### 2. Apparent Authority to Consent

Viewing the evidence in the light most favorable to Plaintiff, the Court will assume there was a valid lease agreement. Nevertheless, the Court finds that the search of the mobile home was still valid under *Illinois v. Rodriguez,* 497 U.S. 177 (1990) and the Supreme Court's more recent decision in *Randolph.* In *Rodriguez,* the Supreme Court held that law enforcement was permitted to conduct a search upon the apparent authority of a third party's consent, even if it turns out the third party did not in fact have actual authority. *Rodriguez,* 497 U.S. 177. Law enforcement may rely on the third party's consent so long as facts available to the officer at the time of the search would warrant a "person of reasonable caution in belief that consenting party had authority over premises." *See U.S. v. Perez,* 948 F.Supp. 1191 (S.D.N.Y.1996); *see also Anderson v. Decristofalo,* 494 F.2d 321 (2d Cir.1974); *Issa v. City of Glencoe,* 118 Fed. Appx. 103 (8th Cir.2004).

Here, the issue is whether Officer Rowlands had a reasonable good faith belief that Plaintiff was not on the property legally and was not there pursuant to a lease agreement and, therefore, Gardner had the authority to consent to a warrantless search of the mobile home. Plaintiff claims that because the Officers were allegedly called to the scene because of the pit bulls, and not for a landlord/tenant dispute, their belief that Plaintiff had no legal right to be in the mobile home was unreasonable. Plaintiff claims Houck was not at the scene and Defendants could not therefore rely on her statements in determining if Plaintiff was in the mobile home legally. Defendants Smith, Rowlands and Bill claim that once each had arrived on the scene they were advised by Gardner that Plaintiff and Houck had moved into the mobile home without having permission to do so. (Smith Aff. ¶ 12, Rowlands Aff. ¶ 3, Bill Aff. ¶ 3.) Defendant Bill claims Houck was at the scene and advised him that what Gardner had said was true and that no formal lease agreement had been made and no money had exchanged hands. (Bill Aff. ¶ 4.) Irrespective of why Defendants arrived at the scene,

according to their affidavits, it was clear that once they arrived they were dealing with a potential trespassing issue.

**\*6** Looking at the evidence in the light most favorable to Plaintiff, the Court will assume that Houck was not present. Similar to *Elliott* and *Decristofalo,* Gardner's statements to Defendant Bill could cause a reasonable officer to conclude that Plaintiff was not legally living in the property and that he was, as Defendant Bill concluded, either squatting or trespassing on the property. (Bill Aff. ¶ 5.) While Plaintiff claims he was objecting to the search and that he had a legal right to be there, Plaintiff also admitted to lying to Defendants about his true identity, for which he was charged with Criminal Impersonation in the Second Degree (N.Y.S PL § 145.00). (Smith Aff. ¶ 7, Garraway Aff. ¶ 12.) Plaintiff's continued conflicting answers to Defendants concerning his true identity gave them reasonable doubt as to his credibility in general. Therefore, this Court finds Defendant Rowlands' reliance on Gardner's representations that Plaintiff did not belong in the home, that there was not an oral lease agreement between she and Plaintiff, and that she was the true owner of the residence with authority to consent to a search thereon, was reasonable against Plaintiff's assertions. Based on the circumstances, Defendant Rowlands believed Gardner had authority to consent to the search and he searched the mobile home for information concerning Plaintiff's identity. While Plaintiff claims Smith took personal letters written by Plaintiff from the home as evidence of Plaintiff's true identity, Defendant Smith claims he never entered the mobile home. Looking at the evidence in the light most favorable to Plaintiff, and assuming that Defendant Smith searched the home as Plaintiff claims, Defendant Smith was privy to the same information that Defendant Rowlands relied on in searching the home. *See Morgan v. Superintendent,* 88 F.Supp.2d 312, 318 (S.D.N.Y.2000) ("[W]here law enforcement authorities are cooperating, the knowledge of one is presumed shared by all ..." and "[t]he determination of whether probable cause to [act] exists can be based on the collective knowledge of all the officers involved ...".). Therefore, even if Defendant Smith did search the home it was based on the reasonable belief that Gardner had authority to consent to the search.

Because entry into the mobile home by Defendants was valid upon either the actual or apparent authority to consent by Gardner, the Court finds a "good faith defense" is available to Defendants who may or may not have been deceived as to who held the true legal interest in the home. If Plaintiff never had a lease agreement with Gardner (oral or written)

or if Houck had an oral agreement with Dunn [2] but was not yet authorized to live there, then Gardner provided actual authority to consent to the search. Assuming there was an oral agreement between Houck and Dunn or between Plaintiff and Gardner, Defendants had reasonable grounds upon which to believe there was not a valid lease agreement and, therefore, that Gardner retained authority to consent to a search of the premises. Therefore, Plaintiff's claims of violations of his Fourth Amendment rights are dismissed.

[2]    There is no indication in the record that any agreement between Houck and Dunn contemplated Plaintiff living in the mobile home. Similarly, there is no evidence in the record that, assuming Houck was legally residing in the mobile home, she permitted Plaintiff to reside there.

### C. Due Process Rights

**\*7** Plaintiff next claims his Constitutional rights to equal protection and due process were violated when Defendants denied him the right to a legal eviction and the right to a fair trial and hearing before a judge to determine a civil dispute. (Pl. Complaint ¶ 5.) Plaintiff alleges Defendant Bill told him "he was kicking me and my family out of the residence at the request of the landlord and that if I ever returned he would personally arrest me." (Garraway Aff. ¶ 24.) Plaintiff claims Bill's threat of arrest was an act of illegal eviction, thereby denying him the right to a legal eviction by Gardner. Defendant Bill claims he never spoke with Plaintiff that day and that at no time did he threaten Plaintiff or Houck that they would be arrested if they did not leave. (Bill Aff. ¶ 6.) Bill claims that he believed Plaintiff and Houck were squatting or trespassing and, therefore, he advised Houck that she and Plaintiff were not there legally. Bill claims he advised Houck of the process by which she could contest Gardner's representations and told her how she could get an order by the town court to allow her to stay.

A wrongful eviction action can be brought against law enforcement officials who are accused of evicting tenants for the landlord. *See Collum v. Incorp. Village of Freeport,* 691 F.Supp. 637, 641 (E.D.N.Y.1998). The court held in *Collum* that "where an officer, without an eviction warrant, gives a tenant a choice between absenting himself from the premises and being arrested and the tenant chooses the former, a wrongful eviction has taken place. [However] ... a finding [that the officer] threatened arrest alone would be insufficient ... the jury would have to find that the threat forced

plaintiff to choose between vacating the premises and being arrested." *Id.*

Here, the issue is whether Defendant Bill evicted Plaintiff. The answer is that he did not. Plaintiff was removed from the premises based on an arrest unrelated to his presence in the mobile home (i.e ., the warrant and criminal impersonation). [3] Taking the evidence in the light most favorable to Plaintiff, even if Defendant Bill did threaten to arrest Plaintiff if he was to return to the property, as discussed above, Defendants had a reasonable good faith belief that Plaintiff and Houck were not there legally and, therefore, were trespassing. Any remarks Defendant Bill may have made to Plaintiff or Houck in regards to arrest were warranted as he had a good faith belief that Plaintiff was engaged in the unlawful act of squatting or trespassing. In addition, in accordance with *Collum,* mere threats of arrest are insufficient to claim wrongful eviction. *Collum,* 691 F.Supp. 637. Bill had independent grounds upon which to arrest Plaintiff and remove him from the property. Therefore, Plaintiff's claim of a violation of his due process rights by an unlawful eviction of his family by Defendants is supported by insufficient evidence.

[3]    According to Plaintiff's version of the facts, Houck was not at the mobile home during the incident and she, therefore, would not have been subjected to removal or arrest. Even if Houck was present, as Defendants claim, Houck was not required to leave the home while the Defendants were there and was left at the home upon their departure. (Bill Aff. ¶ 7, Smith Aff. ¶ 13, Rowlands Aff. ¶ 3). In addition, there is insufficient evidence that Houck's ultimately left the mobile home as a direct result of any alleged threats of arrest made by Defendants.

### D. Qualified Immunity

**\*8** As a general rule, police officers are entitled to qualified immunity if their conduct "does not violate clearly established constitutional rights, or it was objectively reasonable for them to believe their acts did not violate those rights." *Oliveira v. Mayer,* 23 F.3d 642, 648 (2d Cir.1994). Stated another way, officers are entitled to qualified immunity from liability for violating a plaintiff's civil rights unless it was "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Groh v. Ramirez,* 540 U.S. 551, 563 (2004).

As discussed above, this Court finds it was objectively reasonable for Defendants to believe their actions were not

2006 WL 931729

in violation of Plaintiff's constitutional rights. The Court therefore finds Defendants are entitled to qualified immunity.

### G. *Municipality Liability*

Lastly, Plaintiff claims Broome County is liable for the alleged Constitutional violations by Defendants through its failure to properly train Defendants. Defendants argue Plaintiff has not shown a custom or policy adopted by the municipality which caused the alleged violations.

In § 1983 claims, municipalities may not be held responsible under a theory of *respondeat superior. Board of the County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397 (1997). To impose liability onto a municipality the plaintiff must identify a municipal "policy" or "custom" that caused plaintiff's injury. *Id.* (citing *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 694 (1978)). An act performed pursuant to a "custom" may subject a municipality to liability on the theory that the practice is so widespread so as to have force of law. Brown, 520 U.S. at 404. One way to show a custom or policy has been adopted by the municipality is to prove a municipality failed to properly train defendants. In order to show failure to train by a municipality, the plaintiff must "identify a specific deficiency in the city's training program and establish

that the deficiency caused a deprivation of his constitutional rights." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 391 (1989). Here, Plaintiff claims, "Broome County Sheriff Department failed to train [Defendants]." (Pl. Mem. in Opp'n. to Def. Mot. Summ. J., 9). Plaintiff further claims "[a]nytime Defendant Bill is called to a similar civil dispute ... he will always threaten and illegally evict the tenant." *Id.* Plaintiff's conclusory allegations are insufficient to show specific deficiencies in the municipalities training program that resulted in the alleged violations of his rights. As a result, Plaintiff has failed to provide sufficient evidence to show an ongoing, widespread policy or custom of the municipality to violate citizens' Fourth and Fourteenth rights. Therefore, Plaintiff's claim against Broome County is dismissed.

### IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's action is DISMISSED.

 **\*9** IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 931729

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.